## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JACQUELINE STEVENS,

Plaintiff,

v.

BROADCASTING BOARD OF
GOVERNORS, *et al.*,

Defendants.

Case No. 18-cv-5391

Judge Mary M. Rowland

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Jacqueline Stevens brings this action against several federal agencies under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking to compel the adequate search and disclosure of all responsive records withheld in response to her FOIA requests. On March 2, 2020, Stevens filed a motion to compel the production of certain documents related to the case. Dkt. 44. In order to facilitate the litigation, the parties agreed to consolidate their briefing, so that the government responded to Stevens's Motion and filed a Motion for Summary Judgement at the same time. Dkt. 54. In this Opinion, the Court addresses the issues raised in the Motion for Summary Judgement. In a concurrent opinion issued today, the Court addresses the Motion to Compel. For reasons stated herein, the government's Motion for Summary Judgement [54] is granted as to USGS and ICE on the issue of adequacy of search and denied as to the other agencies.

1

## SUMMARY JUDGMENT STANDARD

FOIA confers jurisdiction in the district court to enjoin an agency from improperly withholding records maintained or controlled by the agency. *See* 5 U.S.C. § 552(a)(4)(B); *McGehee v. CIA*, 697 F.2d 1095, 1105 (D.C. Cir. 1983) (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980)). An agency's disclosure obligation is triggered by its receipt of a request that "reasonably describes" the records sought and "is made in accordance with [the agency's] published rules stating the time, place, fees (if any), and procedures to follow." 5 U.S.C. § 552(a)(3)(A); *see Citizens for Responsibility and Ethics in Washington v. FEC*, 711 F.3d 180, 185, n.3 (D.C. Cir. 2013) ("Of course, the duties that FOIA imposes on agencies . . . apply only once an agency has received a proper FOIA request.") (citation omitted).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

2

In a FOIA case, an agency is entitled to summary judgment when it demonstrates that there are no material facts in dispute as to the adequacy of its search for or production of responsive records. *Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 21 (D.D.C. 2012). An inadequate search for records constitutes an improper withholding under the FOIA. *See Maydak v. U.S. Dep't of Justice*, 254 F. Supp. 2d 23, 44 (D.D.C. 2003) (citations omitted). Thus, "[a] requester dissatisfied with the agency's response that no records have been found may challenge the adequacy of the agency's search by filing a lawsuit in the district court after exhausting any administrative remedies." *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). The Court must then determine the adequacy of the agency's search, guided by principles of reasonableness. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998).

When assessing the agency's search, the Court generally "may rely on '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Valencia–Lucena*, 180 F.3d at 326 (quoting *Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Such affidavits are "accorded a presumption of good faith" by the Court. *Demma v. DOJ*, 1996 WL 11932, *3 (N.D. Ill. Jan. 10, 1996). Summary judgment is inappropriate "if a review of the record raises substantial doubt" about the adequacy of the search, *id.*, but "the [mere] fact that a particular document was not found does not demonstrate the inadequacy of a search." *Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 390–91 (D.C.

Cir. 2007) (citations omitted); *see Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.") (citation omitted).

A district court reviewing an agency's motion for summary judgment conducts a *de novo* review of the record, and the responding agency bears the burden of proving that it has complied with its obligations under FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *see also In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 92–93 (D.D.C. 2008) (citing *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003)). The district court must analyze all underlying facts and inferences in the light most favorable to the FOIA requester. *See Willis v. DOJ*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008). Accordingly, summary judgment for an agency is appropriate only if the agency proves that it has "fully discharged its [FOIA] obligations[.]" *Moore*, 916 F. Supp. at 35 (citing *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1382 (8th Cir. 1985)). "A requester is entitled only to records that an agency has in fact chosen to create and retain." *Yeager v. Drug Enf't Admin.*, 678 F.2d 315, 321 (D.C. Cir. 1982). Thus, an agency has no obligation under FOIA "to commit to paper information that does not exist in some form as an agency 'record.'" *Id*. Nor does FOIA obligate an agency to "answer questions disguised as a FOIA request" or to "create documents or opinions in response to an individual's request for information." *Dugan v. Dep't of Justice*, 82 F. Supp. 3d 485, 497 (D.D.C. 2015) (quoting *Adams v. FBI*, 572 F. Supp. 2d 65, 68 (D.D.C. 2008)).

