UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE STEVENS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BROADCASTING BOARD OF ) <br> GOVERORS, *et al.*, ) <br> ) <br> Defendants. ) | No. 18 C 5391 <br><br> Judge Rowland |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT</u>**

The remaining agencies in this case have now addressed the court's concerns regarding the adequacy of their searches for records responsive to plaintiff Jacqueline Stevens's Freedom of Information Act requests. And they have also explained the justifications for the material withheld under one or more of FOIA's exemptions from the normal requirement of disclosure. As a result, the agencies are entitled to summary judgment.

**Background**

This 2018 lawsuit arose out of 29 FOIA requests that Stevens filed from 2015 to 2018, seeking records from 11 different federal agencies. Dkt. 13 (Answer) ¶¶ 2, 21, 29, 34, 39, 53, 58, 63, 67, 75, 81, 86, 92, 97, 101, 105, 109, 113, 116, 120, 126, 131, 134, 138, 141, 146, 151, 156, 162, 168. Stevens alleged that the agencies had not properly responded to her FOIA requests. *Id*. ¶¶ 1-2.

By 2020, the parties had worked together to resolve many of Stevens's concerns, leaving issues relating to only six agencies or departments: (1) Broadcasting Board of Governors, now known as the U.S. Agency for Global Media or USAGM; (2) the Department of Health and Human Services, or HHS; (3) U.S. Citizenship and Immigration Services, or USCIS; (4) U.S. Geological

1

Survey, or USGS; (5) U.S. Agency for International Development, or USAID; and (6) Immigration and Customs Enforcement, or ICE. Dkt. 44 (Motion to Compel) at 3-6. The agencies moved for summary judgment, and the court granted the motion in part and denied it in part. Dkt. 72 at 1.

In ruling on the agencies' summary judgment motion, the court granted summary judgment to USGS and ICE with respect to the adequacy of their searches. Dkt. 72 at 25. But the court denied summary judgment with respect to the adequacy of the searches conducted by USAGM, HHS, USCIS, and USAID. *Id*.

The court also found that Stevens had not waived her right to challenge the agencies' withholdings. Dkt. 71 at 7-10. Stevens has subsequently informed defendants through counsel that she will not be challenging the withholdings made by USGS or USAID, which leaves at issue the withholdings made by USAGM, HHS, USCIS, and ICE.

**Argument**

The agencies are entitled to summary judgment in their favor. With respect to the agencies whose searches for responsive records are still at issue—USAGM, HHS, USCIS, and USAID—the agencies have satisfactorily addressed the court's concerns regarding the searches' adequacy, as shown in the accompanying declarations. And with respect to the agencies whose withholdings are still at issue—USAGM, HHS, USCIS, and ICE—the agencies have properly withheld exempt material under FOIA, as shown in the accompanying declarations and *Vaughn* indices.

Summary judgment is proper when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Stevens v. DHS*, 2014 WL 5796429, *4 (N.D. Ill. Nov. 4, 2014) (citing Fed. R. Civ. P. 56(a)). The moving party must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a

genuine issue exists, the court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).

FOIA cases typically are resolved on summary judgment because they often hinge on whether an agency's undisputed actions violated FOIA. *E.g.*, *Bassiouni v. C.I.A.*, 2004 WL 1125919, *2 (N.D. Ill. Mar. 31, 2004). Summary judgment should be granted if the agency provides the court with declarations or other evidence showing that it conducted an adequate search for records and that any responsive documents were produced or are exempt from disclosure. *E.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (declarations "indicating the agency has conducted a thorough search" are sufficient to sustain agency's burden). Agency submissions in support of a summary judgment motion should be "accorded a presumption of good faith." *Demma v. DOJ*, 1996 WL 11932, *3 (N.D. Ill. Jan. 10, 1996) (citing *Carney*, 19 F.3d at 812).

