UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | No. 1:18cv05391 |
| v. | ) | |
| | ) | Hon. Judge Rowland |
| BROADCASTING BOARD OF | ) | |
| GOVERNORS et al. | ) | |
| | ) | |
| Defendants | ) | |

## <u>DECLARATION OF JACQUELINE STEVENS</u>

I, Jacqueline Stevens, state and declare under penalty of perjury that the following is true and correct:

1.     I am the named Plaintiff in this case.  I have been a tenured full professor in the Political Science Department at Northwestern University ("Northwestern") since 2010.  In 2012 I became the founding Director of the Deportation Research Clinic, Buffet Institute for Global Affairs, Northwestern University ("Clinic").

2.     I make this declaration based on personal knowledge and observations as stated herein. Further, this Declaration contains my professional opinions on certain topic for which I have specialized knowledge based on my education, professional experience, expertise, and research.

3.     If called to testify I could and would testify to each of the facts stated within this Declaration.

4.     My scholarship focuses on laws and theories of membership in political societies since antiquity, especially policies that mobilize state violence on behalf of intergenerational groups

and histories, e.g., nations.  My publications in popular and academic venues frequently analyze information about government operations.  My research practice includes regular requests under the FOIA.  My findings have been featured in numerous newspaper, magazine, radio, and television reports, including those of the *New Yorker*, *New York Times*, *Washington Post Guardian*, *Columbia Journalism Review*,  NPR, PBS, and CNN.  My monographs have been published by Columbia University Press and Princeton University Press.

5.      My scholarly articles have appeared in highly selective venues, including the *American Political Science Review*, *Georgetown Immigration Law Journal*, and *Perspectives on Politics*.  I have published in the field of public health and in 1997-1999 was a Robert Wood Johnson Health Policy Scholar at Yale University.  In 2013 I was awarded a Guggenheim Fellowship.

6.      A statement on the Clinic website states: "The Clinic conveys useful, timely, intelligent research on misconduct in deportation proceedings to affected communities, journalists, policymakers, and scholars ... The Clinic's research mission is rooted in public health approaches to theorizing and addressing community-level risks and interventions."1  Public health experts use individual-level information to help patients and to assist in community-level interventions. Information obtained for the purpose of assisting individuals who report experiencing government misconduct is used to provide analyses for addresssing systemic problems in the government, including incompetence, nativism, and racism.   The same webpage also quotes from an article written by Chief Justice Louis Brandeis: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."2

---

1    "Research Goals," https://deportation-research.buffett.northwestern.edu/research/index.html.
2    Chief Justice Louis Brandeis, "What Publicity Can Do," *Harper's Weekly* (December 20, 1913).

7.     This Declaration is made response to Defendants' second motion for summary judgment and the declarations submitted in support .

## Broadcasting Board of Governors /U.S. Agency for Global Media

8.     The U.S. Agency for Global Media (USAGM) disseminates propaganda, including fake survey results designed to suggest the U.S. military and other foreign operations are endorsed by populations outside the United States.  One means by which this is accomplished is by hiring a contractor to produce data that are fed to U.S. or other reputable media sources.  The news agencies report the contractor outputs and then the U.S. government seizes on this as a supposedly independent result, a fact of which I became aware when trying to track down the source of a clearly ludicrous claim made at a 2005 at a press conference featuring General Karl Eikenberry, the Commander of  Combined Forces in Afghanistan.  He brought up twice an "ABC survey  that was conducted in Afghanistan that had a lot of very positive findings in terms of the confidence of the Afghan people and the way things are moving forward."3  As a political scientist aware of the massive destruction, violence, and corruption in Afghanistan in that time frame, this outcome struck me as implausible.  Through my research, I learned that ABC did not conduct the survey but rather was reporting on supposedly conducted by the "Afghan Center for Socio-economic and Opinion Research," a group co-founded in 2003 by D3 Systems, a USAID contractor.4  I further learned that during his time in Afghanistan, including as U.S. Ambassador, Eikenberry, was given survey results from several different sources.  Some of these were for the purpose of providing accurate information to U.S. officials and others for purposes of

---

3  "Operations in Afghanistan," December 8, 2005, https://www.c-span.org/video/?190236-1/operations-afghanistan.
4   https://web.archive.org/web/20140307073349/https://www.acsor-surveys.com/about-us/.
The 2005 survey also reported 83%  of Afghans held a "favorable view of the United States," another figure that struck me as not credible.

propaganda. Other experts more recently have indicated that the D3 surveys in Afghanistan

contained fake results.5 By statute the USAGM is supposed to limit its propaganda to foreign

audiences,6 an objective that is of course impossible for a published opinion survey with a global

reach, not to mention a press conference held in Arlington, Virginia, as was Eikenberry's in

2005.

9.      USAGM claims that its mission is to provide information in support of freedom and

democracy, and is asserting a "good faith" deference to its search and its avowals of prerogatives

to withhold documents under b(4). And yet the agency through the Declaration of James

McLaren admits that it disregarded for almost one year, for no legal reason, indeed no reason at

all, the most important law the federal government has in place to reveal information to support

democracy in the United States, the FOIA, that it required my appeal even to admit that it

possessed thousands of pages of documents responsive to my request. Adding insult to injury,

USAGM then mentions the omission in my appeal and my complaint to challenge the adequacy

of the search, even though the agency provided no information whatsoever as to how the search

was originally performed. The search now described in the Declaration seems ad hoc, including

the "search of e-mails that were shared with or sent from D3 Systems Inc." *All* such emails?

This seems implausible, insofar as a search is specified for emails from

"matthew.warshaw@d3systems.com," which would be redundant if USAGM searched all emails

---

5  Professor Michael Spagat, Economics Department, University of London,
https://pure.royalholloway.ac.uk/portal/en/persons/michael-spagat(2ff0d241-d999-41bf-bb08-eccbc8b1a917).html,
https://pure.royalholloway.ac.uk/portal/files/33420330/RHUL_PIR_Presentation.pdf
6  Smith-Mundt Modernization Act of 2012. Sec. 208 "(a)  IN GENERAL.—No funds
authorized to be appropriated to the Department of State or the Broadcasting Board of Governors
shall be used to influence public opinion in the United States."
https://www.congress.gov/bill/112th-congress/house-bill/5736/text.

with a "d3systems.com" suffix. Moreover, in light of the large number of pages withheld, I still lack sufficient information on which to assess the adequacy of the searches.

10.     The grounds for the b(4) redactions and withholdings are vague, incoherent, and unlawful. At ¶13, McLaren avers withholding thousands of pages because "The proprietary interests may belong to a third-party contractor, to the US Agency for Global Media, or belong to both parties." Which is it? How many and how much of the 14 reports withheld in full belong to D3, to USAGM, or both? Especially because federal law specifically excludes U.S. government documents from copyright claims, and because USAGM reports have a broad reach that would appear to make them already effectively public, a conclusory assertion of a b(4) exemption seems impossible to support as a matter of policy or law, especially absent any reference to a contract between D3 and USAGM as to the retention of rights to documents produced.

11.     Especially bizarre is the agency's b(4) economic rationale, provided in defiance of basic free market axioms and, well, capitalism. McLaren asserts, "The publication of survey information and pricing may also distort the market...Prices for surveys may rise as competitors view the unit prices of other sources, or the agency may receive low bids from copy-cat firms who are not experts but have exploited the proprietary information of others." ¶ 14. USAGM has it exactly backwards. *Transparency is vital for functioning markets*. Does anyone at USAGM really think entrepreneurs pursuing government contracts will note D3's winning bid and then bid *more* than this? Why is it more "distorting" of the market for me to learn how much taxpayers are paying for D3's surveys compared to other vendors than for McLaren to know how much he will need to pay for a burger from McDonald's versus one from Burger King? Would he encourage McDonalds to hide its prices, out of fear that otherwise Burger King will attempt to

attract a larger market share by charging less, and creating mediocre burgers in an attempt to

trick McLaren into buying bad burgers?

12.     Even more troubling is that the General Accounting Office ("GAO") previously singled

out BBG's failure in Econ. 101.  USAGM claims knowledge of competitors' prices is somehow

distorting and advocates random guessing about supply and demand. GAO says otherwise:

> "Federal statutes require, with certain limited exceptions, that contracting officers
> shall promote and provide for full and open competition in soliciting offers and
> awarding government contracts.  [Federal Acquisition Regulation 2.101]  states that
> full and open competition, when used with respect to a contract action, means that all
> responsible sources are permitted to compete.  The process is intended to permit the
> government to rely on competitive market forces to obtain needed goods and services
> at fair and reasonable prices. When not providing for such competition, the
> contracting officer must, among other things, justify the reason for using other than
> full and open competition, solicit offers from as many potential sources as is
> practicable under the circumstances, and consider actions to facilitate competition for
> any subsequent acquisition of supplies or services."[7]

13.     Further, U.S. copyrights generally are not available for works of the United States

government, or, for that matter, for facts.  To the extent that the b(4) is being invoked because D3

and USAGM share a mutual interest in hiding the special sauce for creative works passed off as

non-fiction, the exemption is invalid because , first, USAGM would be the creative force behind

the production of the work and thus retain the copyright.  Second, the equities in the public's

right to know how their taxpayer dollars are being unlawfully spent to mislead them outweighs a

firm's benefit from a contract that would be threatened by the public's displeasure in learning

about D3's operations, especially because these are more than 15-years-old.[8]

---

7  GAO, "Broadcasting to Cuba:  Weaknesses in Contracting Practices Reduced Visibility into
Selected Award Decisions," General Accounting Office, GAO-08-764, July 2008,  p. 7.
https://www.gao.gov/pdf/product/278119.  The report is old, but the contracts with D3 are even
older.
8  "105. Subject matter of copyright: United States Government works 37(a)  In General.—
Copyright protection under this title is not available for any work of the United States
Government, but the United States Government is not precluded from receiving and holding

14.     The stated rationale for the b(5) withholdings and exemptions also are not supported in the Declaration.  First, McLaren claims that 133 pages from three records were withheld in full pursuant to b(5), but fails to provide any description at all as to the nature of these records or the rationale for the b(5) exemption, thus providing only a conclusory assertion of the exemption. Doc 86,  21 at ¶9(b).

15.     Second, the Vaughn index b(5) exemption for withholding three pages of emails in their entirety is vague – who is communicating on "importance of non-public disclosure of our sources sought for our acquisition"?  What exactly is being "acquired"?  Was there a final decision and if so, why is this not referenced or released?  Finally, to the extent that the agency is controlling information to be released to the public, such communications are specifically excluded from any exemption under b(5).9

### HHS

16.     On May 7, 2018, I submitted a request for ""(1) All contracts, invoices, email, work products, draft and final reports, system records, and screen shots of tabs for system records containing materials received, produced, or maintained by HHS and its components, including but not limited to the Office of Refugee Resettlement and its contractors and subcontractors for work requested, performed, OR discussed in any medium with Professor David R. Senn or his representatives between January 1, 2016, and the date your office produces the responsive records. (2) All correspondence, including but not limited to email and text messages, with employees of Immigration and Customs Enforcement or Customs and Border Protection or its

---

copyrights transferred to it by assignment, bequest, or
otherwise."  https://www.copyright.gov/title17/92chap1.html#105
9  "[I]nternal communications about its responses to outside inquiries from the press, Congress, advocacy groups, and the public are not protected by the deliberative process privilege."  *Stevens v.* DHS, 1:14-cv-03305 Document 144, 04/08/20 Page 17.

components related to policies, protocols, and practices for assessing the age of those in the custody of HHS or ICE in the United States between January 1, 2016, and the date your offices produces responsive records."

17.     Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") has produced responsive records on age assessments performed on individuals held in several shelters designated for unaccompanied children, but many shelters with which HHS contracts produced no responsive records.

18.     In her Declaration, Celeste Smith states, "I confirmed with the HHS IT group that any attachments that were not included in the search results were not available because they had been encrypted" and indicates no effort to obtain unencrypted documents from those who created or received them. ¶14.  Smith also states that HHS does not maintain records of text messages, in violation of the Records Keeping Act.10

19.     The age assessments often use dental radiographs, the vast majority of which are created by Dr. David Senn, a professor at the University of Texas, San Antonio. I have personally interviewed him.  Based on his published work and our interview it became clear his methodology is internally contradictory – in particular his claims about outcomes tied to variations in health and nutrition as well as genetics. For this and other reasons it lacks scientific validity.  Senn told me that ORR was making payments for his services to a division of his

---

10  "Some teleworking employees may find that they use personal email accounts or other electronic messaging applications, like text messages or messaging apps within social media or video conferencing tools, to communicate for work. Please note the Federal Records Act (44 U.S.C. 2911) requires Federal employees who use non-official electronic messaging accounts to copy their electronic messages to an official account or forward a copy to an official account within 20 days (when the messages are not transitory records with a retention of less than 20 days)." National Archives.   Federal Records Management, https://www.archives.gov/records-mgmt/faqs/covid-19.

university11  I also received numerous copies of off-site dental radiograph age assessments

performed by Peter Arvanitis, who runs a family dentistry practice in Arizona,12 but no contracts

or other payment information for him as well.

20.    The age assessments are tied to protocols for evaluating non-treatment dental radiographs

that Dr. Senn created; the assessments are junk science and also harmful, as documented in an

article published in the *American Journal of Public Health* I co-authored based on information

released from these productions.13  ORR has received extensive negative publicity for its

reliance on dental radiographs, including a report by "This American Life" in which my findings

from this FOIA litigation was cited.14  I have hired research assistants who have coded the

Memorandums of Age Assessment produced to date and am awaiting the full response so I can

submit a longer article reviewing the full scope of legal and scientific deficiencies with this

program.

21.    An e-mail from March, 2021 shared with me from my attorney shows that the ORR point

of contact with a previous United  States Assistant Attorney ("AUSA")  assigned to this case was

fully aware of the nature of Dr. Senn's relationship with the ORR.  The email states, "The agency

produced the cooperative agreements that were in place relating to David Senn. They are

---

11  "He handled a larger number of cases in the early 2000s, but last year he saw his caseload
triple — rising to 168. There appears to be a slowdown this calendar year for Senn, one of a few
dentists the government uses for these analyses."Brittny Mejia, "U.S. Is Using Unreliable Dental
Exams to Hold Teen Migrants in Adult Detention." *Los Angeles Times*, June 2, 2019.
https://www.latimes.com/local/lanow/la-me-ln-immigrant-age-migrants-ice-dental-teeth-
bangladesh-20190602-story.html.
12  "Dr. Peter Arvanitis, Family Dentistry,"  https://arvanitisdds.com/.
13 Farzana Kapadia, Jacqueline Stevens, Diana Silver, "Dental Radiographs for Age Estimation
in US Asylum Seekers: Methodological, Ethical, and Health Issues," *American Journal of Public
Health* 110 (2020): 1786-1789.
14  "My Very Unhappy Birthday." This American Life. July, 2019.
https://www.thisamericanlife.org/679/save-the-girl/act-one-7.

checking to see if there are any additional documents (e.g., contracts) and will get back to me

shortly." However, I received no cooperative agreements relating to Senn and no additional

information on the communications and financial arrangements between ORR and Senn. A

cooperative agreement entails a *closer* working relation between federal employees and the

outside party than a contract.15 The Southwest Key cooperative agreements produced and

referenced in the Smith declarations do not refer to age assessments performed or to any forensic

investigative services by professional service providers like Dr. Senn and other dentists.

22.     The Declarations of 2020 and 2022 state, "HHS did not receive or maintain records of

invoices or of other records documenting expenditures made by Southwest Key."16 They

reference ORR officials claiming that "Southwest Key would not have been required to submit

invoices regarding expenditures for age assessments ... because a forensic dental exam was not a

line item in Southwest Key's budget... [and] because ACF does not receive or collect invoices

from a grantee such as Southwest Key as a standard practice and that none were received or

collected from Southwest Key."17

23.     Records and email I reviewed indicate that the case officers or shelter staff initiate the

dental radiographs and the ORR staff sign off on them and then forward to another private firm

for payments to the contractor providing the forensic age assessment. Point Comfort

---

15 "A cooperative agreement 'is distinguished from a grant in that it provides for substantial
involvement between the Federal awarding agency or pass-through entity and the non-Federal
entity in carrying out the activity contemplated by the Federal award.'... In general terms,
"substantial involvement" refers to the degree to which federal employees are directly
performing or implementing parts of the award program...In a cooperative agreement, then,
federal employees participate more closely in performing the program. When you read
"cooperative," think working "side-by-side." The specific ways this involvement is integrated
varies across programs and agencies." Grants.gov, "Community Blog," July 19, 2016,
https://grantsgovprod.wordpress.com/2016/07/19/what-is-a-cooperative-agreement/.
16 Declaration of Celeste Smith, ¶ 8, Doc 86 at 51.
17 *Id*.

Underwriters handled at least one payment for "health care services for minors under the care of ORR/DCS." Point Comfort Underwriters filled in the "Treatment Code" with "9999," even though it is not a a code for medical treatment but used for non-treatment interventions, such as a forensic analysis.

24.     Smith's Declaration states, "...ORR did not enter into contracts with any medical service providers," but does not reference forensic services, even though elsewhere the Declaration indicates Smith is sensitive to this distinction.  ("[F]orensic dental exam was not a line item in Southwest Key's budget." Id. at ¶8.)  Smith confines the scope of claims attributed to ORR Federal Field Specialists to a single statement about *contracts with medical service providers*, and is silent about their knowledge of any working relationships with Senn or forensic dental assessments.  Id. at ¶7.

25.     The Declarations misstate contractor record-keeping obligations for the contracts and expenditures indicated in my request.  The standard Request for Proposals for a shelter contract obligates contractors to: "Provide written and signed agreements between grantees and subgrantees, or subcontractors, or other cooperating entities. These agreements must detail the scope of work to be performed, work schedules, remuneration, and other terms and conditions that structure or define the relationship."18

26.     Moreover, Southwest Key, Inc. has in its contract an obligation to submit to the ORR Project Officer "Memoranda of Understanding (MOU) or similar instrument, with organizations or individuals selected for receipt of sub-awarded funds; A detailed description of Sub-

---

18  "Standing Announcement for Residential (Shelter) Services for Unaccompanied Alien Children," HHS-2017-ACF-ORR-ZU-1132, pp. 35-36, https://www.documentcloud.org/documents/6225378-20181126-ORR-Shelter-Grant-Solicitation-HHS-2017.