# BACKGROUND[1]

## I. The FOIA Requests

Jacqueline Stevens is a professor at Northwestern University. DSOF ¶ 3. Between 2015 and 2018, she filed 29 FOIA requests seeking records from 11 different federal agencies. Dkt. 55, Mot. Summ. J., 1. On August 8, 2018, she filed the present lawsuit to compel production of records responsive to her requests. At present, outstanding issues remain related to requests submitted to six agencies— the U.S. Agency for Global Media (USAGM, formerly the Broadcasting Board of Governors); the Department of Health and Human Services (HHS); Citizenship and Immigration Services (USCIS); the United States Geological Survey (USGS); the United States Administration for International Development (USAID); and Immigration and Customs Enforcement (ICE). DSOF ¶¶ 4-9. Concurrently with its Motion for Summary Judgement, the government has submitted declarations from the officials responsible for fulfilling Stevens's FOIA requests at each agency. *See* Dkt. 56-1 to 6. The declarants signed the declarations under penalty of perjury and stated that the information was true to the best of their knowledge and belief. DSOAF ¶ 81.

---

[1] The facts in this Background section are undisputed unless otherwise noted. The government's Rule 56.1 Statement of Facts (Dkt. 56) is abbreviated as "DSOF". Stevens responded to the government's Statement of Facts at Dkt. 59-1. She did not file her own Statement of Facts. After the first round of briefing, the Court permitted the government to file a Statement of Additional Facts (Dkt. 67), here abbreviated as "DSOAF." Stevens has not responded to these additional facts and so they are deemed admitted. In its Reply, the government asserts that Stevens violated Local Rule 56.1 by citing directly to the record in her briefing. Whether to require strict compliance with Local Rule 56.1 is in the Court's discretion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). Given the limited factual record at issue here, the Court does not require strict adherence to Local Rule 56.1 to adjudicate the merits of the issue.

## II. USAGM

In June 2016, Stevens submitted a FOIA request to USAGM (named the Broadcasting Board of Governors at the time) seeking contracts and work products associated with the company D3 Systems, Inc. DSOF ¶ 10. The request included background information and work status updates. *Id.* The contracts office of USAGM conducted a search. *Id.* at ¶ 11. Eventually, in June 2018, USAGM produced 1,487 pages and withheld 1,195 responsive pages under various FOIA exemptions. *Id.* at ¶ 13. USAGM's declaration asserts that the search was reasonably calculated to locate responsive records and that the agency has no reason to believe that additional responsive records in its custody exist. *Id.* at ¶ 14.

## III. HHS

In May 2018, Stevens submitted two FOIA requests to HHS. *Id.* at ¶ 15. These requests sought all materials related to Professor David Senn and his representatives from 2016 on; all correspondence between HHS, ICE, and Customs and Border Patrol (CBP) related to age assessments of individuals in their custody; contracts and other materials by care provider Southwest Key related to age assessments of unaccompanied alien children; and invoices and other records documenting HHS expenditures related to age assessments maintained or submitted by Southwest Key. *Id.* at ¶¶ 15-16.

HHS determined it had no contract with Senn at the time, and so determined that responsive records would be found in correspondence between the agency's refugee resettlement office and Professor Senn. *Id.* at ¶ 17. HHS searched for emails including

terms related to age assessments sent or received by the office's field specialists and supervisors that also include ICE, CBP or Senn's email addresses. *Id.* at ¶ 18. To search for Senn's correspondence, HHS only looked for emails from or to senn@uthsca.edu. *Id.* The declaration does not specify the age assessment terms used.