I. **The Searches' Adequacy**

The four agencies whose searches are still at issue—USAGM, HHS, USCIS, and USAID—have satisfied their burden on summary judgment to demonstrate that they conducted an adequate search for responsive records because they have shown that they made a good faith effort to conduct a search "reasonably calculated to uncover all relevant documents." *Hart v. FBI*, 1996 WL 403016, *2 (7th Cir. July 16, 1996); *see also DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (agency must make good faith effort to conduct search using methods that "can be reasonably expected to produce the information requested"). The issue "is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The search is thus gauged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (quotation omitted). An agency can establish the reasonableness of its search by

3

"reasonably detailed, nonconclusory affidavits describing its efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006). And here, the four agencies have submitted reasonably detailed, nonconclusory affidavits describing their efforts. DSOF ¶¶ 10-15, 24-31, 33-40, 47-59.

### A. USAGM

Stevens's FOIA request to USAGM sought records relating to contracts with a company called D3 Systems, Inc. DSOF ¶ 10. USAGM's FOIA office asked its contracts office to search for D3 Systems contracts since 2003. *Id.* ¶ 11. An initial search yielded 14 pages, but USAGM proactively requested that the search be expanded to encompass not just contracts but also addenda. *Id.* A supplemental search yielded 109 pages, and USAGM produced all 123 pages. *Id.* Stevens appealed the production, and USAGM's appeals committee directed the contracts office to search again for background information and work status updates shared with or received from D3 Systems, including emails, reports, and notes. *Id.* ¶ 13. This search yielded 1,487 pages. *Id.* ¶ 14.

In denying summary judgment to USAGM, the court found that USAGM's declaration was not detailed enough because it did not provide enough detail about how USAGM conducted its search for responsive records. Dkt. 72 at 15-16. USAGM has now provided more detail in the accompanying declaration by James McLaren. DSOF ¶¶ 10-15.

First, regarding the initial search that yielded 14 pages and the supplemental search that yielded 109 pages, the declaration explains that, although the employees who performed these searches have since left USAGM, there is only one methodology that they could possibly have used to search for responsive records. DSOF ¶ 12. That methodology is searching for D3 Systems's vendor code within a search database called "Momentum" for contracts from 2010-onward and in a corresponding database for contracts from before 2010. *Id.* The declaration explains that this approach would have been reasonably calculated to identify all responsive

contracts and addenda. *Id*. And the approach's efficacy is further shown by the fact that the same search conducted today produces the same outcome. *Id*.

Second, regarding the search directed by USAGM's appeals committee, the declaration explains that the contracts office completed this search by searching for contractual material mentioning "D3" as a contracting party or "D3 systems." DSOF ¶ 14. And in the wake of the court's 2021 summary judgment ruling, USAGM also searched for emails using the following search terms: "BBG59-C-10-0104," "BBG50-P-15-0859," "BBG50-P-16-0599" (the relevant contract numbers), "D3 Systems," "Intermedia," and the email address of USAGM's contract manager for D3 systems. DSOF ¶ 15. The search found 65 responsive records, which USAGM produced. *Id*. This additional detail shows that USAGM's search was adequate.

### B. HHS

#### 1. First Request

Stevens's first request to HHS sought: (1) materials relating to work performed by a professor named David Senn, and (2) correspondence between HHS's refugee resettlement office and employees of ICE and CBP relating to age assessments of people in the custody of HHS's refugee resettlement office or ICE. DSOF ¶ 24. After determining that it had no contractual relationship with Senn, HHS tasked its IT department to search for emails: (1) sent to or received by any of its refugee resettlement office's federal field specialists, who serve as liaisons with the refugee resettlement office's care providers, or their supervisor; (2) that included an ICE email address, a CBP email address, or "senn@uthsca.edu" (Senn's email address); and (3) that included terms relating to age assessments. *Id*. ¶¶ 26-27. HHS produced responsive records in several rounds, totaling 2500 pages. *Id*. ¶ 31.