Recipients' activities, if not adequately described in the MOUs (or similar instrument) or project plan (may include a monitoring tool jointly developed by Project Officer and Grantee); Complete budget for each Sub-Recipient; Schedule for monitoring Sub-Awardees with respect to location, dates, and agenda will be reported in Southwest Key Programs, Inc., quarterly reports to ORR ... Prompt notification to ORR Project Officer of any changes regarding Sub-Recipient."19

27.     My request of records from Southwest Key was broader than the search conducted.  (1) "All contracts, addenda, attachments and other materials produced or received by HHS Office of Refugee Resettlement to which Southwest Key has committed for the performance of age assessments, as indicated in the protocols indicated here: (hps://www.acf.hhs.gov/orr/resource/children-entering-the-united-statesunaccompanied-secon-1#1.62)" and (2) "All invoices or other records maintained or submitted by Southwest Key for documenting expenditures for providing age assessments to HHS or its components, including but not limited to the Office of Refugee Resettlement." HHS-18-F-0211.  Instead of producing responsive documents under their control, Smith and ORR appear to be artfully creating statements that dance around the specifics of my request and also contradicting the black letter language of their contracts with Southwest Key, Inc. and documents released to me.  I believe that if ORR Federal Field Specialists, James De La Cruz were authorized to speak with me, I would be able to quickly ascertain the location of the records responsive to my requests, or the person with direct knowledge of this.

**USCIS**

---

19  Southwest Keys, Inc. Cooperative Agreement between U.S. Department of Health and Human Services, Administration for Children and Families (ACF), Office of Refguee Resettlement (ORR) Division of Unaccompanied Children's Operations (DUCO) and South Key Programs, Inc, 90ZU0148, pp. 23-24. Attachments 1 and 2.

28.     On May 22, 2018 I requested "The initial Scope of Work, attachments, renewals, and email associated with the contract to General Dynamics with Award ID HSSCCG07J00120 and IDV HSHQDC06D00024."

29.     USCIS included in its exhibits several letters to me on the status of its response to my request.  Attachment B is correspondence to me from USCIS dated August 16, 2018, stating, "Your request also included a request for HSHQDC06D00024, which is a CBP contract.  We will forward that request to CBP and write you a separate letter explaining."  Doc 86, p. 65. No additional letter was sent to me and none are included in these attachments referencing the CBP, nor did I receive any correspondence or responsive documents from CBP.

30.     The April, 2022 Declaration of Cynthia Munita describes a portion of a redacted USCIS contract with General Dynamics, LLC: "USCIS redacted price quotes from its contractor General Dynamics, including projected yearly quantity and price proposals for work performed under the contract." Munita Declaration, Doc. 86, p.10 at ¶44.  I only received the bare bones of a contract without the copious attachments, correspondence, and specifications for modifications as well as addendums and related materials I requested, provided by other agency responses, and referenced here, providing new evidence that USCIS has withheld responsive records.20

31.     The portions redacted (see Exhibit A) go beyond simply dollar amounts but include several lines in a narrative portion of the modification request.  There is no specific rationale for

---

20  The Federal Acquisition Regulation defines a contract as including several instruments that were not released to me. " Contract means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and bilateral contract modifications."  https://www.acquisition.gov/far/part-2.

redacting the non-pricing information, only a conclusory tautology: "Disclosure of any additional information on these two pages of records (pp. 1-2) would reveal information that is appropriately exempt from disclosure pursuant to Exemption 4." Id. Doc 86, Vaughn Index for USCIS, p. 84.

32.     Moreover, most of the contract is executed in 2007. The latest information is from 2010. It is unreasonable for General Dynamics LLC to assert any legitimate competitive interest in maintaining secrecy on pricing information more than a decade old.

33.     To the extent General Dynamics maintains this interest, it is trumped by the public's interest in obtaining information about a firm that has been buying up its competitors for federal contracts. Of a 2018 takeover of another large federal contractor, the *Washington Post* reports, "The deal turns General Dynamics into a $9.9 billion-a-year behemoth in government IT services, making it the second-largest firm in that sector..."21

34.     Jill Eggleston in her Declaration of 2020 indicates that USCIS took into account General Dynamics' objections. Doc. 86, p. 60, ¶17. General Dynamics revenues are largely derived from taxpayers, as is evident in the firm's annual report, a business model no one forced on the firm.22 Equities for a b(4) exemption favor public disclosure when, as in this case, the information was obtained from a company pursuing profits, as opposed to proprietary

---

21  Aaron Gregg, "General Dynamics embarks on $9.6 billion deal to capture new defense spending" *Washington Post*, Feb. 12, 2018, https://www.washingtonpost.com/news/capital-business/wp/2018/02/12/general-dynamics-embarks-on-9-6-billion-deal-to-capture-new-defense-spending/.

22  "Awarded a contract with a maximum potential value of $12.6 billion among multiple awardees to provide information technology and technical support services to the Defense Intelligence Agency (DIA) and the National Geospatial-Intelligence Agency (NGA) under the Solutions for the Information Technology Enterprise (SITE) III program," General Dynamics, Annual Report, 2021, p. 13, https://s22.q4cdn.com/891946778/files/doc_financials/2021/ar/GD_2021-AR_Final_Bookmarked.pdf.

information the government acquired from firms for other reasons, e.g., if they are pursuing a mandatory licensing requirement. The public's interest in General Dynamics' scope of work and entire contract requested, including full addendums, outweigh General Dynamics' interest in confidentiality for historical pricing not to mention vague and conclusory claims for redacting non-pricing information.

## USAID

35.     I submitted my request for records on Northwestern contracts with USAID in 2015. USAID failed to provide a single responsive document until after I filed a lawsuit in 2018.[23] The USAID Declaration further reveals that glitches in their productions, including the belated production of documents on a Northwestern contract to run a business school in the West Bank, produced only after I provided a link to a USAID webpage referencing the program. Declaration of Christopher Colbow, August, 2020, ¶11, Doc 86, p. 140.

36.     USAID's Vaughn Indices have been incomplete, i.e., they omit pages that include redactions. Also, their productions lack Bates numbers, making records tracking difficult if not impossible. Similarly, the Declaration provides no information on the systems on which USAID relies to track its contracts for purposes of compliance with Federal Acquisition Regulations.

37.     A contractor whose records are among those produced in response to my request had its USAID contracts terminated due to evidence of fraud.[24] The contracts I received are in the

---

23 "On August 2, an RA at the Deportation Research Clinic called the USAID FOIAOffice to check the status of Stevens ' request , and his call was disconnected. He called again on August 3, 2018, and left a voicemail message requesting assistance." Doc. 1, ¶177.

24 "The Office of Inspector General at the U.S. Agency for International Development has said in a report to Congress that USAID terminated a $150 million development agreement in Pakistan after evidence of procurement fraud had been uncovered." Reuters, "U.S. Suspends Aid Group in Pakistan Fraud Probe," December 10, 2010, https://www.reuters.com/article/us-usa-pakistan-aid-idUSTRE6B90B420101210.

timeframe of the fraud investigation. If a firm is violating contracting laws, it is not protecting

competitive information but rather evidence of a crime, a factor that bears consideration in

evaluating USAID's assertions for b(4) exemptions for this and other contracts.

38.      My request encompassed "all documents since January 1, 2000 involving all emails on

USAID servers with northwestern.edu in any field of the address..." USAID claims that it located

"24,736 emails" and then claims that they were deduplicated, but omits the number after this

occurred. The Declaration then claims, "None were within the scope of the FOIA request," even

though my request was precisely for these emails. Ibid, ¶31, Doc. 86, p. 145. USAID has

indicated these emails are available on something called the USAID FOIA XPress. If USAID

shares with me the number of deduplicated emails I am happy to work with a USAID FOIA

officer for any further targeting, if necessary.

39.      My request was for records "since January 1, 2000..." Since USAID admits it did not

search until 2019, I am requesting that the search for email be current to at least that date, and

not the date on which I sent my request in 2015.

**ICE**

40.      ICE offers several b(5) defenses based on claims of attorney-client privilege tied to

"federal litigation." The federal litigation is not always identified. To the extent it refers to

lawsuits filed by non-citizens and the State of Washington against private prison companies, not

only is ICE not a party to the lawsuits filed against private prisons, ICE has released through this

litigation a letter to GEO stating that ICE is not responsible for GEO's legal fees or for GEO's

violations of employment and labor laws: "Under the terms of the contract, GEO is required to

provide detention services and ensure compliance with all applicable federal, state, and local

work safety laws and regulations. (Contract, Section 11-5 and H-17). GEO's defense of these

private lawsuits is a defense of its contract performance."25  This letter, containing extensive

information distinguishing ICE's interests and view of its contracts from those of GEO, is vital to

my research and was unlawfully withheld for over three years.

41.     Moreover, the information quoted was unlawfully redacted and withheld during the

pendancy of this litigation and provided to Plaintiff in a Supplemental Release in April, 2022

("Supplemental Unredacted Sample Release") only after it was selected as part of the parties'

agreed-upon sample for purposes of this motion..

42.     Numerous challenged b(5) redactions were removed from the sample pages.  The

unlawful redactions in these sample pages are evidence that the balance of ICE's other b(5)

redactions and rationales lack credibility.  For instance, Munita's Declaration repeatedly asserts a

b(5) exemption for records that include communications with GEO because of "federal

litigation" and some sections even assert a "common interest" in the litigation, even though only

GEO is defendant.  The portions removed from the sample pages, including Exhibit B1 and the

redacted communications of June 21, 2018, 2018-ICLI-00052 6054-6061 ("Exhibit B") diminish

ICE's credibility for assertions that are largely conclusory.

43.     A second illustrative example is information conveyed about GEO's refusal to sign an

updated contract reflecting problems in the original contract, apparently tied to capacity and

conditions at the facility:  "OAQ issued a unilateral mod to obligate the FY 18 funding and to

cover the 50 beds we had at the time, at the pay as you go rate of $112.00. We executed the mod

unilaterally because GEO refused to sign and referenced their right to seek future consideration.

We feel confident that GEO would rather accept the pay as you go, vs requesting that we pay the

---

25  Letters from ICE contracting office to GEO contracting vice president, June 21, 2018,
https://deportationresearchclinic.org/ICE-GEO_June2018.pdf. ("Exhibit B1.")

full GM knowing that there would be multiple CDRs [Contract Deficiency Reports] issued immediately that would result in deductions of their monthly invoice. Our primary justification for not being on the hook for the GM despite using the facility, is that given the current issues at the facility, in our judgment it cannot sufficiently hold more than 50 detainees safely and securely." Email October 2, 2018, 2018-ICLI-00052 965-66 ("Exhibit C1"); compare with redacted pages, ("Exhibit C").

44. A third item in the 123-page Supplemental Unredacted Sample Release is an email to GEO's counsel indicating ICE's concern about GEO improperly using recent ICE employees as paid expert witnesses. "In The GEO Group, Inc.'s disclosure of expert witnesses on September 20, 2018, GEO included two potential rebuttal experts who are current or former ICE employees: Scott Baniecki, current(b) (6), (b) (7)(C) , former District Field Office Director for ICE in Ft. Snelling, Minnesota and Assistant Officer in Charge for ICE at Eloy, Arizona. It is our understanding that in order for GEO to proffer testimony from these two individuals — even as rebuttal witnesses —GEO would need to comply with ICE's Touhy regulations. In previous filings in Chen v. The GEO Group, Inc. and in depositions noted in our case, GEO has sought to obtain testimony from current and former ICE employees without completing the Touhy process. This resulted in ICE intervention regarding the proffered and requested testimony." Email October 4, 2018, 18-ICLI-00052 3636. ("Exhibit D1"); compare with redacted pages ("Exhibit D.")

45. A large portion of the sample pages now unredacted in the Supplemental Unredacted Sample Release are clearly public records and never should have been redacted, including the so-called "Flores Settlement Agreement," 2018-ICLI-00052 6330 – 6357, suggesting ICE is entirely remiss in its review responsibilities.

46.     The most substantial dispute revealed from the material still redacted in the sample pages arises from ICE's insistence on redacting in its entirety the factual information in the US Citizen Memorandums.  I have extensive experience reviewing these.  Indeed, I relied on sections that were released to me without privacy waivers but included redactions to protect personally identifying information ("PII") in my reporting in the *The Nation* magazine and a 2011 110-page law review article on which New Yorker staff writer William Finnegan relied heavily in his reporting.26  The memorandums follow a template.  The first portion consists of facts about the case, i.e., where and why ICE charged the individual with being in the U.S. unlawfully, the person's averred country of origin, including the United States, and biographical details about the individuals and the citizenship status of their parents and sometimes grandparents.  These portions in the past were released to me, either in full or with redactions sensitive to PII.

47.     In the wake of agency embarrassment over my reporting on ICE detaining and deporting U.S. citizens as so-called "aliens" ICE has changed its protocols in responding to my requests for these documents.  When I produce a signed waiver, as is the case for some records tied to this litigation, ICE now claims a b(5) exemption, and is withholding all facts as well.  When I do not produce a waiver, ICE asserts a b(6) exemption.  Both of these assertions are conclusory and the equities favoring redactions, especially when I have a waiver, are overcome by the significance of ICE unlawfully holding a U.S. citizen, what Rep. Zoe Lofgren has called "kidnapping," insofar as ICE has no legal authority to lock-up and maintain custody of a U.S. citizen.

48.     Relatedly, entry 5 in the ICE Vaughn Index justifies redactions at 1267-1270 "because the information constitutes attorney insight about the citizenship status of individuals encountered by

---

26  "The Deportation Machine," *The New Yorker*." 2012,
https://www.newyorker.com/magazine/2013/04/29/the-deportation-machine.

ICE, which may be and has been subject to future litigation in immigration and federal court."
However, at least one person copied is in ICE public affairs, Liz Johnson,
https://www.ice.gov/news/releases/ice-expands-digital-presence-spanish-website-twitter.  I
understand from previous FOIA litigation in this jurisdiction that ICE cannot use a b(5)
exemption for discussing strategies of spin control and other media concerns.

49.     With exceptions in the Supplemental Productions, ICE has redacted virtually all email
addresses in their entirety.  This makes it impossible to assess whether GEO or other groups are
part of the threads.  Again, simple nominalism reveals ICE is not a party to the litigation.
Further, courts have rejected claims along these lines advanced by GEO.  As the communications
from the Supplemental Release reveal, statements among ICE attorneys and officers following
litigation, and communications to GEO or other contractors about this litigation, are not subject
to a blanket b(5) exemption.

        The above is true and correct to the best of my knowledge and recollections.

Dated: June 6, 2022


_____

JACQUELINE STEVENS

610 University Place

Second Floor, Political Science Department

Evanston, Illinois  60208

(847) 467-2093

# EXHIBIT  A

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | | PAGE OF PAGES | |
|---|---|---|---|---|---|
| | | | | 1 | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| P00003 | 06/21/2007 | | |

| 6. ISSUED BY | CODE | CIS | 7. ADMINISTERED BY (If other than item 6) | CODE | CIS |
|---|---|---|---|---|---|
| USCIS Contracting Office<br>Department of Homeland Security<br>70 Kimball Avenue<br>South Burlington VT 05403 | | | USCIS Contracting Office<br>Department of Homeland Security<br>70 Kimball Avenue<br>South Burlington VT 05403 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) | | (x) | 9A. AMENDMENT OF SOLICITATION NO |
|---|---|---|---|
| GENERAL DYNAMICS ONE SOURCE LLC<br>3211 JERMANTOWN ROAD<br>FAIRFAX VA 22030 | | | 9B. DATED (SEE ITEM 11) |
| | | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>HSHQDC-06-D-00024<br>HSSCCG-07-J-00120 |
| CODE 6103202150000 | FACILITY CODE | | 10B. DATED (SEE ITEM 11)<br>04/25/2007 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ This above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) | |
|---|---|

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| X | D. OTHER (Specify type of modification and authority)<br>Mutal Agreement of Both Parties | |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return _____1_____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Tax ID Number: [(b)(3)]
DUNS Number: 610320215+0000
The purpose of this modification is the following:

1. Change the Task Order Number located in Block 2 of the OF-347 from HSHQDC-07-J-00409 to HSSCCG-07-J-00120.

2. Allow General Dynamics (Prime) and their subcontractor, [(b)(4)]

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| [(b)(6)] Director of Contracts | 15C. DATE SIGNED | Laura B. Zuchowski | 16C. DATE SIGNED |
| [(b)(6)] | 6/28/07 | 16B. UNITED STATES OF AMERICA<br>Laura B. Zuchowski (Signature of Contracting Officer) | 6/28/2007 |

NSN 7540-01-152-8070
Previous edition unusable

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

(b)(6)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED HSHQDC-06-D-00024/HSSCCG-07-J-00120/P00003 | | | | PAGE 2 | OF 2 |
|---|---|---|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR
GENERAL DYNAMICS ONE SOURCE LLC

| ITEM NO. (A) | SUPPLIES/SERVICES (B) | QUANTITY (C) | UNIT (D) | UNIT PRICE (E) | AMOUNT (F) |
|---|---|---|---|---|---|
| (b)(4) | Security Operations Center on behalf of USCIS at an unclassified level. The Contractor shall work with to secure a ▮▮▮▮ USCIS will assume storage responsibility for classified data at USCIS facilities, until such time as the ▮▮▮ | | | | |
| | All other terms and conditions remain unchanged. Period of Performance: 04/25/2007 to 09/30/2007 | | | | |

OPTIONAL FORM 336 (4-86)
Sponsored by GSA
FAR (48 CFR) 53.110

EXHIBIT B



*Office of Acquisition Management*
**U.S. Department of Homeland Security**
801 I Street NW 9th Floor
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

June 21, 2018

The GEO Group, Inc.
(b) (6), (b) (7)(C), Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

**Subject: Denial of Request for Equitable Adjustment for Contract No. HSCEDM-
11-D-00003 Aurora Contract Detention Facility, CO dated April 18, 2018**

Dear Ms. [redacted],

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ)
received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated
April 18, 2018, for Contract No. HSCEDM-11-D-00003, Aurora ICE Processing Center.
Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in
the amount of $1,928,433.38 in connection with the defense of the lawsuit *Menocal v. The GEO
Group, Inc.,* No. 1:14-cv-02887-JLK-MEH pending in the U.S. District Court for the District of
Colorado.