HHS also found copies of the cooperation agreement between HHS and Southwest Key and financial reports submitted by Southwest Key. *Id.* at ¶ 20. The declaration does not specify how these records were obtained. HHS also determined that it did not receive records of invoices or similar documents from Southwest Key. *Id.* HHS ultimately identified several thousand responsive pages and produced over 2,500 pages with and without redactions. *Id.* at ¶¶ 21-24. The rest were referred to DHS for review as the originating agency. *Id.*

### IV. USCIS

Stevens submitted two FOIA requests to USCIS in May 2018. *Id.* at ¶ 26. She sought: all information from Northwestern used for registering employees for E-Verify except for individual data; all emails with Northwestern employees related to E-Verify; all contracts and work evaluations for contractors on software used by USCIS and third parties for E-Verify; USCIS evaluations used by contracting officers to renew contracts. *Id.*

USCIS FOIA staff determined that the Verification Division was the office most reasonably likely to have responsive records. *Id.* at ¶ 27. An analyst in the division searched for records in the division's computer database, using search terms and

fields like "Northwestern University," "E-Verify," "Hire Date," "Employer Name," "Address." *Id*. at ¶ 28. This search identified the names of Northwestern University contacts. *Id*. Staff produced the E-Verify memorandum of understanding between Northwestern and DHS. *Id*. They then searched the division's emails and other communication using the contact information identified in the memorandum. *Id*. No responsive emails were found, but three relevant phone call "action logs" were found and produced to Stevens. *Id*. The search encompassed the division's email records and databases called AVANT, CRM, SAS and WebHQ. *Id*.

In August 2018, Stevens submitted a second FOIA request to USCIS. *Id*. at ¶ 30. She requested information related to a contract between the agency and General Dynamics, including the initial scope of work, attachments, renewals, and related emails. *Id*. at ¶ 31. USCIS determined that the Office of Contract was most reasonably likely to have responsive records. *Id*. An analyst at the office searched the office's J: drive using the contract number supplied by Stevens. *Id*. at ¶ 32. He located the scope of work and all supporting documents in the office's file related to the contract. *Id*. He did not find any responsive emails. *Id*.

In October 2018, USCIS produced the responsive documents to both requests. For the first request, it sent to Stevens 51 pages of responsive documents and five Excel spreadsheets, all unredacted. *Id*. at ¶ 29. For the second request, USCIS produced 353 responsive records, with 216 pages containing redactions. *Id*. at ¶ 33. The declaration asserts that, for both requests, all files reasonably likely to contain

responsive material were searched and that USCIS does not believe that additional responsive records exist in its control. *Id*. at ¶¶ 28, 32.

**V. USGS**

On May 22, 2018, Stevens submitted a FOIA request for records related to a contract between Northwestern and USGS; records on the expected scope of work and service, including similar contracts; and records on the evaluation and extension of the contract. *Id*. at ¶ 34. USGS assigned the request to the Office of Acquisitions and Grants, the office responsible for contracts with external parties. *Id*. at ¶ 35. A supervisor in the office determined a specialist in the National Acquisition branch would have the responsive records because he had most recently handled a contract with Northwestern. *Id*. at ¶ 36. He determined that the relevant files would be in the electronic filing system and searched the file associated with the contract. *Id*. at ¶ 37. Based on this search, USGS produced 33 pages to Stevens in July 2018. *Id*. at ¶ 38.

Stevens pointed out that the records did not include records associated with previous contracts or evaluations of performance. *Id*. at ¶ 39. USGS eventually identified 21 contracts with Northwestern, seven of which were likely in existence. *Id*. Searching electronic records, the analyst found responsive records for six of the contracts. *Id*. The analyst also identified another employee who had previously worked with Northwestern. *Id*. at ¶ 40. That employee searched her files and found more responsive records. *Id*. at ¶ 40. USGS also says it determined that it did not maintain evaluations of contractor performance for the contracts. *Id*. at ¶ 42.

9

In September and October 2018, USGS produced 626 responsive records. *Id.* at ¶ 41. The agency concluded that no other locations were reasonably likely to have responsive records. *Id.* at ¶ 40.

### VI. USAID

In October 2015, Stevens submitted a FOIA request to USAID. *Id.* at ¶ 43. She requested copies of all contracts and other documents about Northwestern University. *Id.* The request particularly highlighted discussions regarding the Northwestern campus in Doha. *Id.* Stevens subsequently clarified the scope of the request, asking for all emails on USAID servers with "northwestern.edu" in the address field; all references to "northwestern university" on the servers; all materials referring to Northwestern in the "missions in Israel, Kuwait, Qatar, Pakistan, and Saudi Arabia;" and all contracts and grants involving Northwestern. *Id.* at ¶ 46.