In denying summary judgment regarding the adequacy of this first search, the court found that HHS's declaration was not detailed enough because it had not described how it determined

5

that it had no contract with Professor Senn. Dkt. 72 at 16-17. HHS has rectified that omission in the accompanying supplemental declaration by Celeste Smith, which explains that HHS made that determination by searching its Program Support Center's network drive for "David Senn," "Senn," and "Professor Senn" and finding no records indicating the existence of any contract relating to Senn. DSOF ¶ 26. The declaration also explains that HHS confirmed with James De La Cruz, senior supervisor of HHS's refugee resettlement office, that the office had no contractual relationship with Senn. *Id*.

The court also found that HHS's explanation that it searched for terms relating to age assessment was insufficiently detailed because HHS did not explain which search terms it used. Dkt. 72 at 17. The supplemental declaration from Celeste Smith explains which search terms HHS used: (1) "age assessment" or "age assessments"; and (2) "age" and assess* and "practice" or "protocol" or "policy" (which would have located any email containing the word "age," the root word "assess," and any of the words "practice," "protocol," or "policy"). DSOF ¶ 27. This additional detail shows that HHS's search was adequate.

### 2. Second Request

Stevens's second request to HHS sought: (1) contracts and related materials produced or received by HHS's refugee resettlement office relating to age assessments of unaccompanied alien children by care provider Southwest Key; and (2) all invoices or other records maintained or submitted by Southwest Key documenting expenditures by HHS for conducting age assessments. DSOF ¶ 25. In response to part (1) of the request, HHS produced 144 pages of responsive records, consisting of cooperative agreements between HHS and Southwest Key, along with financial reports submitted by Southwest Key. DSOF ¶¶ 28, 30. HHS also determined that it did not have any records responsive to part (2) of the second request because HHS did not receive or maintain invoices or other records documenting expenditures made by Southwest Key. *Id*. ¶ 28.

6

In denying summary judgment regarding the adequacy of this second search, the court found that HHS's declaration was insufficiently detailed because it did not explain how HHS determined that it did not receive invoices or similar records from Southwest Key. Dkt. 72 at 17. HHS has rectified that omission in the accompanying supplemental declaration by Celeste Smith, which explains that HHS made that determination by consulting with Government Information Specialist Glenn Voelker, who advised that any invoices would be maintained by HHS's Administration for Children and Families, or ACF. DSOF ¶ 29. HHS also consulted with Mata Sebgoya, a policy analyst in the refugee resettlement office's Division of Policy and Procedures, who advised that Southwest Key would not have been required to submit invoices regarding expenditures for age assessments to ACF. *Id*. And Senior Grants Management Specialist Bernard Morgan also confirmed that ACF does not receive or collect invoices from grantees like Southwest Key as a standard practice and that no invoices were received or collected from Southwest Key. *Id*.

    **C.**    **USCIS**

        **1.**    **May 2018 Request**

Stevens submitted two FOIA requests in May 2018 that USCIS consolidated into one case for expediency. DSOF ¶ 33. The request sought information relating to Northwestern University's E-Verify program and information relating to contracts between USCIS and third parties for verification of employment through E-Verify. *Id*. USCIS conducted a thorough search for records and did not withhold or redact any material from its subsequent production. *Id*. ¶ 34.

In denying summary judgment regarding the adequacy of this search, the court found that USCIS's search was not reasonably calculated to return all responsive records insofar as it utilized the search term "Northwestern University" without also using common abbreviations for the school such as "NWU" and "NU." Dkt. 72 at 19-20. After reviewing the court's ruling, USCIS's

7

FOIA staff contacted USCIS's Verification Division—previously established as the office reasonably likely to maintain responsive records—and asked the office to conduct another search. DSOF ¶ 36.

Verification Division staff determined that the computerized databases SAS, AVANT, CRM, and WebHQ were reasonably likely to contain responsive records and queried those systems using the search terms "NWU," "NU," and "Northwestern University." DSOF ¶¶ 37-38. The search located no additional responsive records. *Id*.

### 2. August 2018 Request

Stevens submitted another FOIA request in August 2018, seeking information relating to two particular contracts with a company called General Dynamics. DSOF ¶ 39. In its ruling on defendants' 2020 motion for summary judgment, the court found that USCIS's search for records responsive to this request was adequate. Dkt. 72 at 20.