GEO is submitting the REA under Contract No. HSCEDM-11-D-00003, Changes Clause at FAR
52.243-1, Alt. I (Apr 1984), for a "constructive change due to incomplete performance
specifications and standards." GEO included a four-page attachment to the REA that had
numerous items recording invoices submitted by several entities, including: Norton Rose
Fulbright; Precision Discovery; Burns, Figa & Will; Holland & Knight; and Vaughan &
DeMuro. These invoice entries are marked as related to the case of *Alejandro Menocal et al v.
The GEO Group, Inc.*. The fees and expenses for all invoices total $1,928,433.38. GEO noted in
the REA that Norton Rose Fulbright is GEO's primary law firm and that this firm is assisted by
local counsel and an e-discovery service provider. No other supporting documentation was
provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request.
Therefore, I have determined that the REA should be denied in its entirety. The basis for this
determination is as follows:

1. There have been no constructive changes to the terms of the Contract. A constructive
   change occurs when a contractor performs work beyond the contract requirements,
   without a formal order under the Changes clause, either due to an informal order from or
   through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of
   Homeland Security*, CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The contractor has the

burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause at FAR 52.243-1, Atl. 1, GEO fails to identify any express changes in the terms of the Contract and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the Performance Work Statement (PWS) and the contracting officer has not required the contractor to perform work beyond the requirements of the contract terms. (Contract, Section G-2.). The FAR 52.243-1 clause for Changes – Fixed-Price (Aug 1987) – Alternate I (Apr 1984) was incorporated by reference into the contract at Section I – Contract Clauses, at contract inception in 2011. This is a firm-fixed price performance-based contract. As such, the risk of performance, including the burden of administering the contract, falls to the contractor. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2.  The performance specifications and standards are not "incomplete" and are not defective. The Contract, as awarded in 2011, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (Contract, Section H-5, item 10.). Specifically, the contract is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (PBNDS 2008 at Part 5, § 33 and see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00026). Furthermore the award document and contract line item structure set forth the rate of reimbursement for the program. (OF 336, CLIN x004, dated September 15, 2011). Accordingly, the service provider has been on notice about these terms since contract inception, when the performance based contract was negotiated.

3.  GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the contract, GEO is required to provide detention services and ensure compliance with all applicable federal, state, and local work safety laws and regulations. (Contract, Section H-5 and H-17). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by the FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (202) 732-████ or by email at ████████@ice.dhs.gov

Very Respectfully,

████████

Contracting Officer

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



U.S. Immigration
and Customs
Enforcement

June 21, 2018

The GEO Group, Inc.
(b) (6), (b) (7)(C), Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

### Subject: Denial of Request for Equitable Adjustment for Contract no. HSCEDM-15-D-00015, Northwest Detention Center dated April 18, 2018

Dear Ms. Martin,

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ) received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated April 18, 2018, for contract No. HSCEDM-15-D-00015, Northwest Detention Center. Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in the amount of $595,160.69 in connection with the defense of the lawsuits *State of Washington v. The GEO Group, Inc., No. 3:17-cv-05806-TLF,* pending in the U.S. District Court for the Western District of Washington, and *Chen v. The GEO Group Inc., No. 3:17-cv-05769-RJB,* pending in the U.S. District Court for the Western District of Washington.

GEO is submitting the REA under contract No. HSCEDM-15-D-00015, Changes Clause at FAR 52.243-1, Alt. 1 (Apr 1984) for a "constructive change due to incomplete performance specifications and standards." GEO included a one-page attachment to the REA that had nine-line items recording invoices submitted by Norton Rose Fulbright and III Branches, PLLC to GEO for the case of *Chao Chen v. The GEO Group, Inc.* The fees and expenses for all invoices total $113,123.35. GEO also included another one-page attachment to the REA that had 16-line items recording invoices submitted by Norton Rose Fulbright, III Branches, PLLC and Precision Discovery. These invoice entries are marked as related to "Washington W&H Complaint." The fees and expenses for all invoices totaled $482,037.44. GEO noted in the REA that Norton Rose Fulbright is GEO's primary law firm and that this firm is assisted by local counsel and an e-discovery service provider. No other supporting documentation was provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request. Therefore, I have determined that the REA should be denied in its entirety. The basis for this determination is as follows:

1. There have been no constructive changes to the terms of the contract. A constructive change occurs when a contractor performs work beyond the contract requirements,

without a formal order under the Changes clause, either due to an informal order from or through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of Homeland Security,* CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The contractor has the burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause at FAR 52.243-1, Alt. 1, GEO fails to identify any express changes in the terms of the contract and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the contract and the contracting officer has not required the service provider to perform work beyond the requirements of the contract terms. *See* Contract, Section G.1.1. The FAR 52.243-1 clause for Changes – Fixed-Price (Aug 1987) – Alternate I (Apr 1984) was incorporated by reference into the contract at Section I – Contract Clauses, at contract inception in 2015. This contract is a firm-fixed price performance-based contract. As such, the risk of performance, including the burden of administering the contract, falls to the contractor. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2. The performance specifications and standards are not "incomplete" and are not defective. The contract, as awarded in 2015, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (Contract, Section C-Performance Work Statement, Section I.E.- Performance). Specifically, the contract is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00008). Furthermore the contract award document and contract line item structure set forth the rate of reimbursement for the program. (SF 26, CLINs x003, dated September 24, 2015). Accordingly, the contractor has been on notice about these terms since contract inception, when the performance-based contract was negotiated.

3. GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the contract, GEO is required to provide detention services and ensure compliance with all applicable laws, regulations, policies and procedures. (Contract, Section C-Performance Work Statement, I.D.-Partnership Philosphy, E.-Performance, and F.-Ambiguities). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

www.ice.gov

If you have any questions regarding this matter, please contact me at (949) 425- ▮▮▮ or by email at (b) (6), (b) (7)(C) @ice.dhs.gov

Thank you,

Very Respectfully,

(b) (6), (b) (7)(C)

Contracting Officer

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



U.S. Immigration
and Customs
Enforcement

June 21, 2018

The GEO Group, Inc.
(b) (6), (b) (7)(C), Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

(b) (6), (b) (7)(C)
Acting City Manager
City for Adelanto
10400 Rancho Road
Adelanto, CA 92301

**Subject: Denial of Request for Equitable Adjustment for IGSA No. EROIGSA-11-0003 Adelanto Detention Facility, CA dated April 18, 2018**

Dear Ms. [redacted] and Ms. [redacted],

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ) received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated April 18, 2018, for IGSA No. EROISA-11-0003, Adelanto Detention Facility, CA. Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in the amount of $139,059.96 in connection with the defense of the lawsuit *Raul Novoa v. The GEO Group, Inc.,* No. 5:17-cv-02514-JGB-SHK pending in the U.S. District Court for the Central District of California.

GEO is submitting the REA under IGSA no. EROIGSA-11-0003, Changes Clause, Article X.B. for a "constructive change due to incomplete performance specifications and standards." GEO included a one-page attachment to the REA that had four-line items recording invoices submitted by Norton Rose Fulbright to GEO for the case of *Novoa, Raul, et al. v. GEO.* The fees and expenses for all invoices total $139,059.96. GEO noted in the REA that Norton Rose Fulbright is GEO's primary law firm and that this firm is assisted by local counsel and an e-discovery service provider. No other supporting documentation was provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request. Therefore, I have determined that the REA should be denied in its entirety. The basis for this determination is as follows:

1. There have been no constructive changes to the terms of the IGSA. A constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, either due to an informal order from or through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of Homeland Security*, CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The service provider has the burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause Article X.B., GEO fails to identify any express changes in the terms of the IGSA and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the IGSA and the contracting officer has not required the service provider to perform work beyond the requirements of the IGSA terms. This IGSA is a firm-fixed price performance-based contracting vehicle. As such, the risk of performance, including the burden of administering the IGSA, falls to the service provider. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2. The performance specifications and standards are not "incomplete" and are not defective. The IGSA, as awarded in 2011, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (See IGSA, Article V). Specifically, the IGSA is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (PBNDS 2008 at Part 5, § 33 and see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00024). Furthermore the IGSA award document and contract line item structure set forth the rate of reimbursement for the program. (SF 347, CLIN 0007, dated May 31, 2011). Accordingly, the service provider has been on notice about these terms since contract inception, when the performance-based contract was negotiated.

3. GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the IGSA, GEO is required to provide detention services and ensure compliance with all applicable laws, regulations, policies and procedures. (See IGSA, Article III.B.). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the IGSA terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this IGSA are governed by the Disputes Clause at Article X.C. and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

EXHIBIT B1

*Office of Acquisition Management*
**U.S. Department of Homeland Security**
801 I Street NW 9th Floor
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

June 21, 2018

The GEO Group, Inc.
(b)(6);(b)(7)(C) Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

> **Subject: Denial of Request for Equitable Adjustment for Contract No. HSCEDM-11-D-00003 Aurora Contract Detention Facility, CO dated April 18, 2018**

Dear (b)(6);(b)(7)(C)

(b)(5)



(b)(5)

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by the FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (202) 732-(b)(6);(b)(7)(C) by email at (b)(6);(b)(7)(C)

Very Respectfully,

(b)(6);(b)(7)(C)

T
Contracting Officer

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



# U.S. Immigration and Customs Enforcement

June 21, 2018

The GEO Group, Inc.
(b)(6);(b)(7)(C) Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

**Subject: Denial of Request for Equitable Adjustment for Contract no. HSCEDM-15-D-00015, Northwest Detention Center dated April 18, 2018**

Dear Ms. (b)(6);(b)(7)(C)

(b)(5)



(b)(5)

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (949) 425-(b)(6); or by email at (b)(6);(b)(7)(C)

Thank you,

Very Respectfully,
(b)(6);(b)(7)(C)

Contracting Officer

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



**U.S. Immigration
and Customs
Enforcement**

June 21, 2018

The GEO Group, Inc.
(b)(6);(b)(7)(C) Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

(b)(6);(b)(7)(C)
Acting City Manager
City for Adelanto
10400 Rancho Road
Adelanto, CA 92301

### Subject: Denial of Request for Equitable Adjustment for IGSA No. EROIGSA-11-0003 Adelanto Detention Facility, CA dated April 18, 2018

Dear Ms. (b)(6);(b)(7)(C) and Ms. (b)(6);(b)(7)(C)

(b)(5)

www.ice.gov



(b)(5)

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the IGSA terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this IGSA are governed by the Disputes Clause at Article X.C. and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (949) 425-(b)(6); or by email at (b)(6);(b)(7)(C)

Thank you,

Very Respectfully,
,(b)(6);(b)(7)(C)

Contracting Officer

If you have any questions regarding this matter, please contact me at (949) 425-███ or by email at (b) (6), (b) (7)(C)@ice.dhs.gov

Thank you,

Very Respectfully,

(b) (6), (b) (7)(C) &

Contracting Officer

2018-ICLI-00052 6061

EXHIBIT C

**From:** (b) (6), (b) (7)(C)
**Sent:** 5 Oct 2018 12:58:49 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)
**Subject:** FW: Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts
**Attachments:** 110-1.pdf, FINAL Potential Rebuttal Witness Disclosure--(b) (6), (b) (7)(C).pdf, FINAL Potential Rebuttal Witness Disclosure--Baniecke.pdf

FYI.


Sent with BlackBerry Work
(www.blackberry.com)

**From:** (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C) @ATG.WA.GOV>
**Date:** Thursday, Oct 04, 2018, 8:22 PM
**To:** (b) (6), (b) (7)(C) @3brancheslaw.com>, (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C) @ATG.WA.GOV>, (b) (6), (b) (7)(C) @gtlaw.com>
**Cc:** (b) (6), (b) (7)(C) (USAWAW) (b) (6), (b) (7)(C) @usdoj.gov> (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C) @ATG.WA.GOV>
**Subject:** Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts

(b) (6), (b) (7)(C) and (b) (6), (b) (7)(C)

In The GEO Group, Inc.'s disclosure of expert witnesses on September 20, 2018, GEO included two potential rebuttal experts who are current or former ICE employees: Scott Baniecki, current District Field Office Director for ICE in Ft. Snelling, Minnesota and (b) (6), (b) (7)(C), former Assistant Officer in Charge for ICE at Eloy, Arizona. It is our understanding that in order for GEO to proffer testimony from these two individuals – even as rebuttal witnesses –GEO would need to comply with ICE's *Touhy* regulations.

In previous filings in *Chen v. The GEO Group, Inc.* and in depositions noted in our case, GEO has sought to obtain testimony from current and former ICE employees without completing the *Touhy* process. This resulted in ICE intervention regarding the proffered and requested testimony.

Due to this we wanted to confirm that GEO has already complied with the *Touhy* regulations necessary for it to utilize testimony and evidence from these two ICE employees.

Please let us know as soon as possible whether ICE has confirmed that Mr. Baniecki and Mr. (b) (6), (b) (7)(C) have authority to testify about the information and material identified in GEO's Disclosures of Potential Rebuttal Expert Witnesses.

Thank you,
(b) (6), (b) (7)(C)

**From:** (b)(6);(b)(7)(C)
**Sent:** 5 Oct 2018 12:58:49 +0000
**To:** (b)(6);(b)(7)(C)
**Cc:**
**Subject:** FW: Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts
**Attachments:** 110-1.pdf, FINAL Potential Rebuttal Witness Disclosure-(b)(6);(b)(7)pdf, FINAL Potential Rebuttal Witness Disclosure--Baniecke.pdf

FYI.


Sent with BlackBerry Work
(www.blackberry.com)

**From:** (b)(6);(b)(7)(C)
**Date:** Thursday, Oct 04, 2018, 8:22 PM
**To:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)
**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)
**Subject:** Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts

(b)(6);(b)(7)(C)

(b)(5)

Thank you,
(b)(6);(b)(7)

EXHIBIT C1

EXHIBIT D

**From:** Contreras, Patrick D
**Sent:** 2 Oct 2018 23:12:24 +0000
**To:** (b) (6), (b) (7)(C) Price, Corey A;Jennings, David W; (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) Johnson, Tae D
**Cc:** (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)                                                        Asher, Nathalie
R;Dainton, Albert
**Subject:** RE: Montgomery Processing Center (MPC) status

All,

We plan to move 50 cases into MPC tomarrow, with concurrence with OAQ. If all work
out, we should be able to move the the remaining 100 medical cases on Friday.

We are working closely with OAQ on movements to ensure we are following the
contract.

Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** (b) (6), (b) (7)(C)                  @ice.dhs.gov>
**Date:** Tuesday, Oct 02, 2018, 9:15 AM
**To:** Contreras, Patrick D (b) (6), (b) (7)(C) @ice.dhs.gov>, Price, Corey A
(b) (6), (b) (7)(C) @ice.dhs.gov>, Jennings, David W (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) (b) (6), (b) (7)(C) @ice.dhs.gov>, Johnson, Tae D (b) (6), (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C)                    @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)                    @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)                         @ice.dhs.gov>,
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)                    @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, Asher, Nathalie R (b) (6), (b) (7)(C) @ice.dhs.gov>, Dainton, Albert
(b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** RE: Montgomery Processing Center (MPC) status

Yes, that is correct. OAQ issued a unilateral mod to obligate the FY 18 funding and to cover the
50 beds we had at the time, at the pay as you go rate of $112.00. We executed the mod
unilaterally because GEO refused to sign and referenced their right to seek future consideration
under the contract.
(b) (6), (b) (7)(C) will be in DC next week and we plan to discuss the startup of operations/GM at that
time. We feel confident that GEO would rather accept the pay as you go, vs requesting that we
pay the full GM knowing that there would be multiple CDRs issued immediately that would
result in deductions of their monthly invoice.
Our primary justification for not being on the hook for the GM despite using the facility, is that
given the current issues at the facility, in our judgement it cannot sufficiently hold more than 50
detainees safely and securely. The 50 detainees is obviously much less than the GM. As the
issues get fixed and we begin to accept more detainees, that leverage will lessen and OAQ will
not be able to contractually support to paying the full GM. OAQ expects that in the near future we

will need to provide GEO the full notice to proceed, which would trigger the responsibility for the full GM.

OAQ assumes that GEO will be reaching out to the individuals on this email as soon as we insist on the pay as you go model for the start up at Montgomery. Please let us know if you have any questions or issues with how we plan to proceed.

Thanks,

**(b) (6), (b) (7)** , *CFCM*
**(C)ention, Compliance and Removals (DCR) | Unit Chief**
DHS | ICE | Office of Acquisition Management (OAQ)
Phone: 202-732‑ Mobile: 202-345‑
Email: (b) (6), (b) (7) @ice.dhs.gov

**From:** Contreras, Patrick D
**Sent:** Tuesday, October 2, 2018 9:23 AM
**To:** Price, Corey A ; Jennings, David W ; (b) (6), (b) (7) (C) ; Johnson, Tae D
**Cc:** (b) (6), (b) (7)
(b) (6), (b) (7)                                                    Asher, Nathalie R
**Subject:** RE: Montgomery Processing Center (MPC) status

OAQ is fighting for us to pay as we go. These issues have supported us in that endeavor. (b) (6), (b) (7)(C) is that correct?

Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** Price, Corey A (b) (6), (b) (7) @ice.dhs.gov>
**Date:** Tuesday, Oct 02, 2018, 8:20 AM
**To:** Contreras, Patrick D (b) (6), (b) (7) @ice.dhs.gov>, Jennings, David W
(b) (6), (b) (7) @ice.d(C)s.gov>, (b) (6), (b) (7) @ice.dhs.gov>, Johnson, Tae D
(b)(6), (b) (7) @ice.dhs.gov> (C)
**Cc:** (b) (6), (b) (7) @ice.dhs.gov>, (b) (6), (b) (7)
(b) (C)b) (7) @ice.dhs.gov>, (b) (6), (b) (7) (C) @ice.dhs.gov>, (b) (6), (b) (7)
(b) (6), (b) (7) @ice.dhs.gov>(b) (6), (b) (7) @ice.dhs.gov>,
(b) (6), (b) (7) @ice.dhs.gov>(b) (6), (b) (7) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b)(6), (b) (7) @ice.dhs.gov>, (b) (6), ((b) (7) @ice.dhs.gov>, Asher, Nathalie R
(b) (6), (b) (7) @ice.dhs.g(C)>
**Subject:** RE: Montgomery Processing Center (MPC) status

Given the below issues, are we still on the hook to pay for the GM now?

**From:** Contreras, Patrick D (b) (6), (b) (7) @ice.dhs.gov>
**Date:** Monday, Oct 01, 2018, 6:14 PM
**To:** Jennings, David W (b) (6), (b) (7) @ice.dhs.gov>, (b) (6), (b) (7)
(b) (6), (b) (7)(C) @ice.d(C)s.gov>, Johnson, Tae D (b) (6), (b) (7) @ice.dhs.gov>, Price, Corey A
(b) (6), (b) (7) @ice.dhs.gov> (C)
(C)

**From:** Contreras, Patrick D
**Sent:** 2 Oct 2018 23:12:24 +0000
**To:** (b)(6);(b)(7)(C) Price, Corey A;Jennings, David W;(b)(6);(b)(
(b)(6);(b)Johnson, Tae D
**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C) ;Asher, Nathalie
R;(b)(6);(b)(7)(C)
**Subject:** RE: Montgomery Processing Center (MPC) status

All,

We plan to move 50 cases into MPC tomarrow, with concurrence with OAQ. If all work
out, we should be able to move the the remaining 100 medical cases on Friday.

We are working closely with OAQ on movements to ensure we are following the
contract.


Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** (b)(6);(b)(7)(C) (b)(6);(b)(7)(C)
**Date:** Tuesday, Oct 02, 2018, 9:15 AM
**To:** Contreras, Patrick D (b)(6);(b)(7)(C) Price, Corey A
(b)(6);(b)(7)(C) Jennings, David W (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C) Johnson, Tae D <(b)(6);(b)(7)(C)
**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)


(b)(6);(b)(7)(C) Asher, Nathalie R(b)(6);(b)(7)(C)
>
**Subject:** RE: Montgomery Processing Center (MPC) status

Yes, that is correct. OAQ issued a unilateral mod to obligate the FY 18 funding and to cover the
50 beds we had at the time, (b)(7)(E);(b)(5)
(b)(5)

(b)(5)

Thanks,

(b)(6);(b)(7)(C) **CPPB, CFCM**

**Detention, Compliance and Removals (DCR) | Unit Chief**
DHS | ICE | Office of Acquisition Management (OAQ)
Phone: 202-732-(b)(6); Mobile: 202-345-(b)(6);(
Email (b)(6);(b)(7)(C)

**From:** Contreras, Patrick D
**Sent:** Tuesday, October 2, 2018 9:23 AM
**To:** Price, Corey A ; Jennings, David W ;(b)(6);(b)(7)(C) ; Johnson, Tae D
**Cc:** (b)(6);(b)(7)(C)
;(b)(6);(b)(7)(C)　　　　　　　　　(b)(6);(b)(7)(C)　　Asher, Nathalie R
**Subject:** RE: Montgomery Processing Center (MPC) status

(b)(5)

Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** Price, Corey A <(b)(6);(b)(7)(C)
**Date:** Tuesday, Oct 02, 2018, 8:20 AM
**To:** Contreras, Patrick D (b)(6);(b)(7)(C)　　　　　, Jennings, David W
(b)(6);(b)(7)(C)　　　　　　　　　　　　　　　　　　　Johnson, Tae D

**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)

;(b)(6);(b)(7)(C)　　, Quigley, William (b)(6);(b)(7)(C)　　　　Asher, Nathalie R
;(b)(6);(b)(7)(C)
**Subject:** RE: Montgomery Processing Center (MPC) status
Given the below issues, are we still on the hook to pay for the GM now?

**From:** Contreras, Patrick D <(b)(6);(b)(7)(C)
**Date:** Monday, Oct 01, 2018, 6:14 PM
**To:** Jennings, David W (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)　　　　　Johnson, Tae D ;(b)(6);(b)(7)(C)　　　　, Price, Corey A

EXHIBIT D1

**From:** Contreras, Patrick D
**Sent:** 2 Oct 2018 23:12:24 +0000
**To:** (b)(6);(b)(7)(C) Price, Corey A;Jennings, David W;(b)(6);(b)(
(b)(6);(b)(Johnson, Tae D
**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C) ;Asher, Nathalie
R;(b)(6);(b)(7)(C)
**Subject:** RE: Montgomery Processing Center (MPC) status

All,

We plan to move 50 cases into MPC tomarrow, with concurrence with OAQ. If all work
out, we should be able to move the the remaining 100 medical cases on Friday.

We are working closely with OAQ on movements to ensure we are following the
contract.


Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** (b)(6);(b)(7)(C) (b)(6);(b)(7)(C)
**Date:** Tuesday, Oct 02, 2018, 9:15 AM
**To:** Contreras, Patrick D (b)(6);(b)(7)(C) Price, Corey A
(b)(6);(b)(7)(C) Jennings, David W (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C) Johnson, Tae D (b)(6);(b)(7)(C)
**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)

(b)(6);(b)(7)(C) Asher, Nathalie R (b)(6);(b)(7)(C)
>
**Subject:** RE: Montgomery Processing Center (MPC) status

Yes, that is correct. OAQ issued a unilateral mod to obligate the FY 18 funding and to cover the
50 beds we had at the time, (b)(7)(E);(b)(5)
(b)(5)

(b)(5)

Thanks,

(b)(6);(b)(7)(C) **CPPB, CFCM**

**Detention, Compliance and Removals (DCR) | Unit Chief**
DHS | ICE | Office of Acquisition Management (OAQ)
Phone: 202-732-(b)(6); Mobile: 202-345-(b)(6);(
Email (b)(6);(b)(7)(C)

**From:** Contreras, Patrick D
**Sent:** Tuesday, October 2, 2018 9:23 AM
**To:** Price, Corey A ; Jennings, David W ;(b)(6);(b)(7)(C) ; Johnson, Tae D
**Cc:** (b)(6);(b)(7)(C)
;(b)(6);(b)(7)(C) (b)(6);(b)(7)(C) Asher, Nathalie R
**Subject:** RE: Montgomery Processing Center (MPC) status

(b)(5)

Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** Price, Corey A <(b)(6);(b)(7)(C)
**Date:** Tuesday, Oct 02, 2018, 8:20 AM
**To:** Contreras, Patrick D (b)(6);(b)(7)(C) , Jennings, David W
(b)(6);(b)(7)(C) Johnson, Tae D

**Cc:** (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C)

;(b)(6);(b)(7)(C) , Quigley, William (b)(6);(b)(7)(C) Asher, Nathalie R
;(b)(6);(b)(7)(C)
**Subject:** RE: Montgomery Processing Center (MPC) status
Given the below issues, are we still on the hook to pay for the GM now?

**From:** Contreras, Patrick D <(b)(6);(b)(7)(C)
**Date:** Monday, Oct 01, 2018, 6:14 PM
**To:** Jennings, David W (b)(6);(b)(7)(C)
(b)(6);(b)(7)(C) Johnson, Tae D ;(b)(6);(b)(7)(C) , Price, Corey A

EXHIBIT E

**Sent:** Monday, March 26, 2018 10:56 AM
**To:** (b)(6);(b)(7)(C)
**Subject:** FW: HEP C NOTES

Good Day,

I have reviewed the attached and some items are still missing on the request for treatment form but he is a Pakistan detainee in ICE custody since 01/27/2017 (424 days). I hope the info attached along with what is in eCW from his prior stay at an IHSC facility will give you enough info to determine if he is eligible for treatment or not. I am not seeing that he would be a priority but he is requesting to be treated. I do not see that a liver ultrasound was done but an abdominal one was but the results are not included here so I will try to get them but it was on 12/17/2017 per eCW on the DRTLA tab.

Very Respectfully,

CDR (b)(6);(b)(7)(C) RN, BSN, CCNM
Houston Field Medical Coordinator
ICE Health Service Corps / USPHS
16038 Vickery Dr, Suite (b)(6) Office (b)(6);(b)
Houston, TX 77032
eFax- (866) 703-7879
Work Cell- (202) 210 (b)(6);
Desk- (out of order at this time)
(b)(6);(b)(7)(C)

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

**From:** (b)(6);(b)(7)(C)
**Sent:** Monday, March 26, 2018 12:25 PM
**To:** (b)(6);(b)(7)(C)
**Subject:** HEP C NOTES

Commander (b)(6);(I am forwarding you these notes. Please let me know if I can be of further assistance. Thank You

vasculitis, certain types of lymphomas or hematologic malignancies · Immunosuppressant medication for a comorbid medical condition · APRI score = 2 · Porphyria cutanea tarda

Priority Level 2 – Intermediate Priority for Treatment* · Advanced fibrosis on liver biopsy (e.g., Metavir Stage 3 bridging fibrosis) · HIV coinfection · Comorbid liver diseases (e.g., HBV coinfection, autoimmune hepatitis, hemochromatosis, steatohepatitis, etc.) · Chronic kidney disease (GFR =mL/min per 1.73 m2 ) · Diabetes mellitus

Best wishes, (b)(6);(b)(7)(C)

CDR (b)(6);(b)(7)(C) MD, MPH, FACP, FIDSA
U.S. Public Health Service
IHSC Infectious Disease Consultant

*** ID consults will be provided Monday through Fridays. **Routine consults will be answered within 5 business days.** ***

ICE Health Service Corps/Enforcement & Removal Operations
610 W Ash St # (b)(6); San Diego, CA 92101
O 619-338 (b)(6); (Tues, Wed, Fri), 619-302 (b)(6) (Mon, Thurs)
C 202-321 (b)(7)(C)
(b)(6);(b)(7)(C)

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

**From:** (b)(6);(b)(7)(C)
**Sent:** Monday, March 26, 2018 10:56 AM
**To:** (b)(6);(b)(7)(C)
**Subject:** FW: HEP C NOTES

Good Day,

I have reviewed the attached and some items are still missing on the request for treatment form but he is a Pakistan detainee in ICE custody since 01/27/2017 (424 days). I hope the info attached along with what is in eCW from his prior stay at an IHSC facility will give you enough info to determine if he is eligible for treatment or not. I am not seeing that he would be a priority but he is requesting to be treated. I do not see that a liver ultrasound was done but an abdominal one was but the results are not included here so I will try to get them but it was on 12/17/2017 per eCW on the DRTLA tab.

Very Respectfully,

(Program Office Name)
**U.S. Department of Homeland Security**
(Program Office Address Line 1)
(Program Office Address Line 2)



U.S. Immigration
and Customs
Enforcement

## Appendix A: PC Designation Letter

MEMORANDUM FOR (Program Office Name) Employees

FROM:  (APO Name)
　　　　Accountable Property Officer

SUBJECT: Appointment as Property Custodian

Ref:　(a) Personal Property Operations Handbook
　　　(b) Office of Asset Administration Webpage
　　　(c) Office of Asset Administration SOP No: OAA/PROP 00006

1.  In accordance with references (a) and (b), you are hereby appointed as Property Custodian for all (Program Office Name) property that is under your Custodial Steward Code: (Steward Code and Group).  As Custodian, you will be responsible for the accountability and safeguarding of accountable property, and accuracy of information recorded in Sunflower.

2.  As the Property Custodian, your responsibilities include, but are not limited to:  Ensuring that all computers under your administrative control are encrypted; reviewing all procurement requests for property; safeguarding sensitive equipment such as laptop computers, blackberries, and thumb drives; ensuring property is recorded in Sunflower within 5 working days of receiving the property; ensuring that all property, which no longer meets the operational requirement of ICE, is reported as excess and disposed of properly; coordinating Reports of Survey for property lost, stolen, or damaged;  coordinating the search for missing property; maintaining property management files and supporting documentation to support and substantiate the information recorded in Sunflower including assigning property to users and ensuring user, location, and accountability for the asset is accurate/up-to-date.

3.  A physical inventory of all Personal Property is required every year, in accordance with references (a) and (b), and upon relief of the custodian. Inventories may be taken more frequently than required, if deemed necessary by the APO/EAD/AD/Office Manager.  I will designate other staff to conduct periodic physical inventories of property based on guidance from the ICE Property Management Officer.  You will assist as needed in those inventories and prepare inventory packages for my review and forward to the Headquarters Program Property Officer.

4. For a more comprehensive list of responsibilities and guidance, refer to references (a) and (b).

Copy to: (HPPM Name)
　　　　(Program Office) – HPPM

79

(Program Office Name)

**U.S. Department of Homeland Security**
(Program Office Address Line 1)
(Program Office Address Line 2)



U.S. Immigration
and Customs
Enforcement

## Appendix B: HPPM Designation Letter

MEMORANDUM FOR (Program Office Name) Employees

FROM: (APO Name)
   Accountable Property Officer

SUBJECT: Appointment as Headquarters Program Property Manager

Ref:  (c) Personal Property Operations Handbook
   (d) Office of Asset Administration Webpage

1. In accordance with references (a) and (b), you are hereby appointed as Headquarters Program Property Manager (HPPM) for all (Program Office Name) property that is under the Parent Steward Code: (Steward Code and Group). As HPPM, you have oversight for your area of jurisdiction to ensure an accurate accounting of all program property. Serve as liaisons between (Program Office Name) and the Office of Asset Administration (OAA) Property Branch, to coordinate property matters, and are considered the Subject Matter Experts for (Program Office Name).

2. As the HPPM, your responsibilities include, but are not limited to: Overseeing and administering property management responsibilities. Ensuring that offices comply with established deadlines for inventory, recording property transactions, and reporting. Serving as the first-level of property management support to Property Custodians (PC). Facilitating, coordinating, and compiling supporting documentation for property transactions upon request. Verifying the accuracy of supporting documentation before submission to the Property Branch. Submitting monthly ROS, including negative reports (reporting that there are no ROS) to the Property Branch. Ensuring that property personnel are aware of and register for required property management training. Monitoring and managing their Program's personal property inventory. Ensuring timely maintenance of property records for transactions including acquisitions, transfers, and disposals of personal property. Performing quality assurance reviews of property records. Disseminating property related communications within their program. Disseminating and reinforcing all communication sent from the Property Branch to Program Offices.

3. For a more comprehensive list of responsibilities and guidance, refer to references (a) and (b).

Copy to: OAA Property Branch

80

**From:** Contreras, Patrick D
**Sent:** 2 Oct 2018 23:12:24 +0000
**To:** (b) (6), (b) (7)(C) Price, Corey A;Jennings, David W; Johnson, Tae D
**Cc:** (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) Asher, Nathalie
R;Dainton, Albert
**Subject:** RE: Montgomery Processing Center (MPC) status

All,

We plan to move 50 cases into MPC tomorrow, with concurrence with OAQ. If all work out, we should be able to move the the remaining 100 medical cases on Friday.

We are working closely with OAQ on movements to ensure we are following the contract.


Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Date:** Tuesday, Oct 02, 2018, 9:15 AM
**To:** Contreras, Patrick D (b) (6), (b) (7)(C) @ice.dhs.gov>, Price, Corey A
(b) (6), (b) (7)(C) @ice.dhs.gov>, Jennings, David W (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) @ice.dhs.gov>, Johnson, Tae D (b) (6). (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) @ice.dhs.gov>,
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, Asher, Nathalie R (b) (6), (b) (7)(C) @ice.dhs.gov>, Dainton, Albert
(b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** RE: Montgomery Processing Center (MPC) status

Yes, that is correct. OAQ issued a unilateral mod to obligate the FY 18 funding and to cover the 50 beds we had at the time, at the pay as you go rate of $112.00. We executed the mod unilaterally because GEO refused to sign and referenced their right to seek future consideration under the contract.

(b) (6), (b) (7)(C) will be in DC next week and we plan to discuss the startup of operations/GM at that time. We feel confident that GEO would rather accept the pay as you go, vs requesting that we pay the full GM knowing that there would be multiple CDRs issued immediately that would result in deductions of their monthly invoice.

Our primary justification for not being on the hook for the GM despite using the facility, is that given the current issues at the facility, in our judgement it cannot sufficiently hold more than 50 detainees safely and securely. The 50 detainees is obviously much less than the GM. As the issues get fixed and we begin to accept more detainees, that leverage will lessen and OAQ will not be able to contractually support not paying the GM. OAQ expects that in the near future we

will need to provide GEO the full notice to proceed, which would trigger the responsibility for the full GM.

OAQ assumes that GEO will be reaching out to the individuals on this email as soon as we insist on the pay as you go model for the start up at Montgomery. Please let us know if you have any questions or issues with how we plan to proceed.

Thanks,

(b) (6), (b) (7)(C) , CFCM
**Detention, Compliance and Removals (DCR) | Unit Chief**
DHS | ICE | Office of Acquisition Management (OAQ)
Phone: 202-732 (b) (6), (b) (7)(C)  Mobile: 202-345 (b) (6), (b) (7)(C)
Email: (b) (6), (b) (7)(C) @ice.dhs.gov

**From:** Contreras, Patrick D
**Sent:** Tuesday, October 2, 2018 9:23 AM
**To:** Price, Corey A ; Jennings, David W ; (b) (6), (b) (7)(C) ; Johnson, Tae D
**Cc:** (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)                                              Asher, Nathalie R
**Subject:** RE: Montgomery Processing Center (MPC) status

OAQ is fighting for us to pay as we go. These issues have supported us in that endeavor. (b) (6), (b) (7)(C) is that correct?

Patrick D. Contreras
Field Office Director (SES)
Houston, Texas

**From:** Price, Corey A (b) (6), (b) (7)(C) @ice.dhs.gov>
**Date:** Tuesday, Oct 02, 2018, 8:20 AM
**To:** Contreras, Patrick D (b) (6), (b) (7)(C) @ice.dhs.gov>, Jennings, David W
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)            @ice.dhs.gov>, Johnson, Tae D
(b) (6), (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C)                 @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)                 @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) |            @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)            @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)            @ice.dhs.gov>, Asher, Nathalie R
(b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** RE: Montgomery Processing Center (MPC) status

Given the below issues, are we still on the hook to pay for the GM now?

**From:** Contreras, Patrick D (b) (6), (b) (7)(C) @ice.dhs.gov>
**Date:** Monday, Oct 01, 2018, 6:14 PM
**To:** Jennings, David W (b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>, Johnson, Tae D (b) (6), (b) (7)(C) @ice.dhs.gov>, Price, Corey A
(b) (6), (b) (7)(C) @ice.dhs.gov>

USL Memo

**ATTY WORK PRODUCT – <u>DO NOT FOIA</u>**
File Prep Sheet

(b) (5), (b) (6), (b) (7)(C)


(b) (5), (b) (6), (b) (7)(C)

**From:** (b) (6), (b) (7)(C)
**Sent:** 6 Jun 2018 13:09:12 +0000
**To:** (b) (6), (b) (7)(C)
**Subject:** FW: VWP tasking

(b) (6), (b) (7)(C), this must be the tasker you mentioned yesterday. I am updating the pending litigation descriptions in anticipation...
(b) (6), (b) (7)(C), ECU should add CALD on here if not already...

(b) (6), (b) (7)(C)

(b) (6), (b) (7)(C) |Associate Legal Advisor
**District Court Litigation Division**
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
202-732-(b)(6), (b)(7)(C) (desk) | 202-875-(b)(6), (b)(7)(C) (cell)

**Attorney/Client Privilege \*\*\*Attorney Work Product**
This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).

**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, June 06, 2018 8:12 AM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** VWP tasking

(b) (6), (b) (7)(C):

Sometime today – probably mid- to late morning – I'm likely to reassign a VWP tasking to you, probably with a short turnaround. The document to review is supposed to be "a summary of the Voluntary Work Program including the mechanics of the program (such as how detainees volunteer the scope of the agreement what tasks are performed how the individual is paid etc.) and the statutory/regulatory basis for the program." We're waiting for Policy to provide some input, then OPLA (DCLD, EROLD and LELD) are to review. Policy's deadline is 11 a.m. and ours is noon, so hopefully it'll be a short document.