Over the course of several years, USAID forwarded the request to its Mission in the West Bank and Gaza, Mission in Pakistan, Bureau for the Middle East, Bureau for Asia, and Bureau for Management, Office of the Chief Information Officer, Information and Assurance Division. *Id.* at ¶¶ 48, 51, 54-55; DSOAF at ¶ 86. These bureaus and missions were the closest corresponding to the ones Stevens requested, and the Information and Assurance Division could search USAID servers. *Id.* USAID bureaus and independent offices usually contain sub-offices like an Office of the Assistant Administrator and an Office of Strategic Planning operations, which are included within a bureau's FOIA search. DSOAF at ¶¶ 83-84.

10

Every staff member in USAID's Mission in the West Bank and Gaza searched for the term "Northwestern" in their gmail, desktop, documents folder, local drive, and shared drives. *Id.* at ¶ 85. In order to narrow the search, a FOIA specialist instructed the Mission to not include emails from staff that are alumni of Northwestern or logistical emails from faculty passing through. Dkt. 56-5, Colbow Decl. ¶ 20. This was done with the expectation that the emails would be captured in the Information and Assurance Division's email search. *Id.* Responsive records were found and produced. DSOF at ¶ 50. The Pakistan mission conducted a similar search, however, no responsive records were found. *Id.*

An officer at the Bureau for Middle East searched the network drive of its predecessor bureau using the term "Northwestern" but retrieved no results. *Id.* at ¶ 54. The officer also searched file drawers and consulted with several long-term employees, but located no files related to Northwestern. *Id.* Another employee conducted a paper file search and also did not find any responsive records. *Id.* The Bureau for Asia searched its accounting system and shared drives using the term "northwestern" and received no responsive records. DSOAF at ¶ 86. Meanwhile, the Information and Assurance Division searched the "Gmail Vault" archive of all USAID accounts for the search term "@northwestern.edu" over the relevant time frame. DSOF at ¶ 55. This returned almost twenty-five thousand emails. *Id.* USAID determined, however, that none of the records were responsive to the FOIA request. *Id.* USAID ultimately produced to Stevens 927 responsive pages. *Id.* at ¶ 53.

### VII. ICE

There are unresolved issues related to four FOIA requests that Stevens submitted to ICE. *Id.* at ¶ 57. First, in March 2018, Stevens submitted a FOIA request to ICE seeking all documents uploaded to the PLAnet case management system starting in 2016 regarding people claiming U.S. citizenship. *Id.* at ¶ 58. The Enforcement and Removal Operations (ERO) determined it was unlikely to possess responsive records because PLAnet is used by the Office of the Principal Legal Advisor. *Id.* at ¶ 59. The legal office then produced a 36-page Excel spreadsheet of U.S. citizen claims from the PLAnet database to Stevens. *Id.* at ¶¶ 60, 62.

Also in March 2018, Stevens submitted a FOIA request for all material since 2016 related to the use of detainee labor by private contractors. *Id.* at ¶ 65. ICE tasked its Enforcement and Removal Office to search for responsive records. *Id.* at ¶ 67. The custody management division of that office employed the search term "Voluntary Work Program" to search paper and electronic files for responsive records. *Id.* ICE also tasked the Office of Acquisition Management to search for responsive records. *Id.* at ¶ 68. That office assigned its division responsible for detention contracts to conduct the search, which did so by searching all records regarding "private use of detainee labor." *Id.* at ¶ 68.

These searches found 22 potentially responsive pages. *Id.* at ¶ 69. The Office of the Principal Legal Advisor also uncovered 4,015 responsive pages. *Id.* at ¶ 70. And ICE reviewed several thousand records referred by USCIS. *Id.* at ¶ 69. In total, ICE produced 6,062 responsive pages. *Id.* at ¶¶ 69-70.