### D. USAID

Stevens submitted a FOIA request to USAID in October 2015, seeking records relating to contracts or emails with Northwestern University, including records relating to Northwestern's campus in Qatar. DSOF ¶ 47. USAID conducted a thorough search for responsive records and produced 927 pages. *Id*. ¶ 48. The court found USAID's efforts largely adequate, but the court found that the missions and bureaus that search for records should have used search terms like "NWU" in addition to the search term "Northwestern." Dkt. 72 at 21-23.

In response to the court's order, an e-discovery expert at USAID attempted to search USAID's entire Gmail Vault, encompassing all of USAID's email and cloud-stored records, for the terms "NWU," "NU," and "Northwestern." DSOF ¶ 50. The search yielded 30,747 items for "NWU," more than 1.4 million items for "Northwestern," and more than 1.3 million items for "NU." *Id*.

8

USAID tried to create a sampling methodology that would allow it to create a sample that would be between 100% and 85% representative of the entire universe of records. DSOF ¶ 51. But attempting to gather even a sample of 96 items from each of the three searches would have been unduly burdensome, because creating the samples would still require exporting the entire universe of records, which would require USAID to duplicate potentially terabytes of data. *Id*. ¶¶ 51-52. At a minimum, that would cause network congestion and cloud storage issues. *Id*. ¶ 52. For example, exporting the "Northwestern" search results would require at least *15,663 zip files*, each one of which would need to be individually "unzipped." *Id*. USAID cannot reasonably estimate how long with would take or what the cost would be, given the unknown total size of the massive set of data. *Id*. (Even tabulating the total size is prohibitively difficult: it would require someone to manually calculate the total size of the 15,633 zip files after unzipping them. *Id*.)

Even if USAID could overcome that challenge, the e-discovery expert determined that the process of generating a random sample of 96 items from each of the three massive sets of records would take between 7 and 42 days for each. DSOF ¶ 53. Setting aside any manpower limitations, the exported files are only searchable for 15 days, so based on the 7-to-42-day estimated time for completion, the process would not even be likely to succeed. *Id*.

In addition to being impractical, conducting a sample of the massive search results would also be unlikely to yield responsive records. DSOF ¶ 54. USAID's missions and bureaus were able to focus their searches on the places likely to have information, and even those searches yielded a high number of false positives, likely because (1) the term "Northwestern" is a directional locator; (2) "NWU" is an abbreviation for North-West University in South Africa; and (3) "NU" is a descriptor of one of the 56 recognized ethnic groups in China, and "nu" is a common letter combination in words such as "January." *Id*.

USAID's individual missions and bureaus also took action in response to the court's

9

summary judgment order. USAID's Mission in West Bank and Gaza, which had previously searched for the term "Northwestern," tasked an IT specialist to search its local drives and shared drives using the search terms "NWU" and "NU." DSOF ¶ 55. The specialist was unable to run the search due to his "grave concerns" about "potentially crashing the Mission network" and not being able to recover the network if so. *Id*. USAID's Mission in Pakistan, which had previously searched for the term "Northwestern," searched its Office of Education's Google Docs folder using the search terms "NWU" and "NU" and found no responsive records. *Id*. ¶ 56. USAID's Bureau for the Middle East, which had previously searched for the term "Northwestern," used the search terms "NWU" and "NU" on its Google drive and on the shared network drive of its predecessor bureau and found no responsive records. *Id*. ¶ 57. And USAID's Asia Bureau searched its shared drive and Google drive using the search terms "Northwestern," "NWU," and "NU" and found no responsive records. *Id*. ¶ 58.