Deputy Chief, DCLD
ICE/OPLA
188 Harvest Lane
Williston, VT 05495
Ph. 802-872-(b)(6), (b)(7)(C)

\*\*\*Warning\*\*\*Attorney-Client Privilege\*\*\*Attorney Work Product\*\*\*
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this e-mail has been misdirected and immediately destroy all originals and copies. Furthermore, do not print, copy or re-transmit, disseminate or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** Tuesday, June 05, 2018 9:06 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>; DCLD-ECU_Taskings (b)
@ice.dhs.gov>; LELD Taskings (b) (7)(E) @ice.dhs.gov>; EROLD TASKINGS
(b) (7)(E) @ice.dhs.gov>
**Subject:** FW: PLAnet Task Assigned

Hi 

Yes - ERO cleared with a response around 6pm, but we are waiting for Policy. I will notify you when this task is ready for your review. I will be pinging OES early tomorrow and will keep you apprised of any developments.

Thank you,

(b) (6), (b) (7)(C)

Sent with BlackBerry Work
(www.blackberry.com)

> **From:** DCLD-ECU_Taskings
> **Sent:** Tuesday, June 5, 2018 7:11 PM
> **To:** OPLA Tasking (b) (7)(E) @ice.dhs.gov>
> **Cc:** LELD Taskings (b) (7)(E) @ice.dhs.gov>; EROLD TASKINGS
> (b) (7)(E) @ice.dhs.gov>; DCLD-ECU_Taskings <
> @ice.dhs.gov>
> **Subject:** RE: PLAnet Task Assigned
>
> I'm writing to ask for some clarification of this tasking. In the Documents section, the attachment titled "ICE response – overview of voluntary work program" is blank. Are we waiting for ERO to draft the overview? If so, when should we expect to receive that draft? If our work on the tasking is due at noon tomorrow, I'm concerned we're going to be left with little time to review the overview.
>
> Thank you.
>
> (b) (6), (b) (7)(C)
> Deputy Chief, DCLD
> ICE/OPLA
> 188 Harvest Lane
> Williston, VT 05495
> Ph. 802-872-
>
> ***Warning***Attorney-Client Privilege***Attorney Work Product***
> This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this e-mail has been misdirected and immediately destroy all originals and copies. Furthermore, do not print, copy or re-transmit, disseminate or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the

**From:** (b) (6), (b) (7)(C)
**Sent:** 5 Oct 2018 12:58:49 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)
**Subject:** FW: Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts
**Attachments:** 110-1.pdf, FINAL Potential Rebuttal Witness Disclosure--(b) (6), (b) (7)(C).pdf, FINAL Potential Rebuttal Witness Disclosure--Baniecke.pdf

FYI.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C)@ATG.WA.GOV>
**Date:** Thursday, Oct 04, 2018, 8:22 PM
**To:** (b) (6), (b) (7)(C)@3brancheslaw.com>, (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C)@ATG.WA.GOV>, (b) (6), (b) (7)(C) @gtlaw.com>
**Cc:** (b) (6), (b) (7)(C) (USAWAW) (b) (6), (b) (7)(C)@usdoj.gov>, (b) (6), (b) (7)(C) (b) (6), (b) (7)(C)@ice.dhs.gov>, (b) (6), (b) (7)(C) (ATG) (b) (6), (b) (7)(C)@ATG.WA.GOV>
**Subject:** Washington v. The GEO Group, Inc. - GEO's ICE Rebuttal Experts

(b) (6), (b) (7)(C) and (b) (6), (b) (7)(C)

In The GEO Group, Inc.'s disclosure of expert witnesses on September 20, 2018, GEO included two potential rebuttal experts who are current or former ICE employees: Scott Baniecki, current District Field Office Director for ICE in Ft. Snelling, Minnesota and (b) (6), (b) (7)(C), former Assistant Officer in Charge for ICE at Eloy, Arizona. It is our understanding that in order for GEO to proffer testimony from these two individuals – even as rebuttal witnesses –GEO would need to comply with ICE's *Touhy* regulations.

In previous filings in *Chen v. The GEO Group, Inc.* and in depositions noted in our case, GEO has sought to obtain testimony from current and former ICE employees without completing the *Touhy* process. This resulted in ICE intervention regarding the proffered and requested testimony.

Due to this we wanted to confirm that GEO has already complied with the *Touhy* regulations necessary for it to utilize testimony and evidence from these two ICE employees.

Please let us know as soon as possible whether ICE has confirmed that Mr. Baniecki and Mr. (b) (6), (b) (7)(C) have authority to testify about the information and material identified in GEO's Disclosures of Potential Rebuttal Expert Witnesses.

Thank you,
(b) (6), (b) (7)(C)

**From:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Sent:** Tuesday, June 12, 2018 3:09 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
(b) (6), (b) (7)(C) @ice.dhs.gov>; (b) (6), (b) (7)(C) @ice.dhs.gov>
(USAWAW) (b) (6) (7)(C) @usa.doj.gov>
**Subject:** RE: Chen v. GEO Touhy

Sure. No problem! Just keep me posted.


Sent with BlackBerry Work
(www.blackberry.com)

**From:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Date:** Tuesday, Jun 12, 2018, 6:06 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov> @ice.dhs.gov>,
(b) (6), (b) (7)(C) @ice.dhs.gov>, (b) (6), (b) (7)(C) (USAWAW)
(b) (6), (b) (7)(C) @usdoj.gov>
**Subject:** RE: Chen v. GEO Touhy

- Thanks for incorporating a number of my comments from earlier. I sent this final version to my supervisor because she was fielding questions from the SES's last week about the subpoenas. I doubt she'll have much to add but she generally checks her email into the evening hours and I will let you know if she has any comments.

I think we are still waiting to hear from about whether she or ICE will send the letter so I think we have a little bit more time.


Best,

(b) (6), (b) (7)(C)
Associate Legal Advisor
Commercial and Administrative Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
Department of Homeland Security
Tel: (202) 732-
(b) (6), (b) (7)(C) @ice.dhs.gov

\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\* This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:**     ICE-OPLA-EROLD
**Sent:**     23 Feb 2018 17:04:31 -0500
**To:**       (b) (6), (b) (7)(C);#OPLASCREmailAlerts
**Cc:**        (b) (6), (b) (7)(C)
**Subject:**  RE: ALERT NOTIFICATION -- SNA -- Class Action Lawsuit filed against CoreCivic

Thank you for your email, (b) (6), (b) (7)(C)  , copied here, will be the EROLD POC on this case.

(b) (6), (b) (7)(C)

DESK: (202) 732-
MOBILE: (202) 492-

Notice: Attorney Work Product/Privileged Communication

\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\*
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** Friday, February 23, 2018 10:36 AM
**To:** #OPLASCREmailAlerts
**Subject:** ALERT NOTIFICATION -- SNA -- Class Action Lawsuit filed against CoreCivic

### This alert may be of interest to EROLD and DCLD

This appeared in today's ICE Briefing and attached is the complaint filed against CoreCivic.

Austin American-Statesman [2/22/2018 10:32 PM, Katie Hall, 57K, TX] reports that a class action lawsuit filed in federal court Thursday argues that a company that manages immigrant detention centers – including the T. Don Hutto Center in Taylor – is violating the federal Trafficking Victims and Protection Act by forcing labor on those in the center. Martha Gonzalez – a Harris County resident who was formerly detained at one center in Laredo, one in Taylor and a third center just north of Laredo – is suing private prison company CoreCivic on behalf of herself and "all others similarly situated." Gonzalez's lawsuit says she was required to work at these detention centers under threat of isolation, retaliation and other deprivations."CoreCivic threatened detainees who refused to work with confinement, physical restraint, substantial and sustained restrictions, deprivation, violation of their liberty and solitary confinement," the lawsuit says. "CoreCivic made frequent examples of individual detainees who complained or refused to work." U.S. Immigration and Customs Enforcement contracts with CoreCivic to operate the detention center. Neither entity immediately responded to requests for comment.

From: **(b) (6), (b) (7)(C)**
Sent: 7 Jun 2017 12:23:23 -0400
To: **(b) (6), (b) (7)(C)**
Cc: **(b) (6), (b) (7)(C)**
Subject: RE: CoreCivic

Thanks

Sent with BlackBerry Work
(www.blackberry.com)

**From:** **(b) (6), (b) (7)(C)** @ice.dhs.gov>
**Date:** Wednesday, Jun 07, 2017, 11:19 AM
**To:** **(b) (6), (b) (7)(C)** @ice.dhs.gov>, **(b) (6), (b) (7)(C)** @ice.dhs.gov>
**Cc:** **(b) (6), (b) (7)(C)** @ice.dhs.gov> **(b) (6), (b) (7)(C)**
**(b) (6), (b) (7)(C)** @ice.dhs.gov>
**Subject:** RE: CoreCivic

Absolutely **(b) (6), (b) (7)(C)** The meeting is really to discuss Menocal, but I expect to ask for DOJ's preliminary thoughts on the CoreCivic case. We are also going to include Menocal on Monday's hot lit. I'll run a draft update by you later today in **(b) (6), (b) (7)(C)** absence…



**(b) (6), (b) (7)(C)** |Associate Legal Advisor
Office of the Principal Legal Advisor | DCLD
202-732-**(b) (6), (b) (7)(C)** (desk) | 202-875-**(b) (6), (b) (7)(C)** (cell)



U.S. Immigration
and Customs
Enforcement

**Attorney/Client Privilege ***Attorney Work Product**
This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).

**From:** **(b) (6), (b) (7)(C)**
**Sent:** Wednesday, June 07, 2017 12:16 PM
**To:** **(b) (6), (b) (7)(C)**
**Subject:** RE: CoreCivic

**(b) (6), (b) (7)(C)** ,

Can you just include me in the meeting invite for tomorrow?

Thanks.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** ██(b) (6), (b) (7)(C)██ @ice.dhs.gov>
**Date:** Wednesday, Jun 07, 2017, 11:07 AM
**To:** ██(b) (6), (b) (7)(C)██ @ice.dhs.gov>
**Subject:** FW: CoreCivic

██(b) (6), (b) (7)(C)██

Tomorrow, June 08, 2017, there is a call on the CoreCivic complaint which apparently may impact Menocal. Since I am on leave starting tomorrow, I thought I would notify you in case you want to assign another EROLD ALA to attend. Please let me know if there is anything I can do to assist.

Regards,

██(b) (6), (b) (7)(C)██
Associate Legal Advisor
Detention and Removal Law Section
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
202-732-████ (office)
202-441-████ (cell)
██(b) (6), (b) (7)(C)██ @ice.dhs.gov

**\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** ██(b) (6), (b) (7)(C)██
**Sent:** Wednesday, June 07, 2017 12:01 PM
**To:** ██(b) (6), (b) (7)(C)██
**Cc:** ██(b) (6), (b) (7)(C)██
**Subject:** RE: CoreCivic

Office of the Principal Legal Advisor | DCLD
202-732-███ (desk) | 202-875-███ (cell)



U.S. Immigration
and Customs
Enforcement

**Attorney/Client Privilege ***Attorney Work Product**
This document contains confidential and/or sensitive attorney/client privileged information or attorney work
product and is not for release, review, retransmission, dissemination or use by anyone other than the
intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all
originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal
Advisor, U.S. Immigration & Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE
ONLY.  FOIA exempt under 5 U.S.C. § 552(b)(5).

**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, June 07, 2017 11:40 AM
**To:** (b) (6), (b) (7)(C)
**Subject:** CoreCivic

I haven't gotten a chance to read this yet but I do find it alarming that this is happening.
I'm literally sitting in a negotiation room with CoreCivic execs (contracting reps).

Can we schedule a meeting amongst us either later this afternoon or tomorrow morning
ish time?

We can also discuss the recent ruling on the GEO case and tentative taking points with
our DOJ counterparts.

Thanks,

███

Sent with BlackBerry Work
(www.blackberry.com)

**From:** (b) (6), (b) (7)(C)
**Sent:** 11 Jul 2018 12:25:43 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)
**Subject:** RE: Depositions in Voluntary Work Program Class Action



Just a quick update on the depositions for the Washington VWP case. At this point, GEO counsel has agreed to not pursue the depositions on July 24 and 25, 2018. Apparently, they are working on a declaration instead, which is being reviewed at their headquarters, and will then be submitted directly to ICE. Please let me know if you have any questions.

Regards,

(b) (6), (b) (7)(C)
Associate Legal Advisor
Detention and Removal Law Section
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
202-732 (b) (6), (b) (7)(C) (office)
202-441 (b) (6), (b) (7)(C) (cell)
(b) (6), (b) (7)(C) @ice.dhs.gov

**\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** Monday, June 25, 2018 9:22 AM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** Depositions in Voluntary Work Program Class Action



Per our discussion on Friday, June 22, 2018, I drafted the below email for you to send to Tae Johnson regarding the upcoming depositions in the *Washington* VWP case, currently scheduled for July 24 and 25, 2018. Please let me know if you have additional questions or would like me to edit it in any way.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** <span style="background-color:red">(b) (6), (b) (7)(C)</span>
**Sent:** Thursday, September 20, 2018 7:30 PM
**To:** <span style="background-color:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background-color:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>
**Subject:** RE: Draft Letter to DOJ Fed Program re VWP issues

Gentlemen –

Please find my track-changes in the enclosed.  I'm on AWS tomorrow but will call into the DOJ call.  And if we need/want to discuss this further, let me know.

I'm also attaching the flurry of letters and responses cited in the letter.

Best,

<span style="background-color:red">(b) (6), (b) (7)(C)</span>
Associate Legal Advisor
Commercial and Administrative Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
Department of Homeland Security
Tel: (202) 732-
<span style="background-color:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** <span style="background-color:red">(b) (6), (b) (7)(C)</span>
**Sent:** Thursday, September 20, 2018 9:43 AM
**To:** <span style="background-color:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background-color:red">(b) (6), (b) (7)(C)</span>
<span style="background-color:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>
**Subject:** RE: Draft Letter to DOJ Fed Program re VWP issues

No problem, <span style="background-color:red">(b) (5)</span>


**From:** (b) (6), (b) (7)(C)
**Sent:** 5 Jun 2018 12:40:53 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)Johnson, Tae D;(b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)
**Subject:** RE: Due 06 04 3pm DSCU SENT: 18062002 , RFI - S1 - Overview of Voluntary Work Program has been created



Thank you for bringing this task to my attention. Although the topic (*i.e.*, the voluntary work program) is related, this task is separate from my inquiry to you and (b) (6), (b) (7)(C) last week. I am interested in any policies ERO has regarding the voluntary work program, aside from the PBNDS and the National Detainee Handbook. Until your email, I was unaware of this task. As (b) (6), (b) (7) notes below, I anticipate OPLA will be sent this task for review once the other components have closed. OPLA will be able to provide the summaries of the pending litigation, if requested in the task. Since the information requested is similar to what I requested from you and (b) (6), (b) last week, can you send me the response ERO uploaded? I do not want to duplicate work for you and (b) (6), (b); however, I do not have permission to access the ERO version of the task. Please let me know if you have any questions or concerns.

Thanks,

(b) (6), (b) (7)(C)
Associate Legal Advisor
Detention and Removal Law Section
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
202-732-(b) (6), (b) (7) (office)
202-441-(b) (6), (b) (7) (cell)
(b) (6), (b) (7)(C) @ice.dhs.gov

**\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** Monday, June 4, 2018 3:30 PM
**To:** ICE-OPLA-EROLD (b) (7)(E) @ice.dhs.gov>; (b) (6), (b) (7)(C) @ice.dhs.gov>;
(b) (7)(E) @dhs.gov
**Cc:** (b) (6), (b) (7)(C) @ice.dhs.gov>; Johnson, Tae D (b) (6), (b) (7)(C)@ice.dhs.gov>;
(b) (6), (b) (7)(C) @ice.dhs.gov>; (b) (6), (b) (7)(C) @ice.dhs.gov>;

**Cc:** (b) (6), (b) (7)(C) @bfwlaw.com>
**Subject:** GEO Lawsuit

Hi ▮:

I hope you had good and restful holidays.  The plaintiffs in the GEO lawsuit have asked for a videotaped inspection of the Aurora Facility on February 27.  That may be something DHS/ICE will not allow, so we wanted to loop you into the conversation.  I'm happy to discuss further on the phone at your convenience.

Regards,



 

Attorney                                      T 303.796.▮▮
                                               E ▮▮@bfwlaw.com



**bfwlaw.com**
6400 S. Fiddlers Green Circle, Suite ▮▮
Greenwood Village, Colorado 80111

CONFIDENTIALITY NOTICE: This message, the attachments, and any metadata contained in this email may be confidential and privileged.

Genco Op. No. 92-8 (INS), 1992 WL 1369347

U.S. Department of Justice

Immigration and Naturalization Service

General Counsel's Office

Legal Opinion: The Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities

**G. H. Kleinknecht, Associate Commissioner, Enforcement**

February 26, 1992

## I. QUESTION PRESENTED

**\*1** Does work performed by alien detainees in a detention facility operated by or contracted through the Immigration and Naturalization Service (INS or the Service) subject the Service to the employer sanctions provisions of the Immigration and Nationality Act (the Act)?[1]

## II. SUMMARY CONCLUSION

No. Alien detainees who perform work for the INS while in INS custody in a contract or Service detention facility are not considered "employees" for purposes of employer sanctions.

## III. LEGAL ANALYSIS

Background. On April 22, 1988, the Office of General Counsel opined to the Field Advisory Committee that inmates who perform duties in federal and state penal institutions are not subject to the employer sanctions provisions as set forth in § 274A of the Act.[2] At that time the issue of work performed by alien detainees in INS operated or controlled detention facilities was not addressed. This supplemental memorandum is therefore provided.

Analysis. In 1988, we determined that inmates who perform duties pursuant to prison work programs and receive gratuity for so doing are not subject to employer sanctions provisions as set forth in § 274A of the Act because no employer/employee relationship is ever formed. Inmates may be required to participate in an institutional work program, and for that participation receive remuneration. Work performed is for the purpose of rehabilitation and institutional maintenance, not compensation. Therefore, an inmate who participates in a work program in a state or federal facility is not doing so "for wages or other remuneration" and is not therefore an "employee" as defined by 8 C.F.R. § 274a.1(f). Likewise, the facility does not engage an inmate's services "for wages or other remuneration" and cannot be an employer as defined by 8 C.F.R. § 274a.1(g).

Similarly, an alien detained in an INS facility does not meet the definition of "employee", nor does the INS meet the definition of "employer." A detainee performs work for institution maintenance, not compensation. The allowance paid to a detainee for work performed is specifically provided for by 8 U.S.C. § 1555(d) and currently limited by Congress to $1 per day.[3] This payment does not constitute an appointment of the detainee to the position of a federal employee.[4] The allowance is not subject to the provisions of the Fair Labor Standards Act (FLSA).[5]

Further, the specific Congressional intent behind the passage of the employer sanctions provision of the Act was to deter illegal immigration by removing the lure of employment. Work performed by alien detainees is incident to their detention. Therefore, this is certainly not the type of employment to which Congress referred as creating a magnet for illegal aliens.

**\*2** Therefore, we conclude that the work performed by alien detainees in INS custody does not fall within the purview of the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

employer sanctions provisions.

/s/ GROVER JOSEPH REES III
General Counsel

**Attachment**

Footnotes

1      8 U.S.C. 1324a.

2      Office of General Counsel Legal Opinion, entitled "Form I-9 Requirements: Inmates Employed Within Federal and State Institutions," dated April 27, 1988.

3      FY 1978 Appropriation Act, P. L. 95-86, 91 Stat. 426(August 2, 1977).

4      Alvarado-Guevara et al. v. INS, No. 90-1476, (Fed. Cir. Jan.6, 1992). Although this case is not citable as precedent, the Court held that detainees lacked proper appointment to be considered employees of the Service.

5      29 U.S.C. §§ 201 et seq.

Genco Op. No. 92-8 (INS), 1992 WL 1369347

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.



# Battered Spouse/Child

- Exceptions include disclosures "to an officer of the [DHS], or any federal or State law enforcement agency."  In addition, any information provided under this part may be used for the purposes of enforcement of the INA or in any criminal proceeding.  Unlike the VAWA restriction, the battered spouse/child disclosure restriction extends only to information that the subject provided to the agency in support of the application for waiver and does not extend to all information relating to the subject



U.S. Immigration
and Customs
Enforcement



# **ICE**

# **S Visa Information Confidential Informant**

- No specific statutory prohibition on the disclosure of S Visa Information or information contained in confidential informant (CI) files. However, it is ICE practice to protect this information to the greatest extent possible under the law. (b)(7)(E)

(b)(7)(E)



U.S. Immigration and Customs Enforcement



# ICE

# Asylum

■ The agency has determined that information "pertaining to" an asylum application would include any information from which the public could reasonably infer that an asylum claim was filed. In addition to discretionary disclosures authorized by the Secretary of Homeland Security, the regulations allow disclosures to any U.S. Government official or contractor who has a need for the information in connection with: 1) the adjudication of an asylum claim; 2) The reconsideration of a request for a credible fear interview; 3) the defense of any legal action arising out of the adjudication of an asylum claim or credible fear determination (or lack thereof); 4) the defense of any legal action where the adjudication of an asylum claim or credible fear determination is a part; or 5) any federal criminal or civil investigation.



U.S. Immigration
and Customs
Enforcement

2018-ICLI-00052 5224



# Asylum

- The agency may also release such information to federal, state or local courts that considering any legal actionarising from the adjudication or failure to adjudicate the asylum claimArising from the proceedings of which the asylum application or credible fear determination was a part.Secretary of Homeland Security has authorized the systematic disclosure of asylum information to Canada for asylum adjudication purposes and to U.S. federal agencies for intelligence purposes.  As a matter of policy, the agency has applied the asylum confidentiality provisions to refugee applicants as well. Information relating to a request for refugee status may be contained on Forms I-730, I-602, and I-643, as well as on any accompanying documents to support claim for refugee status.



U.S. Immigration and Customs Enforcement

in PLAnet (in case you wanted to contact CALD and participate). Please let me know if you have any questions!

CALD PLAnet note:
"Spoke with CFO Appropriations Liaison who suggested setting up a call with approps staffer to discuss issue. Waiting on CFO to set up call."

**EROLD**- Internal - Minimum Wage Lawsuits on ICE's CDF - 05-29-2018 - ███



**DCLD**- Internal - Minimum Wage Lawsuits on ICE's CDF - 05-29-2018 - ███,

**CALD**- Internal - Minimum Wage Lawsuits on ICE's CDF - 05-29-2018 -

Thanks,
███
Associate Legal Advisor
Executive Communications Unit
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
500 12th Street SW, Room ███
Washington, DC 20536
Office: (202) 732-███
Mobile: (703) 587-███



U.S. Immigration
and Customs
Enforcement

** Warning *** Attorney/Client Privilege *** Attorney Work Product ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** ███
**Sent:** Tuesday, May 29, 2018 8:39 AM

**To:** OPLA Tasking <span style="background:red">(b) (7)(E)</span> @ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span>
<span style="background:black">(b) (6), (b) (7)(C)</span>@ice.dhs.gov>
**Cc:** <span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span>
<span style="background:red">(b) (6), (b) (7)(C)</span>@ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>
**Subject:** FW: Minimum wage lawsuits on ICE's CDF

Good Morning <span style="background:black">(b) (6), (b) (7)(C)</span> /OPLA,

Follow up on Minimum Wage lawsuits:

**The Hill asked** Can ICE report that the agency is taking all actions possible to resolve this problem outside of the courtroom, including working with DOL to determine the viability of issuing policy guidance. Please advise by June 4th. Thanks

Very Respectfully,

<span style="background:red">(b) (6), (b) (7)(C)</span>
Appropriations Liaison
Office of Chief Financial Officer
U.S. Immigration and Customs Enforcement
<span style="background:black">(b) (6), (b) (7)(C)</span> @ice.dhs.gov
202-732<span style="background:black">(b) (6), (b) (7)(C)</span> (desk)
202-674<span style="background:black">(b) (6), (b) (7)(C)</span> (cell)

**From:** <span style="background:red">(b) (6), (b) (7)(C)</span> (Appropriations) [mailto:<span style="background:red">(b) (6), (b) (7)(C)</span>@appro.senate.gov]
**Sent:** Friday, May 25, 2018 6:59 PM
**To:** <span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span> (Appropriations)
<span style="background:red">(b) (6), (b) (7)(C)</span>@appro.senate.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span> @mail.house.gov>; <span style="background:black">(b) (6), (b) (7)(C)</span>
<span style="background:red">(b) (6), (b) (7)(C)</span> @mail.house.gov>
**Cc:** <span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span>
<span style="background:red">(b) (6), (b) (7)(C)</span>@ice.dhs.gov>; <span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>; <span style="background:black">(b) (6), (b) (7)(C)</span>
<span style="background:red">(b) (6), (b) (7)(C)</span> @ice.dhs.gov>
**Subject:** RE: Minimum wage lawsuits on ICE's CDF

<span style="background:black">(b) (6), (b) (7)(C)</span>

I appreciate the sensitivity. Can ICE report that the agency is taking all actions possible to resolve this problem outside of the courtroom, including working with DOL to determine the viability of issuing policy guidance?  Please let me know.

Thanks,
<span style="background:black">(b) (6), (b) (7)(C)</span>



**From:** ████ [mailto: ████@ice.dhs.gov]
**Sent:** Thursday, May 17, 2018 11:05 AM
**To:** ████ (Appropriations) ████@appro.senate.gov>; ████ (Appropriations) ████@appro.senate.gov>; ████ ████@mail.house.gov>; ████ ████@mail.house.gov>
**Cc:** ████ ████@ice.dhs.gov>; ████ ████@ice.dhs.gov>; ████@ice.dhs.gov>; ████ ████@ice.dhs.gov>
**Subject:** Minimum wage lawsuits on ICE's CDF

Good morning ████,

OPLA advised us that due to the sensitive of pending litigation cases that the only information we can provide you at this time is the letter from Acting Director Homan to Rep Loudermilk from last month.

There have been many discussions with DOJ on these cases, all of which are still in litigation and are quite sensitive. Our leadership has decided to keep the answers very basic for now.


Very Respectfully,

████
Appropriations Liaison
Office of Chief Financial Officer
U.S. Immigration and Customs Enforcement
████ @ice.dhs.gov
202-732-████ (desk)
202-674-████ (cell)



**From:** ████ (Appropriations) [mailto:████@appro.senate.gov]
**Sent:** Thursday, May 10, 2018 2:58 PM
**To:** ████ ████@ice.dhs.gov>; ████ ████@ice.dhs.gov>; ████ ████@ice.dhs.gov>; ████@ice.dhs.gov>
**Cc:** ████ (Appropriations) ████@appro.senate.gov>; ████ ████@mail.house.gov>; ████@mail.house.gov>; ████ ████@mail.house.gov>
**Subject:** Minimum wage lawsuits

Good day,

I hope you are having a pleasant day.

Please see the attached letter (recognize it's a House letter but it articulates the issue well). Can you please provide us a quick rundown on what, if anything ICE is doing as these lawsuits,

charging detention facilities with NOT providing minimum wages for detainees, continue against vendors who are providing opportunities for detainees to voluntarily work at ICE detention facilities?

It seems some coordination with DOL (and possibly DOJ) and some administrative actions could help head off some absurd outcomes.

Thanks,



**To:** DCLD-ECU_Taskings(b) (7)(E)                    @ice.dhs.gov>
**Subject:** PLAnet Task Assigned

You have been assigned a PLAnet Task:

101350- RETASK 1- SES- S1 / Overview of Voluntary - 07-10-2018

Description:

BACKGROUND: The Front Office has asked for a bit more information regarding the attached
"Overview of Voluntary Work Program." Need more information on wages: -Do we know what
average is? -How is the $ flow established? -What is the basis of lawsuit?
INSTRUCTIONS: Review and comment
COMPONENTS: ERO ODSA
OPLA DIVISIONS: EROLD DCLD
ICATT Link: (b) (7)(E)

Due Date:

7/11/2018 8:00 AM

Link:

(b) (7)(E)

Sincerely,

PLAnet Tasking Team

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

The Honorable Barry Loudermilk
U.S. House of Representatives
Washington, DC 20515

Dear Representative Loudermilk:

Thank you for your March 7, 2018 letter regarding litigation challenging the Voluntary Work Program at U.S. Immigration and Customs Enforcement (ICE) contract detention facilities.

ICE takes seriously all legal challenges with the potential to impact its detention operations, even when ICE is not a party to the litigation at issue. Accordingly, we are tracking closely the litigation referenced in your letter and are working with the Department of Justice to determine the appropriate path forward.

Thank you again for your letter and your interest in this important issue. The co-signers of your letter will receive separate, identical responses.

Sincerely,

Thomas D. Homan
Deputy Director and Senior Official
Performing the Duties of the Director

Ref. 100198

www.ice.gov

| | |
|---|---|
| **From:** | (b) (6), (b) (7)(C) |
| **Sent:** | 8 Jun 2018 12:02:34 +0000 |
| **To:** | (b) (6), (b) (7)(C) |
| **Subject:** | RE: The GEO Group Request.pdf |

(b) (6), (b) (7)(C), thanks for this.

I heard from the AUSA assisting us in the Washington and Chen cases that there is a meeting on Monday with GEO and ICE to discuss "the issues in this litigation." Have either of you heard anything about that? ((b) (6), (b) (7)(C) wasn't aware but is also checking on it.)

Thanks,

(b) (6), (b)

(b) (6), (b) (7)(C) |Associate Legal Advisor
**District Court Litigation Division**
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
202-732-(b)(6) (desk) | 202-875-(b)(6) (cell)

**Attorney/Client Privilege ***Attorney Work Product**
This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).

---

**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, June 06, 2018 4:03 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** FW: The GEO Group Request.pdf

 – Per our conversation, see attached.

My understanding is that (b) (6), (b) (7)(C) is working on a response...?

Best,

(b) (6), (b) (7)(C)
Associate Legal Advisor
Commercial and Administrative Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
Department of Homeland Security
Tel: (202) 732-(b)(6) (b)(7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov

*** Warning *** Attorney/Client Privilege *** Attorney Work Product *** This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or

| | |
|---|---|
| **From:** | ▮(b) (6), (b) (7)(C)▮ |
| **Sent:** | 16 Feb 2018 12:06:40 -0500 |
| **To:** | ▮(b) (6), (b) (7)(C)▮ |
| **Cc:** | ▮(b) (6), (b) (7)(C)▮ |
| **Subject:** | RE: VWP Class Action at Adelanto |

▮,

Here is AFOD ▮(b) (6), (b) (7)(C)▮ contact info:
(760) 561-▮▮ - Office
(310) 628-▮▮ - cell

I copied him on this email. Once you guys set up a time, please let me know what number to call. I only ask that you give me at least 30 minutes' notice.

Thank you,


▮(b) (6), (b) (7)(C)▮
Deputy Chief Counsel
213-948▮▮
Sent with BlackBerry Work
(www.blackberry.com)

**From:** ▮(b) (6), (b) (7)(C)▮ @ice.dhs.gov>
**Date:** Friday, Feb 16, 2018, 5:47 AM
**To:** ▮(b) (6), (b) (7)(C)▮ @ice.dhs.gov>
**Subject:** VWP Class Action at Adelanto

Good Morning, ▮▮,

GEO submitted a letter to ICE Director Homan (see attached) regarding the voluntary work program class actions. OPLA leadership will be meeting next week with GEO counsel. DCLD, CALD, and EROLD will be briefing management next Tuesday, February 20, on developments with the cases. In preparation for this briefing, I will need to speak with the AFOD or DFOD at Adelanto today, February 16, 2018. I have not notified the AFOD or DFOD yet and am hoping you can advise me on who you would recommend I speak with today. You are welcome to participate in the call as well. Due to the time zone difference, I hope to complete this call any time before 2:00 PM EST. Please let me know if you have any questions or concerns.

Thanks,

▮(b) (6), (b) (7)(C)▮
Associate Legal Advisor
Detention and Removal Law Section
Enforcement and Removal Operations Law Division
Office of the Principal Legal Advisor
DHS U.S. Immigration and Customs Enforcement
202-732-▮▮ (office)

I am quickly reviewing the declaration and don't see any showstoppers. Can DCLD take the lead on cleaning up the track changes and setting up time to review this with Tae. Please include (b) (6), (b) (7)(C) from CALD on any meetings with Tae.

Thanks,
(b) (6), (b) (7)(C)

**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, August 1, 2018 10:13 AM
**To:** (b) (6), (b) (7)(C)                                @ice.dhs.gov>; (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C) @ice.dhs.gov>; (b) (6), (b) (7)(C)                       @ice.dhs.gov>; (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)      @ice.dhs.gov>
**Subject:** FW: VWP

We really need to meet on this today as it appears that the issue is going to be forced by a hearing scheduled tomorrow. Does everyone have some time to meet now or after Chiefs?

The AUSA is chomping to get on a conference call with the attorneys to figure out next steps, but I think ICE needs ot figure out our position as it relates to Tracy's declaration, and whether to move forward with our own declaration.

(b) (6), (b) (7)(C)
Chief, Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
(202) 732-(b)(6), (b) (Desk)
(202) 300-(b)(6), (b) (Mobile)

*** WARNING *** ATTORNEY/CLIENT PRIVILEGE *** ATTORNEY WORK PRODUCT ***
This document contains confidential and/or sensitive attorney/client privileged information or attorney work product and is not for release, review, retransmission, dissemination or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document must be approved by the Office of the Principal Legal Advisor, U.S. Immigration & Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY. FOIA exempt under 5 U.S.C. § 552(b)(5).

**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, August 1, 2018 9:31 AM
**To:** (b) (6), (b) (7)(C)            @ice.dhs.gov>
**Subject:** VWP

Hi 

To add to the VWP mess, (b) (6), (b) hearing is actually tomorrow. She provided the wrong date. The AUSA also emailed me last night and I am going to be speaking to her today about the Valerio declaration. I think that (b) (5)

(b) (5)



*Office of Acquisition Management*
**U.S. Department of Homeland Security**
801 I Street NW 9ᵗʰ Floor
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

June 21, 2018

The GEO Group, Inc.
██████████, Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53ʳᵈ Street
Boca Raton, Florida 33487

**Subject: Denial of Request for Equitable Adjustment for Contract No. HSCEDM-
11-D-00003 Aurora Contract Detention Facility, CO dated April 18, 2018**

Dear Ms. ██████,

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ)
received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated
April 18, 2018, for Contract No. HSCEDM-11-D-00003, Aurora ICE Processing Center.
Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in
the amount of $1,928,433.38 in connection with the defense of the lawsuit *Menocal v. The GEO
Group, Inc.,* No. 1:14-cv-02887-JLK-MEH pending in the U.S. District Court for the District of
Colorado.

GEO is submitting the REA under Contract No. HSCEDM-11-D-00003, Changes Clause at FAR
52.243-1, Alt. I (Apr 1984), for a "constructive change due to incomplete performance
specifications and standards." GEO included a four-page attachment to the REA that had
numerous items recording invoices submitted by several entities, including: Norton Rose
Fulbright; Precision Discovery; Burns, Figa & Will; Holland & Knight; and Vaughan &
DeMuro. These invoice entries are marked as related to the case of *Alejandro Menocal et al v.
The GEO Group, Inc.*. The fees and expenses for all invoices total $1,928,433.38. GEO noted in
the REA that Norton Rose Fulbright is GEO's primary law firm and that this firm is assisted by
local counsel and an e-discovery service provider. No other supporting documentation was
provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request.
Therefore, I have determined that the REA should be denied in its entirety. The basis for this
determination is as follows:

1. There have been no constructive changes to the terms of the Contract. A constructive
   change occurs when a contractor performs work beyond the contract requirements,
   without a formal order under the Changes clause, either due to an informal order from or
   through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of
   Homeland Security*, CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The contractor has the

burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause at FAR 52.243-1, Atl. 1, GEO fails to identify any express changes in the terms of the Contract and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the Performance Work Statement (PWS) and the contracting officer has not required the contractor to perform work beyond the requirements of the contract terms. (Contract, Section G-2.). The FAR 52.243-1 clause for Changes – Fixed-Price (Aug 1987) – Alternate I (Apr 1984) was incorporated by reference into the contract at Section I – Contract Clauses, at contract inception in 2011. This is a firm-fixed price performance-based contract. As such, the risk of performance, including the burden of administering the contract, falls to the contractor. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2.  The performance specifications and standards are not "incomplete" and are not defective. The Contract, as awarded in 2011, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (Contract, Section H-5, item 10.). Specifically, the contract is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (PBNDS 2008 at Part 5, § 33 and see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00026). Furthermore the award document and contract line item structure set forth the rate of reimbursement for the program. (OF 336, CLIN x004, dated September 15, 2011). Accordingly, the service provider has been on notice about these terms since contract inception, when the performance based contract was negotiated.

3.  GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the contract, GEO is required to provide detention services and ensure compliance with all applicable federal, state, and local work safety laws and regulations. (Contract, Section H-5 and H-17). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by the FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (202) 732-████ or by email at (b) (6), (b) (7)(C) @ice.dhs.gov

Very Respectfully,

(b) (6), (b) (7)(C)

Contracting Officer

www.ice.gov

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



U.S. Immigration
and Customs
Enforcement

June 21, 2018

The GEO Group, Inc.
■■■■■■■■■■■■, Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

**Subject: Denial of Request for Equitable Adjustment for Contract no. HSCEDM-
15-D-00015, Northwest Detention Center dated April 18, 2018**

Dear Ms. Martin,

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ)
received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated
April 18, 2018, for contract No. HSCEDM-15-D-00015, Northwest Detention Center.
Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in
the amount of $595,160.69 in connection with the defense of the lawsuits *State of Washington v.
The GEO Group, Inc., No. 3:17-cv-05806-TLF,* pending in the U.S. District Court for the
Western District of Washington, and *Chen v. The GEO Group Inc., No. 3:17-cv-05769-RJB,*
pending in the U.S. District Court for the Western District of Washington.