Finally, In June 2018, Stevens submitted two requests for records related to grievances submitted by people in ICE custody to ICE or Polk County officials, starting in 2016. *Id.* at ¶¶ 72, 76. The Enforcement and Removal Office was tasked with searching for responsive records. *Id.* at ¶¶ 73, 77. The custody management division and Houston field office carried out the search. *Id.* They searched their email systems, hard drives, and shared drives using the search terms "Grievances," "Grievance logs," "responding to grievances," and "Polk County Detention Facility." *Id.* at ¶¶ 74, 78. This search returned on responsive Excel spreadsheet. *Id.* A supplemental search by the Enforcement and Removal Office found another responsive Excel spreadsheet. *Id.* at ¶ 79. Both were produced to Stevens. *Id.* at ¶¶ 75, 79.

## ANALYSIS

For the agencies at issue, Stevens contests the adequacy of the scope of the search conducted and the process employed. To succeed at summary judgement, an agency declaration must show, with reasonable detail, that the search "was reasonably calculated to uncover all relevant documents." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Stevens also challenges the legal adequacy of several of the declarations.

### I. The Declarations Are Admissible Evidence

The first issue we address is the legal sufficiency of the declarations submitted by the government. Stevens argues that four of the declarations, those submitted by officials from USAGM, HHS, USCIS, and ICE, are legally insufficient and should be

disregarded by the Court. Courts have held that "unsworn declarations, subscribed by the declarant as true under penalty of perjury" may be used to satisfy the agency's obligation to show that it conducted an adequate search. *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 n.1 (2d Cir. 1994). 28 U.S.C. § 1746 describes the form such declarations must take to be legally cognizable. Specifically, the declaration must take "substantially the following form: . . . 'I declare . . . under penalty of perjury that the foregoing is true and correct.'" 28 U.S.C. § 1746. The disputed declarations state, "I declare that the foregoing is true and correct to the best of my knowledge and belief and is given under penalty of injury," or some close variation thereof. Dkt. 56-2, Smith Decl. ¶ 21.

Stevens takes issue with the use of the phrase "true and correct to the best of my knowledge and belief." She raises two objections. She suggests that using the phrase means that declaration is invalid under 28 U.S.C. § 1746 and thus inadmissible hearsay. But the statute only requires that the declaration take "substantially" the prescribed form, and the instant declarations were all made under penalty of perjury. *See* DSOAF at ¶ 81.

Stevens also claims that the declarations should be disregarded because they are made on "information and belief" and thus rely on second-hand information. But the plain meaning of the declarants' statements is that they believe what they are saying. They clearly are not offering unverified allegations based on "information and belief" as a plaintiff might in a complaint. What is more, declarations in FOIA cases may rely on information relayed to the declarant by other members of the agency. *See*

14

*DiBacco v. Dep't of the Army*, 926 F.3d 827, 833 (D.C. Cir. 2019). The Court need not disregard the declarations.

**II. USAGM**

*Scope of Search*

Stevens objects to the scope of search employed by USAGM. She argues that the Office of Professional Research and the Voice of America, divisions of USAGM, should have also conducted searches for responsive documents. The agency's declaration, however, affirms that that search was reasonably calculated to find responsive records and that the agency does not believe there are additional responsive records that have not been produced. DSOF at ¶ 14. Stevens offers no contradictory evidence, instead saying that USAGM should justify its more limited search. But "speculative claims about [the] existence of other documents cannot rebut [the] presumption of good faith afforded [to] agency affidavits." *Mace v. E.E.O.C.*, 197 F.3d 329, 330 (8th Cir. 1999) (citing *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C.Cir.1991)).[2] The scope of USAGM's search was not unreasonable.

*Search Process*

Stevens also objects to the search process described by USAGM, specifically that the declaration does not list the search terms employed. It is well established that a FOIA declaration must be "reasonably detailed" and particularly list the "search

---

[2] Stevens attempts to distinguish *SafeCard* and related cases from the present situation, presumably to suggest that the present declarations are not entitled to good faith. It is clear, however, that the good-faith principle articulated by *SafeCard* and its progeny does not depend on whether the agency conducted a "room-to-room search for the box of missing documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

terms" used. *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999); *see also Reps. Comm. for Freedom of Press v. Fed. Bureau of Investigation*, 877 F.3d 399, 404 (D.C. Cir. 2017) (denying summary judgement when an agency affidavit failed to include the search terms employed). USAGM's declaration fails to meet this basic standard.