## II. Proper Withholdings

The agencies here also properly withheld various information protected from disclosure by one or more FOIA exemptions. 5 U.S.C. § 522(b); *DOJ v. Tax Analysts*, 492 U.S. 136, 150-51 (1989). An agency bears the burden of showing that any withheld information falls into one or more of those exemptions. 5 U.S.C. § 552(a)(4)(B); *NRDC v. NRC*, 216 F.3d 1180, 1190 (D.C. Cir. 2000). Here, the agencies' declarations and *Vaughn* indices adequately describe the withheld material and the justifications for nondisclosure. DSOF ¶¶ 16-23, 32, 41-46, 60-68; *Stevens*, 2014 WL 5796429 at *4 (summary judgment for agency is appropriate "if the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed") (quoting *Patterson v. IRS*, 56 F.3d 832, 836 (7th Cir. 1995)).

A.     **Exemption 4**

Exemption 4 covers two broad categories: (1) trade secrets; and (2) information that is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. 5 U.S.C. § 552(b)(4). The exemption protects the interests of both the government and the people submitting the information. *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 873 (D.C. Cir. 1992). It protects the government by encouraging submitters to voluntarily furnish useful commercial information and by helping to assure the government that the information will be reliable. *Id*. And it protects submitters from the competitive disadvantage that could result from disclosure. *Id*.

Here, USAGM withheld 14 surveys under Exemption 4. DSOF ¶ 16. USAGM's survey questions are the result of extensive research and reliability testing, and they are proprietary, representing USAGM's investment of time, money, and expertise. *Id*. ¶ 17. USAGM contracts with third parties to use their proprietary surveys; contracts with third parties to use USAGM-developed surveys; and contracts with third parties to use surveys partially developed by USAGM and partially developed by the third party. *Id*. The surveys are designed to help USAGM reach the largest audience possible in countries that suppress the freedom of information. *Id*. ¶ 18. If the surveys were made public, there would be no benefit to the United States public, and the information could be misused by foreign governments to thwart USAGM's congressionally mandated objectives. *Id*. Publication of the surveys could also cause USAGM to receive bids from copycat firms that are not experts but that have exploited proprietary information from their competitors. *Id*. USAGM also redacted under Exemption 4 certain information from the 65 pages of emails that it produced. DSOF ¶ 19. For example, on 6 of the 65 pages, USAGM redacted the proprietary or confidential pricing information submitted by Gallup, a third-party entity. DSOF ¶ 21.

USCIS also redacted information under Exemption 4. DSOF ¶ 41. For example, USCIS redacted price quotes from its contractor General Dynamics, including projected yearly quantity and price proposals for work performed under the contract. DSOF ¶ 44. The information USCIS redacted is customarily and actually treated as private and confidential, since disclosure would threaten the company's competitive position by providing its competitors with the dollar amounts that it proposed to USCIS. *Id*.

B.     **Exemption 5**

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with an agency." 5 U.S.C. § 552(b)(5). To qualify for this exemption, a document must fall within the ambit of the traditional privileges that the government could assert in civil litigation against a private litigant. *Enviro Tech v. EPA*, 371 F.3d 370, 374 (7th Cir. 2004). Those privileges are the attorney-client, attorney work-product, and deliberative-process privileges. *Barmes v. IRS*, 60 F.Supp.2d 896, 901 (S.D. Ind. 1998) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)). Here, ICE properly withheld information under all three privileges. DSOF ¶¶ 62-68.

The deliberative-process privilege protects records "reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which government decisions and policies are formulated." *Loving v. Dep't of Defense*, 550 F.3d 32, 38 (D.C. Cir. 2008). To qualify for the deliberative-process privilege, the information must be: (1) "predecisional," meaning it must be antecedent to the adoption of an agency policy; and (2) "deliberative," meaning it reflects the give-and-take of the consultative process. *Reilly v. Dep't of Energy*, 2007 WL 4548300, *4 (N.D. Ill. Dec. 18, 2017). The privilege reflects "the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters

would be impossible." *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997); *see also United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.").