GEO is submitting the REA under contract No. HSCEDM-15-D-00015, Changes Clause at FAR
52.243-1, Alt. 1 (Apr 1984) for a "constructive change due to incomplete performance
specifications and standards." GEO included a one-page attachment to the REA that had nine-
line items recording invoices submitted by Norton Rose Fulbright and III Branches, PLLC to
GEO for the case of *Chao Chen v. The GEO Group, Inc.* The fees and expenses for all invoices
total $113,123.35. GEO also included another one-page attachment to the REA that had 16-line
items recording invoices submitted by Norton Rose Fulbright, III Branches, PLLC and Precision
Discovery. These invoice entries are marked as related to "Washington W&H Complaint." The
fees and expenses for all invoices totaled $482,037.44. GEO noted in the REA that Norton Rose
Fulbright is GEO's primary law firm and that this firm is assisted by local counsel and an e-
discovery service provider. No other supporting documentation was provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request.
Therefore, I have determined that the REA should be denied in its entirety. The basis for this
determination is as follows:

1. There have been no constructive changes to the terms of the contract. A constructive
   change occurs when a contractor performs work beyond the contract requirements,

without a formal order under the Changes clause, either due to an informal order from or through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of Homeland Security*, CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The contractor has the burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause at FAR 52.243-1, Alt. 1, GEO fails to identify any express changes in the terms of the contract and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the contract and the contracting officer has not required the service provider to perform work beyond the requirements of the contract terms. *See* Contract, Section G.1.1. The FAR 52.243-1 clause for Changes – Fixed-Price (Aug 1987) – Alternate I (Apr 1984) was incorporated by reference into the contract at Section I – Contract Clauses, at contract inception in 2015. This contract is a firm-fixed price performance-based contract. As such, the risk of performance, including the burden of administering the contract, falls to the contractor. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2. The performance specifications and standards are not "incomplete" and are not defective. The contract, as awarded in 2015, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (Contract, Section C-Performance Work Statement, Section I.E.-Performance). Specifically, the contract is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00008). Furthermore the contract award document and contract line item structure set forth the rate of reimbursement for the program. (SF 26, CLINs x003, dated September 24, 2015). Accordingly, the contractor has been on notice about these terms since contract inception, when the performance-based contract was negotiated.

3. GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the contract, GEO is required to provide detention services and ensure compliance with all applicable laws, regulations, policies and procedures. (Contract, Section C-Performance Work Statement, I.D.-Partnership Philosphy, E.-Performance, and F.-Ambiguities). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the contract terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this contract are governed by FAR 52.233-1 - Disputes and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

www.ice.gov

If you have any questions regarding this matter, please contact me at (949) 425-████ or by email at (b) (6), (b) (7)(C)@ice.dhs.gov

Thank you,

Very Respectfully,

(b) (6), (b) (7)(C)

Contracting Officer

*Office of Acquisition Management*

**U.S. Department of Homeland Security**
24000 Avila Road, Suite 3104
Laguna Niguel, CA 92677



**U.S. Immigration
and Customs
Enforcement**

June 21, 2018

The GEO Group, Inc.
(b) (6), (b) (7)(C), Executive VP, Contract Admin
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

(b) (6), (b) (7)(C)

Acting City Manager
City for Adelanto
10400 Rancho Road
Adelanto, CA 92301

**Subject: Denial of Request for Equitable Adjustment for IGSA No. EROIGSA-11-0003 Adelanto Detention Facility, CA dated April 18, 2018**

Dear Ms. ███ and Ms. ███,

Immigration and Customs Enforcement (ICE)/Office of Acquisition Management (OAQ) received a Request for Equitable Adjustment (REA) from The GEO Group, Inc. (GEO) dated April 18, 2018, for IGSA No. EROISA-11-0003, Adelanto Detention Facility, CA. Specifically, the REA is for legal fees and expenses incurred by GEO through March 31, 2018 in the amount of $139,059.96 in connection with the defense of the lawsuit *Raul Novoa v. The GEO Group, Inc.,* No. 5:17-cv-02514-JGB-SHK pending in the U.S. District Court for the Central District of California.

GEO is submitting the REA under IGSA no. EROIGSA-11-0003, Changes Clause, Article X.B. for a "constructive change due to incomplete performance specifications and standards." GEO included a one-page attachment to the REA that had four-line items recording invoices submitted by Norton Rose Fulbright to GEO for the case of *Novoa, Raul, et al. v. GEO.* The fees and expenses for all invoices total $139,059.96. GEO noted in the REA that Norton Rose Fulbright is GEO's primary law firm and that this firm is assisted by local counsel and an e-discovery service provider. No other supporting documentation was provided with the REA.

ICE/OAQ has carefully reviewed the REA and finds no legal basis to pay any part of the request. Therefore, I have determined that the REA should be denied in its entirety. The basis for this determination is as follows:

1. There have been no constructive changes to the terms of the IGSA. A constructive change occurs when a contractor performs work beyond the contract requirements, without a formal order under the Changes clause, either due to an informal order from or through the fault of the Government. *See Nu-Way Concrete Co., Inc. v. Dep't of Homeland Security*, CBCA No. 1411, 11-1 BCA ¶ 34636, (2010). The service provider has the burden of demonstrating a constructive change. *Id.* Although GEO's REA cites to the Changes Clause Article X.B., GEO fails to identify any express changes in the terms of the IGSA and fails to show a constructive change. In fact, there have been no relevant changes to the terms or scope of the IGSA and the contracting officer has not required the service provider to perform work beyond the requirements of the IGSA terms. This IGSA is a firm-fixed price performance-based contracting vehicle. As such, the risk of performance, including the burden of administering the IGSA, falls to the service provider. Where there is no change to the contract, whether expressly or constructively, an equitable adjustment is not appropriate.

2. The performance specifications and standards are not "incomplete" and are not defective. The IGSA, as awarded in 2011, included a requirement to house detainees and perform related detention service in accordance with the Performance Based National Detention Standards (PBNDS). (See IGSA, Article V). Specifically, the IGSA is clear about the terms and conditions of the Voluntary Work Program. The PBNDS outlines the purpose, scope, and expected outcomes of the program (PBNDS 2008 at Part 5, § 33 and see PBNDS 2011 (2016 Revisions) at Part 5.8, as incorporated in Mod P00024). Furthermore the IGSA award document and contract line item structure set forth the rate of reimbursement for the program. (SF 347, CLIN 0007, dated May 31, 2011). Accordingly, the service provider has been on notice about these terms since contract inception, when the performance-based contract was negotiated.

3. GEO's legal fees and expenses are not cognizable costs under the contract terms or under FAR 31.205-47. Under the terms of the IGSA, GEO is required to provide detention services and ensure compliance with all applicable laws, regulations, policies and procedures. (See IGSA, Article III.B.). GEO's defense of these private lawsuits is a defense of its contract performance.

Based on the above, GEO's REA is denied in its entirety. As a threshold matter, GEO has failed to show its entitlement to such a modification under the IGSA terms or applicable laws and regulations. Additionally, GEO has failed to address the reasonableness or provide adequate supporting data for the quantum sought. While the government denies this REA in its entirety, please note that disputes under this IGSA are governed by the Disputes Clause at Article X.C. and the Contract Disputes Act (41 U.S.C. §§ 7101-7109).

If you have any questions regarding this matter, please contact me at (949) 425-████ or by email at ████@ice.dhs.gov

Thank you,

Very Respectfully,

**(b) (6), (b) (7)(C)**

Contracting Officer



| From: | (b) (6), (b) (7)(C) | @ice.dhs.gov> |
| To: | (b) (6), (b) (7)(C) (ACF) (b) (7)(E) (b) (7)(E) | (b) (6), (b) (7)(C) >" |
| Subject: | RE: (b) (6), (b) (7)(C)  A# (b) (6), (b) (7)(C) |
| Date: | 2016/08/11 13:21:31 |
| Priority: | Normal |
| Type: | Note |

Good Morning,

Thank you for the update. At this time, I'd prefer the attorney not to have my contact information as I do not want her to know that HSI has an interest in her client. I've also been coordinating with ICE ERO (b) (6), (b) (7)(C) regarding (b) (6), (b) (7)(C) and hope to make contact with him once he is in ICE custody. I will also reach out to the Guatemalan Consulate.

One question: What was the attorney's reaction upon hearing it was determined (b) (6), (b) (7)(C) is an adult and is being transferred to ICE? I am trying to determine if the attorney knew (b) (6), (b) (7)(C) was not a juvenile prior to filling out his G-28.

Thank you for reaching out and for all of the information you have provided!

Thanks,

(b) (6), (b) (7)(C)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, et al, Plaintiffs

v.

JANET RENO, Attorney General of the United States, et al., Defendants

Case No. CV 85-4544-RJK(Px)

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement (the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

**I DEFINITIONS**

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

7. The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with correctional facilities.

## II SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall

initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of the Agreement attached hereto as Exhibit 2.

## III CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

## IV STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

## V PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19 (i) within three (3) days, if the minor

was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

1. as otherwise provided under Paragraph 13 or Paragraph 21;

2. as otherwise required by any court decree or court-approved settlement;

3. in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4. where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B. For purposes of this Paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

**VI GENERAL POLICY FAVORING RELEASE**

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

**A. a parent;**

**B. a legal guardian;**

**C. an adult relative (brother, sister, aunt, uncle, or grandparent);**

**D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;**

**E. a licensed program willing to accept legal custody; or**

**F. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.**

15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

A. provide for the minor's physical, mental, and financial well-being;

B. ensure the minor's presence at all future proceedings before the INS and the immigration court;

C. notify the INS of any change of address within five (5) days following a move;

D. in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

E. notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F. if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this Paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian in writing seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

18. Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

**VII INS CUSTODY**

19. In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier. All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20. Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or

the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21. A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

> A. has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

>> i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

>> ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.);

> As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

> B. has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

> C. has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc. This list is not exhaustive.);

> D. is an escape-risk; or

> E. must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

22. The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

A. the minor is currently under a final order of deportation or exclusion;

B. the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

C. the minor has previously absconded or attempted to abscond from INS custody.

23. The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24A. A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B. Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770; (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services providers compiled pursuant to INS regulation (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

## VIII TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except

    A. when being transported from the place of arrest or apprehension to an INS office, or

    B. where separate transportation would be otherwise impractical.

When transported together pursuant to Clause (B) minors shall be separated from adults. The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26. The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14. The INS may, in its discretion, provide transportation to minors.

## IX TRANSFER OF MINORS

27. Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner. No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

## X MONITORING AND REPORTS

28A. An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date

record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to the parties, including the final report referenced in Paragraph 35, so that they can submit comments on the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on an annual basis until three years after the court determines that the INS has achieved substantial compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to determine whether the INS has achieved substantial compliance with the terms of this Agreement.

**XI ATTORNEY-CLIENT VISITS**

32. A. Plaintiffs' counsel are entitled to attorney-client visits with class members even though they may not have the names of class members who are housed at a particular location. All visits shall occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

B. Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minor in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**XII FACILITY VISITS**

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32, Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23. Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit. The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff. In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

**XIII TRAINING**

34. Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training. Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

## XIV DISMISSAL

35. After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action. Until such dismissal, the court shall retain jurisdiction over this action.

## XV RESERVATION OF RIGHTS

36. Nothing in this agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

## XVI NOTICE AND DISPUTE RESOLUTION

37. This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24. The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement. Notice of a claim that defendants have violated the terms of this Agreement shall be served on plaintiffs addressed to:

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

## XVII PUBLICITY

38. Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement. The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by the parties, as set forth in Exhibit 5 attached. The parties shall pursue such other public dissemination of information regarding this Agreement as the parties shall agree.

## XVIII ATTORNEYS FEES AND COSTS

39. Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs the total sum of $_____, in full settlement of all attorneys' fees and costs in this case.

## XIX TERMINATION

40. All terms of this Agreement shall terminate the earlier of five years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement, except the following: the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors.

## XX REPRESENTATIONS AND WARRANTY

41. Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law. Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation. Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation. The undersigned, by their signatures on

behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

## EXHIBIT 1
### Minimum Standards for Licensed Programs

A. Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1. Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2. Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3. An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification.

4. Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with

appropriate reading materials in languages other than English for use during the minor's leisure time.

5. Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6. At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7. Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8. Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9. Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10. Whenever possible, access to religious services of the minor's choice.

11. Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12. A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13. Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14. Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or exclusion hearing before an immigration judge, the right to apply for political asylum or to request voluntary departure in lieu of deportation.

B. Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language and the complex needs of each minor.

C. Program rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed shall not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

D. A comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment. Individual plans shall be implemented and closely coordinated through an operative case management system.

E. Programs shall develop, maintain and safeguard individual client case records. Agencies and organizations are required to develop a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure.

F. Programs shall maintain adequate records and make regular reports as required by the INS that permit the INS to monitor and enforce this order and other requirements and standards as the INS may determine are in the best interests of the minors.

Exhibit 2
Instructions to Service Officers re:
Processing, Treatment, and Placement of Minors

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treates and shall continued to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide them a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the minor cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in INS custody from delinquent offenders. The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

**(d) Release.** The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released in the following order of preference, to:

    (i) a parent;

    (ii) a legal guardian;

    (iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

    (iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

    (v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

    (vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

**(e) Certification of custodian.** Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

    (i) provide for the minor's physical, mental, and financial well-being;

    (ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

    (iii) notify the INS of any change of address within five (5) days following a move;

    (iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

    (v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours. Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement. However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f) Suitability assessment.** An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program. A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. The assessment will also take into consideration the wishes and concerns of the minor.

**(g) Family reunification.** Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above. Such efforts at family reunification will continue so long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h) Placement in licensed programs.** A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential group, or foster care services for dependent children, including a program operating group homes, foster homes or facilities for special needs minors. Exhibit 1 of the Flores v. Reno Settlement Agreement describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (l) below;

(ii) a court decree or court-approved settlement requires otherwise;

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) where the minor must be transported from remote areas for processing or speaks an unusual language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor -

(i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is

(a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. ); or

(b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);

(ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

(iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);

(iv) is an escape-risk; or

(v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;
>
> (b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;
>
> (c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program. All determinations to place a minor in a secure facility must be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case in which he either affirmatively requests, or fails to request or refuse, such a hearing on the Notice of Custody Determination. A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review in the form attached, and (2) the list of free legal services providers compiled pursuant to 8 C.F.R. § 292a.

**(k) Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults. INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released. The Service may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner. No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

**(l) Periodic reporting.** All INS district offices and Border Patrol stations must report to the Juvenile Coordinator statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours. Information will include: (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration status, and (f) hearing dates. The Juvenile Coordinator must also be informed of the reasons for placing a minor in a medium security facility or detention facility as described in paragraph (i).

**(m) Attorney-client visits by Plaintiffs' counsel.** The INS will permit lawyers for the *Reno v. Flores* plaintiff class to visit minors even though they may not have the names of minors who are housed at a particular location. A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

**(n) Visits to licensed facilities.** In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed. The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit. The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement,, unless Plaintiffs' counsel and the facility's staff agree otherwise. In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

## EXHIBIT 3
### Contingency Plan

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in licensed programs licensed by an appropriate state agency as expeditiously as possible. An emergency is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities. An influx is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1. The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses. The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the list. The Emergency Placement List will include the facility name; the number of beds at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age); and any special services that are available.

2. The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, and (3) date placed in INS custody.

3. Within one business day of the emergency or influx the Juvenile Coordinator, or his or her designee will contact the programs on the Emergency Placement List to determine available placements. As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their

availability. To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4. In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5. Each year, the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of INS resources. The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6. The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.

## EXHIBIT 4
### Agreement Concerning Facility Visits Under Paragraph 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.

Exhibit 5
List of Organizations to Receive Information re: Settlement Agreement

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101 , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W. 4th Floor, Washington, DC 20001

Rogelio Nuñez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX 78550

### Exhibit 6
### Notice of Right to Judicial Review

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case. You may call a lawyer to help you do this. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

My office received a response from the National Identity Verification Center within the Afghan Central Civil Registration Authority. Their response, attached,

lists the year of birth as it was originally reported in his real tazkera – 20 years old as of ████ – aka born in ████ (not ████ as listed in the new tazkera). ████ aged himself down by 6 years, so give or take a month he is actually 22 or 23 years old.

Also, he may have given himself a few extra names in the new tazkera, as he is only listed as "████" in the original. The new tazkera, as it reads in the English translation, was issued 1396.12.19, aka 10 March 2018, so it was likely obtained for the purpose of providing it to ████.

Per usual, the uncle had no problem getting a tazkera for his nephew to say whatever he wanted—but luckily our contacts found the original entry in the master

ledger. When I say master ledger, it's exactly how it sounds. They have 1000s of ledger books that serve as the repository for identity records, and they're slowly being digitized. The operation is well below the international standard, and they spell Afghanistan wrong in their letterhead memos, but their information is solid. They will likely "investigate" the person who issued the tazkera with the fake year of birth, so you may have helped catch yet another corrupt Afghan bureaucrat.

We're trying to follow up locally with the uncle mentioned in the I-213, ████, who allegedly provided ████ with the Afghan passport and Ecuadorean visa. Did ████ happen to provide his Facebook information? That would be too easy.

Regards,

████

-------------------------------------------------------------------------------

(b) (6), (b) (7)(C)

**Special Agent, Diplomatic Security Service**

Assistant Regional Security Officer for Investigations (ARSO-I)

U.S. Embassy Kabul, Afghanistan

I have attached a better copy of the document as well as information developed from interviews. He claims the following:

**(b) (6), (b) (7)(C)** A# **(b) (6), (b) (7)(C)**

DOB: born on the New Year of **(b) (6), (b) (7)(C)** ),

COB: Nangahar, city of Achin District, province of  Afghanistan

Father: Haji Usman Khan, deceased

Mother: **(b) (6), (b) (7)(C)**, 45 years old

In speaking with our attorneys, it would be very helpful for us to obtain a "duplicate" of the birth certificate with a date of birth of "14 years old as of the year 1392" to prove to the Immigration Judge documents issued by the government of Afghanistan are not necessarily bona fide. Past rulings have not typically been in the government's favor. The Court will take a foreign government issued document at face value short of a contradictory document issued from the same source.

Please let us know what additional information would be helpful. We have access to interview this subject at will. Unfortunately we do not have an local officers familiar with Afghanistan. He claims his uncle **(b) (6), (b) (7)(C)** ) in Atishtom secured an official Afghanistan passport and Ecuadorean visa for him. He claims those documents were stolen in the jungle in Panama by robbers. The attached I-213 details his story.

Thanks,



**From:** (b) (6), (b) (7)(C)
**Sent:** 22 Jun 2018 17:06:18 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)
**Subject:** FW: MARENTETTE - A039 202 154 - USC Claim - DET

PRE-DECISIONAL/ATTY WORK PRODUCT

Hi, ████

Thanks for your work on this claim. (b) (5)

You conclude that (b) (5)

Your recommendation is that (b) (5)



(b) (5)

(b) (5)

Thanks for your review.

Best,
████

(b) (6), (b) (7)(C), Associate Legal Advisor
Immigration Law & Practice Division (East)
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
U.S. Department of Homeland Security
Office: (202) 732-████

*** Warning *** Attorney/Client Privilege *** Attorney Work Product ***Deliberative Process***Warning***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments

must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** OPLA USC Claims
**Sent:** Thursday, June 21, 2018 12:07 PM
**To:** (b) (6), (b) (7)(C)                      @ice.dhs.gov>
**Subject:** Fw: MARENTETTE - A039 202 154 – USC Claim - DET

**From:** (b) (6), (b) (7)(C)
**Sent:** Thursday, June 21, 2018 8:00 AM
**To:** OPLA USC Claims; USC CLAIMS ERO
**Cc:** Pincheck, Catherine; (b) (6), (b) (7)(C)                      Adducci, Rebecca J; (b)(6), (b)(7)(C)
(b) (6), (b) (7)(C)
**Subject:** MARENTETTE - A039 202 154 - USC Claim - DET

Good morning,

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending before the Detroit Immigration Court, (b) (5)

We conclude that (b) (5)

ACC (b) (6), (b) (7)(C) will serve as OCC Detroit's POC for this case.

(b) (6), (b) (7)(C)
Deputy Chief Counsel
U.S. Immigration & Customs Enforcement
333 Mount Elliott, ▉ Floor
Detroit, MI 48207
Office: 313-568-▉
Direct: 313-446-▉

*** Warning *** Attorney/Client Privilege *** Attorney  Product ***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** 22 Jun 2018 18:05:03 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** (b) (6), (b) (7)(C)
**Subject:** FW: MARENTETTE - A039 202 154 - USC Claim - DET
**Attachments:** MARENTETTE - A039 202 154 - USC Claim - DET.doc

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

HQERO Domestic Operations,

(b) (5)



Regards,

(b) (6), (b) (7)(C), Associate Legal Advisor
Immigration Law & Practice Division (East)
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
U.S. Department of Homeland Security
Office: (202) 732-

*** Warning *** Attorney/Client Privilege *** Attorney Work Product ***Deliberative Process***Warning***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** OPLA USC Claims
**Sent:** Thursday, June 21, 2018 12:07 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** Fw: MARENTETTE - A039 202 154 - USC Claim - DET

**From:** (b) (6), (b) (7)(C)
**Sent:** Thursday, June 21, 2018 8:00 AM
**To:** OPLA USC Claims; USC CLAIMS ERO
**Cc:** Pincheck, Catherine; (b) (6), (b) (7)(C) Adducci, Rebecca J; (b)(6), (b)(7)(C)
(b) (6), (b) (7)(C)
**Subject:** MARENTETTE - A039 202 154 - USC Claim - DET

Good morning,

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending before
the Detroit Immigration Court, (b) (5)

We conclude that (b) (5)

ACC (b) (6), (b) (7)(C) will serve as OCC Detroit's POC for this case.

(b) (6), (b) (7)(C)
Deputy Chief Counsel
U.S. Immigration & Customs Enforcement

333 Mount Elliott, ▮▮ Floor
Detroit, MI 48207
Office: 313-568-▮▮
Direct: 313-446-▮▮

*** Warning *** Attorney/Client Privilege *** Attorney  Product ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

| | |
|---|---|
| MEMORANDUM FOR: | Deputy Principal Legal Advisor for Field Operations, OPLA |
| | Assistant Director for Field Operations, ERO |
| FROM: | Catherine M. Pincheck, Chief Counsel |
| | Office of Chief Counsel, Detroit |
| | Rebecca J. Adducci, Field Office Director |
| | Enforcement and Removal Operations, Field Office Detroit |
| SUBJECT: | Claim to United States Citizenship |
| | Jennifer MARENTETTE, |
| | A039 202 154 |
| DATE: | June 21, 2018 |

## STATEMENT OF THE CASE

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending before the Detroit Immigration Court, (b) (5)

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8096

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



3

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



LEGAL ANALYSIS



4

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8099

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



6

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8101

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

CONCLUSION AND RECOMMENDATION



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**From:** (b) (6), (b) (7)(C)
**Sent:** 22 Jun 2018 18:28:54 +0000
**To:** (b) (6), (b) (7)(C)
**Cc:** OPLA USC Claims; (b) (6), (b) (7)(C)
**Subject:** FW: MARENTETTE - A039 202 154 - USC Claim - DET
**Attachments:** MARENTETTE - A039 202 154 - USC Claim - DET.DOC

PRE-DECISIONAL/ATTY WORK PRODUCT

Good Afternoon,



Sincerely,

(b) (6), (b) (7)(C), Associate Legal Advisor
Immigration Law & Practice Division (East)
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
U.S. Department of Homeland Security
Office: (202) 732-(b) (6), (b) (7)(C)

*** Warning *** Attorney/Client Privilege *** Attorney Work Product ***Deliberative Process***Warning***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged
information or attorney work product and/or law enforcement sensitive information. It is not for release, review,
retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this
email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-
transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments
must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This
document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of
Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** (b) (6), (b) (7)(C)
**Sent:** Friday, June 22, 2018 2:11 PM

**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** RE: MARENTETTE - A039 202 154 - USC Claim - DET

Good Afternoon,

(b) (5)

Thanks

**From:** (b) (6), (b) (7)(C)
**Sent:** Friday, June 22, 2018 2:05 PM
**To:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Cc:** (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** FW: MARENTETTE - A039 202 154 - USC Claim - DET

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

HQERO Domestic Operations,



Regards,

(b) (6), (b) (7)(C), Associate Legal Advisor
Immigration Law & Practice Division (East)
Office of the Principal Legal Advisor
U.S. Immigration & Customs Enforcement
U.S. Department of Homeland Security
Office: (202) 732-

\*\*\* Warning \*\*\* Attorney/Client Privilege \*\*\* Attorney Work Product \*\*\*Deliberative Process\*\*\*Warning\*\*\*
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information.  It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.  Please notify the sender if this email has been misdirected and immediately destroy all originals and copies.  Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information.  Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement.  This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**From:** OPLA USC Claims
**Sent:** Thursday, June 21, 2018 12:07 PM
**To:** (b) (6), (b) (7)(C)                    @ice.dhs.gov>
**Subject:** Fw: MARENTETTE - A039 202 154 - USC Claim - DET

**From:** (b) (6), (b) (7)(C)
**Sent:** Thursday, June 21, 2018 8:00 AM
**To:** OPLA USC Claims; USC CLAIMS ERO
**Cc:** Pincheck, Catherine; (b) (6), (b) (7)(C)                    Adducci, Rebecca J; (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)
**Subject:** MARENTETTE - A039 202 154 - USC Claim - DET

Good morning,

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending before the Detroit Immigration Court, (b) (5)

We conclude that (b) (5)

ACC (b) (6), (b) (7)(C) will serve as OCC Detroit's POC for this case.

(b) (6), (b) (7)(C)
Deputy Chief Counsel
U.S. Immigration & Customs Enforcement
333 Mount Elliott, ▮▮▮ Floor
Detroit, MI 48207
Office: 313-568-▮▮▮▮
Direct: 313-446-▮▮▮▮

*** Warning *** Attorney/Client Privilege *** Attorney Product ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this email has been misdirected and immediately destroy all originals and copies. Furthermore do not print, copy, re-transmit, disseminate, or otherwise use this information. Any disclosure of this communication or its attachments must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 USC §§ 552(b)(5), (b)(7).

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

MEMORANDUM FOR:    Deputy Principal Legal Advisor for Field Operations, OPLA
                   Assistant Director for Field Operations, ERO

FROM:              Catherine M. Pincheck, Chief Counsel
                   Office of Chief Counsel, Detroit

                   Rebecca J. Adducci, Field Office Director
                   Enforcement and Removal Operations, Field Office Detroit

SUBJECT:           Claim to United States Citizenship
                   Jennifer MARENTETTE,
                   A039 202 154

DATE:              June 21, 2018

STATEMENT OF THE CASE

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending
before the Detroit Immigration Court, (b) (5)

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



3

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



LEGAL ANALYSIS



4

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8112

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



7

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



8

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

## CONCLUSION AND RECOMMENDATION



9

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

MEMORANDUM FOR:    Deputy Principal Legal Advisor for Field Operations, OPLA
Assistant Director for Field Operations, ERO

FROM:    Catherine M. Pincheck, Chief Counsel
Office of Chief Counsel, Detroit

Rebecca J. Adducci, Field Office Director
Enforcement and Removal Operations, Field Office Detroit

SUBJECT:    Claim to United States Citizenship
Jennifer MARENTETTE,
A039 202 154

DATE:    June 21, 2018

STATEMENT OF THE CASE

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending
before the Detroit Immigration Court, (b) (5)

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8127

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



<u>LEGAL ANALYSIS</u>



4

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

6

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



7

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



8

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

## CONCLUSION AND RECOMMENDATION



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

| | |
|---|---|
| MEMORANDUM FOR: | Deputy Principal Legal Advisor for Field Operations, OPLA |
| | Assistant Director for Field Operations, ERO |
| FROM: | Catherine M. Pincheck, Chief Counsel |
| | Office of Chief Counsel, Detroit |
| | |
| | Rebecca J. Adducci, Field Office Director |
| | Enforcement and Removal Operations, Field Office Detroit |
| SUBJECT: | Claim to United States Citizenship |
| | Jennifer MARENTETTE, |
| | A039 202 154 |
| DATE: | June 21, 2018 |

STATEMENT OF THE CASE

Jennifer Marentette (the "claimant"), A039 202 154, is in removal proceedings pending before the Detroit Immigration Court. (b) (5)

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



2

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



3

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



LEGAL ANALYSIS



4

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



5

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

2018-ICLI-00052 8157

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**



**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

**SENSITIVE/PRIVILEGED**PRE-DECISIONAL**ATTORNEY WORK PRODUCT**

## CONCLUSION AND RECOMMENDATION



9

Pincheck, Catherine

| | |
|---|---|
| **From:** | (b) (6), (b) (7)(C) (b) (6), (b) (7)(C) > |
| **Sent:** | Monday, June 25, 2018 8:43 AM |
| **To:** | Padilla, Kenneth |
| **Cc:** | Pincheck, Catherine |
| **Subject:** | Re: USC in Proceedings; OCC is objecting to termination |

Thank you for your prompt response.



(b) (6), (b) (7)(C) ATTORNEY AT LAW
LICENSED IN ILLINOIS
(b) (6), (b) (7)(C) | EAST LANSING, MI 48823
(b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)



2018
Member

**DISCLAIMER**

This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication, and as such may be privileged and confidential. If you are not the intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

On Jun 25, 2018, at 8:41 AM, Padilla, Kenneth (b) (6), (b) (7)(C) @ice.dhs.gov> wrote:

Hello (b) (6), (b) (7)(C) ,

Thank you for your email. I believe you misunderstood my statement on the panel. The questions posed on the panel related to detaining aliens who claim U.S. citizenship. The Agency will do an analysis within 24 hours, and if there is probative evidence, the alien will be released. I did not discuss aliens in non-detained settings. It is possible for an alien to be released from detention and proceed in the non-detained setting until the Agency can confirm that he or she is actually a citizen.

Ms. Pincheck is one of the best Chief Counsel that I have in the country, and I am positive that she is doing everything correct. If the evidence confirms that your client is a citizen, I am positive Ms. Pincheck will move to terminate. In the interim, I ask for patience to allow the Agency to do its due diligence.

1

**Pincheck, Catherine**

| | |
|---|---|
| **From:** | Pincheck, Catherine |
| **Sent:** | Friday, June 15, 2018 12:59 PM |
| **To:** | (b) (6), (b) (7)(C) |
| **Subject:** | RE: USC memo/motion to terminate A039 202 154 |

No, I did not. I never received an update after documents were received (I am guessing something further was received). I had that contact with (b) (6), (b) (7)(C) and ERO to get this done. Last I heard, (b) (6), (b) (7)(C) didn't give us the documents we needed.

**From:** (b) (6), (b) (7)(C)
**Sent:** Friday, June 15, 2018 12:57 PM
**To:** Pincheck, Catherine (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** RE: USC memo/motion to terminate A039 202 154

I missed a word. I was just asking if you had read the motion to dismiss. It's that case you had contact with (b) (6), (b) (7)(C) about.

**From:** Pincheck, Catherine
**Sent:** Friday, June 15, 2018 12:56 PM
**To:** (b) (6), (b) (7)(C) (b) (6), (b) (7)(C)@ice.dhs.gov>
**Subject:** RE: USC memo/motion to terminate A039 202 154

The name isn't even familiar to me. But, I will look to be sure.

**From:** (b) (6), (b) (7)(C)
**Sent:** Friday, June 15, 2018 12:54 PM
**To:** Pincheck, Catherine (b) (6), (b) (7)(C) @ice.dhs.gov>
**Subject:** FW: USC memo/motion to terminate A039 202 154

Did you the motion to dismiss filed in this case? You are named. Here is the prayer for relief:

2018-ICLI-00052 8318

SF95 Continuation Form
Jennifer Marentette
A-039-202-154
Page 2 of 4

Chief Counsel ("OCC"), asserting that she is removable from the United States. The Claimant was placed under an Order of Supervision by ICE Enforcement and Removal Operations ("ERO").

During her initial meeting with ICE Deportation Officer (b) (6), (b) (7)(C) in Detroit, The Claimant again tried to assert her acquisition of U.S. citizenship at birth. However, when the Claimant told Officer (b) (6), (b)(7)(C) that she believed herself to be a U.S. citizen, he consulted a book, and told her that the law didn't go into effect until 1986, and that since she was born in 1985, she is not a U.S. citizen. This is incorrect as a matter of law.[1]

After yet again trying to assert that she acquired U.S. citizenship at birth, the Claimant subsequently wrongfully underwent **years** of disruption, distress and harassment by ICE ERO officers. Not only was she terrified that she would have to spend tens of thousands of dollars and years of her life resolving this issue and hoping not to be deported and separated from her family, she suffered in many other ways. She had to reduce her work schedule to a four-day work week to be available for telephone check-ins, which has caused her years of distress. The Claimant was regularly humiliated and embarrassed when ICE ERO officers contacted and stopped by her work and randomly stopped by her home, including on the day more than a year ago when she and her family lost all their possessions in a devastating house fire. The Claimant had to cancel a vacation with her family when she missed ICE ERO's phone call, and was then required to go check in at a local police station out of town. The Claimant describes going in person to ICE ERO in Detroit on multiple occasions, having taken a full day off work to travel, and having the appointments canceled by ICE ERO at the last minute; and going to ICE ERO in Detroit and being forced to stand outside in the sweltering heat for hours. The Claimant describes ICE ERO's treatment of not only herself, but all the immigrants passing through the office, as "being treated like an animal" and "wrong." Claimant met with three private attorneys for consultations, but none identified her obvious claim to U.S. citizenship.

Within 10 to 15 minutes of her first meeting with the Claimant in mid-April 2018, counsel advised her that she was a U.S. citizen with about a 90% probability (counsel needed to determine (b) (6), (b) (7)(C) birthdate to make sure that he was not under the age of 19 on her date

---

[1] The Claimant was born out of wedlock on May 12, 1985 in Sögel, Germany to a U.S. citizen active duty military father, (b) (6), (b) (7)(C) , and a German mother. (b) (6), (b)(7)(C) (b) (6), (b) (7)(C) was born on (b)(6) in Ohio, and resided in the United States until he joined the United States Army at the age of 17. At the time of the Claimant's birth, (b) (6), (b) (7)(C) was 19 years and 11 months of age, and was stationed in Germany as active duty military, from which service he was later honorably discharged. On October 9, 1985, (b) (6), (b)(7)(C) voluntarily signed a Vaterschaftsanerkennung, the German acknowledgment of legal paternity and agreement to provide support, **and all the requirements for the Claimant's acquisition of U.S. citizenship at birth were met on that date.** The Claimant's mother married her U.S. citizen active duty military stepfather, (b) (6), (b)(7)(C) who petitioned for immigrant visas for the Claimant's mother and for the Claimant. The U.S. Department of State utterly failed to identify the Claimant's U.S. citizenship, and as a result, instead of properly filing a Consular Report of Birth Abroad and issuing her a U.S. passport, they improperly issued her an immigrant visa. The Claimant grew up in the United States from the age of 10 months on, and during her middle/school and high school years, her biological parents engaged in a child support dispute in Otsego County, Michigan, which resulted in a DNA test establishing paternity with a probability of 99.99% and a Michigan court order establishing paternity and ordering support.

2. Visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

3. Detainees will be advised of their right to contact their consular representatives and receive visits from their consulate officers

4. Detainees will be advised of visiting privileges and procedures as part of the facility's admission and orientation program in a language they can understand.

5. Information about visiting policies and procedures will be readily available to the public.

6. The number of visitors a detainee may receive and the length of visits will be limited only by reasonable constraints of space, scheduling, staff availability, safety, security, and good order. The minimum duration for a visit shall be 30 minutes.

7. Visitors will be required to adequately identify themselves and register to be admitted into a facility, and safety, security and good order will be maintained.

8. A background check will be conducted on all new volunteers prior to their being approved to provide services to detainees.

9. Each new volunteer will complete an appropriate, documented orientation program and sign an acknowledgement of his or her understanding of the applicable rules and procedures and agreement to comply with them.

10. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

**Voluntary Work Program**

1. Detainees may have opportunities to work and earn money while confined, subject to the number of work opportunities available and within the constraints of safety, security, and good order.

2. Detainees will be able to volunteer for work assignments but otherwise not be required to work, except to do personal housekeeping.

3. Essential operations and services will be enhanced through productivity from detainees.

4. The negative impact of confinement will be reduced through less idleness, improved morale and fewer disciplinary incidents.

5. Detainee working conditions will comply with all applicable federal, state, and local work safety laws and regulations.

6. There will be no discrimination regarding voluntary work program access based on any detainee's race, religion, national origin, gender, sexual orientation, or disability.

7. The applicable contents and procedures in this Standard will be communicated to the detainee in a language or manner that the detainee can understand.

2018-ICLI-00052 8695