The government objects that USAGM has produced 1,501 pages responsive to the request. But summary judgement turns on the search process employed, not the number of documents produced. *See Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Veterans Affs.*, 69 F. Supp. 3d 115, 123 (D.D.C. 2014). The Court cannot determine whether USAGM conducted a reasonable search for documents responsive to Stevens's FOIA request without knowing what it looked for. Summary judgement is denied as to USAGM.

### III. HHS

*Scope of Search*

There are several issues with the HHS's declaration outlining its search for documents responsive to Stevens's two FOIA requests. One of Stevens's requests was for files related to work requested of Professor Senn. DSOF at ¶ 15. The declaration states that HHS determined there had been no contract with Senn at the relevant time. *Id.* at ¶ 17. It does not, however, describe how the agency reached that conclusion. *Id.* It does not list, for example, the files searched or the search terms used. *Id.* The government responds that Stevens has not properly disputed whether there was, in fact, a contract and has offered no evidence suggesting that there was.

16

But the Court evaluates FOIA declarations based on the process described, not on the contested existence of responsive documents. *See Citizens for Resp. & Ethics in Washington*, 69 F. Supp. 3d at 123. Without a more detailed account of the agency's search, the Court cannot grant summary judgement.

The same reasoning applies to at least two other elements of HHS's declaration. The declaration states that HHS determined that it did not receive any invoices or similar records from Southwest Key. DSOF at ¶ 20. But again, the Court cannot tell how this conclusion was arrived at. If it was the result of a search, more detail must be provided. If it was inferred from an agency policy, it should be articulated. Although the Court assumes good faith in an agency declaration, it still must be "reasonably detailed" as to the process of the search conducted. *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). Similarly, the assertion that the agency used "terms relating to age assessment" when searching for emails on the subject is insufficiently detailed. Courts have consistently held that a declaration should list the search terms used. *Id.* A general reference to the type of term employed is not an adequate substitute. Summary judgement is denied as to HHS.

Stevens also raises several other, less persuasive, objections. Stevens asserts that HHS only searched for a contract with Senn and not related documents like proposals or bids. The declaration makes clear, however, that HHS did in fact search for such related communication. DSOF at ¶ 18. Stevens also says that the search for communication with Senn was insufficient because it searched specifically for his email address and did not include searches for communication with his potential

"representatives." Stevens argues that the agency should have searched for any email with the same domain as Senn. Searching for communication with Senn's email, however, is a reasonable way for the agency to identify any representatives also included in the conversation. If any had been identified, HHS would have then been required to search for their correspondence as well. Searching for the domain would have returned all emails from people from the same academic institution, whether or not they worked with Senn. Given that HHS's search was reasonable, the Court will not require the agency to pursue other "speculative" approaches. *Mace v. E.E.O.C.*, 197 F.3d 329, 330 (8th Cir. 1999).

Finally, Stevens says that HHS did not search for materials related to age assessments provided by Southwest Key. But this is not the case. HHS produced its cooperative agreement with Southwest Key and related financial reports. DSOF at ¶ 20.

**IV. USCIS**

*Scope of Search*

Stevens objects to the scope of search described in USCIS's declaration. According to the declaration, for the two requests filed the search was performed by the Verification Office and the Office of Contracting respectively because they were the places "most reasonably likely" to have responsive documents. DSOF at ¶¶ 27, 31. As Stevens correctly points out, "'most likely' is not the relevant metric" *DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015). The agency must search all locations reasonably likely to produce responsive results, not just the one most likely. *Id*.

18

However, simply using the phrase "most likely" is not enough to render a declaration inadequate. Although "most likely" may imply that there are other "likely" locations left unsearched, it does not necessarily make it so. In *DiBiacco v. U.S. Army*, the D.C. Circuit ruled for the Army on summary judgement, even though it described searching the location "most likely" to have responsive records, because it subsequently clarified that "the only place containing records responsive" was the one searched and the Army "knew of no other locations that might contain responsive records." *Id*.

In the instant case, USCIS's original declaration makes clear that "all files reasonably likely to contain responsive material were searched, and USCIS has no reason to believe that additional responsive records exist that are within its custody and control." DSOF at ¶¶ 28, 32. As in *DiBiacco*, this is sufficient to clarify the ambiguity introduced by the declarant's inelegant drafting.

*Search Process*

Stevens also objects to the search process employed by USCIS to fulfill the two requests. Specifically, she believes that the agency should have used broader search terms than "Northwestern University" for the first request and the relevant contract number for the second. Stevens argues that the first search should have included common abbreviations for Northwestern such as "NWU" and "NU." In *Bagwell v. U.S. Department of Justice*, the D.C. District Court reviewed the adequacy of a search for documents related to Pennsylvania State University. *Bagwell v. U.S. Dep't of Just.*, 311 F. Supp. 3d 223 (D.D.C. 2018). The court held that only searching for the school's

full title was insufficient "[b]ecause it is likely that emails concerning the investigation would use 'PSU or 'Penn State' rather than the full name," and so "the Department's search was not reasonably calculated to find all responsive emails." *Id.* at 230.

Although perhaps not quite as common as Penn State, NU and NWU are common abbreviations for Northwestern. In fact, the government's own declarations include quotes of agency emails referring to "NWU." *See* Dkt. 56-5, Colbow Decl. ¶ 17. As in *Bagwell*, the government has been "unable to provide a sufficient explanation for why the Department used the full name of the University alone as a search term." *Bagwell*, 311 F. Supp. 3d at 230. That other terms were also used does not obviate the likelihood that responsive documents were missed due to the overly-narrow name. The search thus does not appear "reasonably calculated" to return all responsive records. There may be a good structural reason why only "Northwestern University" was used as a search term, but the declaration and government briefing do not provide it, and the Court will not speculate. Summary judgement is denied as to USCIS.

As noted, Stevens also objects to the use of the contract's contract number to find relevant documents. In this case, however, she does not suggest obvious alternatives and the declaration makes clear that the approach was calculated to uncover all responsive files. DSOF at ¶ 32. This search was reasonable.

## V. USGS

*Search Process*

Stevens only raises one issue with USGS's search. She claims that USGS's declaration fails to list the terms used by the agency to conduct its search. However, the declaration makes clear that the agency searched for records related to the contract Stevens identified in the contract's digital file, and that information on related contracts was gathered by searching for their identifying numbers in the agency's electronic filing system. DSOF at ¶¶ 37, 39. The search process outlined by the declaration is reasonable. Summary judgement is granted as to USGS on the issue of adequacy of search.

## VI. USAID

*Scope of Search*

Stevens raises several objections to the scope of USAID's search, but none are persuasive. First, she complains that the declaration does not describe any search taking place before she initiated this litigation. However, it is the thoroughness of a search, not its timeliness, that determines whether it was reasonable under FOIA. *See Navigators Ins. Co. v. Dep't of Just.*, 155 F. Supp. 3d 157, 169 (D. Conn. 2016); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015) (upholding summary judgement for the government even though it only produced documents after litigation began). Next, she objects to USAID's apparent failure to search several locations, like the Office of the Assistant Administrator, she had requested be searched. The government has subsequently made clear that those locations are sub-

21

offices that exist within the bureaus and missions that they were searched. DSOAF at ¶ 83. As a result, the sub-offices were included in the searches conducted. *Id.* at ¶ 84.

Stevens also notes that the declaration does not describe what systems the Mission in the West Bank and Gaza searched. The government has subsequently clarified that every staff member searched their emails, desktop, documents folder, local drive, and share drive, a reasonable scope. DSOAF at ¶ 85. Stevens also states that the declaration did not demonstrate that the Information and Assurance Division, the Bureau of Asia, and the Mission in Pakistan searched the locations reasonably likely to find responsive documents. But the declaration describes the locations searched by each of these divisions in reasonable detail, and it is entitled to good faith. *See* DSOF at ¶¶ 50, 54; DSOAF at ¶ 86. The scope of search outlined by the USAID's declaration is reasonable.

*Search Process*

There are two potential issues with the search process employed by USAID, both related to the Evanston, Illinois research university. First, Stevens objects to the exclusion by the Mission in the West Bank and Gaza of certain emails from or to alumni of the school and logistical exchanges with faculty visiting the region. This decision appears to have been reasonable, however, because such exchanges were captured by the search of all USAID email accounts performed by the Information and Assurance Division. Dkt. 56-5, Colbow Decl. ¶ 20. Second, the missions and bureaus involved reportedly searched their files using the search term

"Northwestern." DSOF at ¶¶ 48, 51, 54-55; DSOAF at ¶ 86. For the same reasons as discussed with USCIS, this search is insufficient as it omits other common terms for the school like NWU. Summary judgement is denied as to USAID.

**VII. ICE**

*Scope of Search*

Stevens raises three issues with the scope of ICE's search. First, she hints that she believes some other portions of the agency, like Homeland Security Investigations, should have conducted searches for responsive documents. But, again, "speculative claims about [the] existence of other documents cannot rebut [the] presumption of good faith afforded [to] agency affidavits." *Mace v. E.E.O.C.*, 197 F.3d 329, 330 (8th Cir. 1999) (citing *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C.Cir.1991).)

She also highlights the use of the phrase "most likely . . . to contain responsive documents" when describing the files searched. Dkt. 56-6, Fuentes Decl. ¶ 15. As discussed above, simply searching the places most likely to yield responsive documents is not enough. But that phrase appears in a portion of the declaration describing the general guidance that ICE's FOIA Office provides to program offices tasked with FOIA requests.

In contrast, the practice of ERO, one of the offices that performed searches, is to direct "specific employees or offices to conduct searches of their file systems (including both paper files and electronic files) which in their judgment, based upon their knowledge of the manner in which they routinely keep records, would be reasonably

likely to have responsive records, if any." *Id.* at ¶ 20. This approach is consistent with FOIA's requirements. One passing use of the word "most," not connected to any search actually conducted, cannot overcome the good faith afforded the declaration.

Finally, Stevens objects to ERO's transfer of her FOIA request for documents on the PLAnet system to the legal department, which manages the system. She wants ERO to also search for documents related to citizenship claims. For support, she points to a recent case in this district, in which she was the plaintiff, where the legal department's search for documents related to citizenship claims was insufficient and ERO was also required to conduct a search. *Stevens v. U.S. Immigr. & Customs Enf't*, 432 F. Supp. 3d 752, 762 (N.D. Ill. 2020). Contrary to her assertions, however, that case does not deal specifically with the PLAnet system—it does not even mention it. *Id.*

In that case, Stevens had requested "all correspondence on the detention or removal proceedings for people claiming or proving U.S. citizenship." *Id.* at 759. Based on this broad request, the court ordered ERO to produce responsive records. *Id.* at 763. Her request in the present case is narrower—she seeks "all documents uploaded to the PLAnet case management system since January 1, 2016 regarding persons claiming or proving U.S. citizenship." DSOF at ¶ 58. Therefore, whether or not ERO has documents related to citizenship claims beyond those on the PLAnet system is irrelevant. Such documents are beyond the scope of her request. ICE's legal office searched the PLAnet system and produced responsive documents. *Id.* at ¶ 60. Having ERO conducted the same search of the same system, if possible, would be an

unreasonable waste of agency resources. The scope of the search conducted by ICE was reasonable.

*Search Process*

Stevens raises the same objection to ICE's search process as she did with USAGM and USGS—the declaration does not list search terms used. But as with USGS, this is not actually the case. The agency produced a spreadsheet of U.S. citizenship claims in PLAnet and listed the search terms employed to find other responsive documents. DSOF at ¶¶ 60; 67-68; 74; 78. Summary judgment is granted as to ICE on the issue of adequacy of search.

## CONCLUSION

For the stated reasons, the government's Motion for Summary Judgment [54] is granted as to USGS and ICE on the issue of adequacy of search. As to USAGM and HHS, summary judgement is denied due to insufficient detail in their declarations describing their search process. Summary judgement is also denied as to USCIS and USAID because their searches related to Northwestern University were inadequate.

E N T E R :

Dated: March 30, 2021

_____
MARY M. ROWLAND
United States District Judge