Here, the deliberative-process privilege applies to all 81 entries in ICE's *Vaughn* index. *Id.* ¶ 63. The withheld communications are pre-decisional because they were prepared to help a decision-maker reach a final decision. *Id.* The communications are deliberative because they occurred during consultative processes, and the facts and options discussed are selective in nature and highlight the portions of records that were deemed pertinent to recommendations and decisions. *Id.* Releasing these communications would discourage the expression of candid opinions and inhibit the free and frank exchange of information among agency personnel, which would create a chilling effect on intra- and inter-agency communications. *Id.*

For example, ICE redacted information in a draft document titled "Request for Proposal – Questions and Answers," which contains unanswered questions, suggestions of who could address the questions, draft answers and edits, and internal questions. *Id.* ¶ 64. This is a classic example of information that the deliberative-process privilege protects. *Jordan v. DOJ*, 591 F.2d 753, 773 (D.C. Cir. 1978) ("officials should be judged by what they decided[,] not for matters they considered before making up their minds") (quotation omitted); *In re Apollo Grp.*, 251 F.R.D. 12, 31 (D.D.C. 2008) (drafts "by their very nature" are "typically predecisional and deliberative" because they reflect "tentative" views "that might be altered or rejected upon further deliberation"). Considerable deference should be given to ICE's judgment about what constitutes the give-and-take of deliberative process, because an agency is best situated "to know what confidentiality is needed 'to prevent the injury to the quality of agency decisions.'" *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F.Supp. 114, 118 (D.D.C. 1984) (quoting *Sears,*

13

*Roebuck & Co.*, 421 U.S. at 151).

The attorney-client and attorney work-product privileges also apply to some of the entries in ICE's *Vaughn* index. DSOF ¶ 65. These entries contain confidential communications involving ICE attorneys and active and ongoing litigation. *Id*. For example, ICE redacted information in an email between ICE attorneys following an attorney's review of a contract/invoice ICE received. *Id*. ¶ 66. The withheld portion contains the attorney's opinions about ongoing litigation, specifically the attorney's process of understanding the contract terms and the attorney's opinion regarding the contractor's strategy. *Id*. One can hardly imagine a more straightforward application of the attorney-client and attorney work-product privileges.

### C. Exemption 6

Exemption 6 protects information when its release would be a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (courts broadly interpret Exemption 6 to encompass all information applying to a particular individual). To determine whether releasing information would constitute a "clearly unwarranted invasion of personal privacy," the court balances the interest of protecting a person's private affairs from unnecessary public scrutiny against the public's right to governmental information. *Id*. The *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure would shed light "on the agency's performance of its statutory duties" or otherwise let citizens know what their government is up to.

Here, USAGM redacted phone numbers, names of subordinate agency personnel, and names and email addresses of individual third-party contractor personnel under Exemption 6, to protect their privacy. DSOF ¶¶ 19-20. For example, on pages 54-55, 58, and 60, USAGM redacted the names, phone numbers, and email addresses of sources from whom quotes were sought, because disclosure would compromise USAGM's ability to seek competitive quotes. DSOF ¶¶

22-23.

Similarly, HHS redacted the names of employees under Exemption 6, as well as their titles. DSOF ¶ 32. HHS redacted the titles because, if the titles were left unredacted, the employees could still be identified. *Id*. To test this theory, HHS ran Google searches of titles at specific facilities, and the searches yielded names of individuals who currently or formerly held those titles, so HHS redacted the titles to be certain that individual shelter employees cannot be connected to particular records. *Id*.

No public interest in the disclosure of this type of information exists, because its release would not shed light on the agencies' activities or add to the public's knowledge of the Department's fulfillment of its statutory duties. The privacy interests in the information outweigh the (non-existent) public interest, so the information is exempt from release under Exemption 6. 5 U.S.C. § 552(b)(6); *see also NARA v. Favish*, 541 U.S. 157, 172 (2004) (burden is on requester to demonstrate sufficient public interest for disclosure); *Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494-99 (1994) (releasing personal information of third parties and agency employees does not contribute significantly to public understanding of government's operations or activities). The agencies properly withheld information under Exemption 6.

## Conclusion

For the reasons above, summary judgment should be granted in defendants' favor.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov