UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE STEVENS,  Plaintiff,  v.  BROADCASTING BOARD OF GOVERORS, *et al.*,  Defendants. | No. 18 C 5391  Judge Rowland |

## **DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

Nothing in plaintiff Stevens's response presents a reason to deny the defendants' summary judgment motion. The agencies conducted adequate searches and properly withheld certain information that FOIA exempts from disclosure. Summary judgment should be granted.

### Argument

Stevens complains that the agencies have not provided enough information, but the undisputed facts show: (1) that the searches by USGAM, HHS, USCIS, and USAID were adequate; and (2) that the withholdings by USAGM, HHS, USCIS, and ICE were proper.

### I. The Searches' Adequacy

Stevens says that USAGM, HHS, USCIS, and USAID have not sufficiently described their "databases" and "search methods," her theory being that the agencies' declarations do not adequately describe each agency's "general file system" and do not provide "remotely reasonable detail" about the scope and method of searching. Resp. at 3. References to "personal files," "shared drives," and "email files," Stevens says, do not satisfy an agency's obligation to explain what databases it maintains, how it selects the databases that it searches, and what types of documents the databases contain. *Id.* at 5. The problem with this argument is that the court *has already found* that the agencies' searches were adequate with respect to their scope. Dkt. 72 at 15

1

("The scope of USAGM's search was not unreasonable."), 18 ("HHS's search was reasonable"), 19 ("USCIS's original declaration makes clear that all files reasonably likely to contain responsive material were searched") (quotation omitted), 22 ("[t]he scope of search outlined by the USAID's declaration is reasonable"); *see also id.* at 21 (granting summary judgment to USGS on its search's adequacy), 25 (granting summary judgment to ICE on its search's adequacy).

What the court found lacking when it partially denied the agencies' 2020 motion for summary judgment was not the *scope* of the agencies' searches, but certain aspects of the *process*. Specifically, the court found: (1) that USAGM should have listed the search terms it employed (Dkt. 72 at 15-16); (2) that HHS should have explained how it determined it did not have a contract with David Senn (*id.* at 16); (3) that HHS should have explained how it determined it did not receive invoices from Southwest Key (*id.* at 17); (4) that HHS should have identified the search terms relating to age assessment it used (*id.*); (5) that USCIS should have used search terms "NU" and "NWU" in addition to "Northwestern University" (*id.* at 20); and (6) that USAID should have used search terms like "NWU" in addition to "Northwestern" (*id.* at 23). The agencies have now adequately addressed those issues. Mem. (Dkt. 85) at 4-5, 6-10.

A. USAGM

In response to the court's ruling that USAGM should have listed the search terms it used (Dkt. 72 at 15-16), USAGM has now explained that, although the employees who performed the initial searches have since left USAGM, there is only one methodology they could possibly have used: a search for D3 Systems's vendor code within a search database called "Momentum" for contracts from 2010 onward and in a corresponding database for contracts from before 2010. DSOF ¶ 12. Bolstering that explanation is the fact that the same search conducted today produces the same results. *Id.* USAGM has also explained that it later searched for contractual material mentioning "D3" as a contracting party or "D3" systems and searched its emails using a variety of

2

search terms: "BBG59-C-10-0104," "BBG50-P-15-0859," "BBG50-P-16-0599," "D3 Systems," "Intermedia," and the email address of USAGM's contract manager for D3 Systems. *Id*. ¶ 15.

Stevens responds that USAGM's declaration described its search of a "Momentum" database and "another system" without describing USAGM's general recordkeeping system and how those two systems fit within the system. Resp. at 4. Without that information, Stevens says, the court cannot determine that it was reasonable for USAGM not to search other locations. *Id*. But again, the court has already found that USAGM's search was adequate with respect to *scope*. Dkt. 72 at 15 ("The scope of USAGM's search was not unreasonable.").

Stevens also says that the search USAGM conducted after her administrative appeal was deficient because, even though the search yielded 1,487 additional pages, USAGM a few years later found 65 more pages. Resp. at 4. But as this court has already observed, summary judgment "turns on the search process employed, not the number of documents produced." Dkt. 72 at 16; *see also Ancient Coin Collectors Guild v. Dep't of State*, 614 F.3d 504, 514 (D.C. Cir. 2011) (search is gauged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search"); *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (issue "is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate").

Stevens also criticizes USAGM for using expanded search terms in the 2021 search and for searching in an unidentified location. Resp. at 4. But USAGM undertook that additional search voluntarily, after already having met its FOIA obligations. She also criticizes USAGM for not searching for "system records, reports, draft reports, and notes." *Id*. But USAGM has explained that it searched for *all contractual material* mentioning D3 Systems. DSOF ¶ 14.

### B. HHS

In response to the court's ruling that HHS should have (1) explained how it determined it

3

did not have a contract with David Senn (Dkt. 72 at 16), (2) explained how it determined it did not receive invoices from Southwest Key (*id*. at 17), and (3) identified the search terms relating to age assessment it used (*id*.), HHS has now complied with the ruling.

First, HHS has now explained that it determined it did not have a contract with David Senn by searching its Program Support Center's network drive for "David Senn," "Senn," and "Professor Senn," a search that returned no records indicating the existence of any contract relating to Senn, and by confirming with James De La Cruz, the *senior supervisor* of HHS's refugee resettlement office, that the office had no contractual relationship with Senn. DSOF ¶ 26.

Second, HHS has explained that it determined it did not receive invoices from Southwest Key: (1) by consulting with Government Information Specialist Glenn Voelker, who advised that any invoices would be maintained by HHS's Administration for Children and Families, or ACF; (2) by consulting with Mata Sebgoya, a policy analyst in the refugee resettlement office's policy division, who advised that Southwest Key would not have been required to submit invoices regarding expenditures for age assessments to ACF; and (3) by consulting with Senior Grants Management Specialist Bernard Morgan, who confirmed that ACF does not receive or collect invoices from grantees like Southwest Key as a standard practice and that no invoices were received or collected from Southwest Key. DSOF ¶ 29.

Third, HHS has now explained that it used the search terms: (1) "age assessment" or "age assessments"; and (2) "age" and assess* and "practice" or "protocol" or "policy" (which would have located any email containing the word "age," the root word "assess," and any of the words "practice," "protocol," or "policy"). DSOF ¶ 27.

In response, Stevens says that HHS has not explained its "recordkeeping practices" or the "system of records" that it uses. Resp. at 4. And she criticizes HHS for not providing "details" regarding "where emails are stored" or "where written paper correspondence is kept." *Id*. at 5.

4

But again, the court has already found that the *scope* of HHS's search was reasonable. Dkt. 72 at 16 ("HHS's search was reasonable").

Stevens also says that HHS has declared "in a conclusory fashion" that no documents indicated the existence of a contractual relationship between HHS and Senn without providing details on how it made the determination. Resp. at 4. And elsewhere, Stevens says that HHS has provided "no information" on how it determined that it does not have a contract with Senn. *Id*. at 7. But that was the problem with HHS's declaration the *last* time. Dkt. 72 at 16-17. As mentioned above, *this* time HHS has rectified the omission by explaining in detail how it reached that conclusion. Mem. at 5-6; DSOF ¶ 26.

Stevens also criticizes HHS for declaring that it searched its "PSC network drive" without providing further detail. Resp. at 4-5. The court can take judicial notice that HHS's Program Support Center—or PSC—handles HHS's financial management, accounting, acquisition management, grants management, and supply chain management. https://www.hhs.gov/about/agencies/asa/psc/index.html. And HHS explained that it searched the Center's *entire network drive* using the search terms "David Senn," "Senn," and "Professor Senn." DSOF ¶ 26.

Stevens also says that HHS has not provided enough detail on how its employee Mata Sebgoya determined that the refugee resettlement office did not enter into a contract with Senn. Resp. at 5. But HHS explained that Sebgoya *personally spoke* with the senior supervisor of the refugee resettlement office's field specialists (James De La Cruz), and with the project officers responsible for the Southwest Key contract, all of whom confirmed that the refugee resettlement office did not enter into contracts with medical service providers. Def. Resp. to PSOAF ¶ 9. Stevens counters that Senn was not a "medical provider" for HHS and instead conducts "forensic investigation at the request of ICE." Resp. at 5. But if Senn contracts with ICE, then there is no reason to think that he would contract with HHS.

5

Stevens insists that HHS has not identified "the process" that its employees used to determine that it did not have a contract with Senn. Resp. at 7. Once again, HHS has explained this in detail: Sebgoya spoke personally with the supervisor of the refugee resettlement office's field specialists, along with the project officers responsible for the Southwest Key contract, and all of them confirmed that the refugee resettlement office did not enter into contracts with Southwest Key. Def. Resp. to PSAOF ¶ 9. And on top of that, information specialist Garfield Daley searched HHS's Program Support Center network drive for "David Senn" and "Senn" and "Professor Senn" and found nothing indicating the existence of a contract with Senn. *Id.*

Finally, Stevens says that Senn told her that HHS's refugee resettlement office was paying his university for his services, and she says it would "defy credulity" to think that HHS could be paying for Senn's services without having a contract with him. Resp. at 7. But even if Senn told Stevens that HHS pays *his university* for some type of service, then that on its face explains why HHS would not have a contract with *Senn*.

    C.    USCIS

In response to the court's ruling that USCIS should have used search terms "NU" and "NWU" in addition to "Northwestern University" (Dkt. 72 at 20), USCIS rectified that omission. DSOF ¶¶ 35-38. Stevens responds the USCIS's declaration searched four databases without explaining "the system of records maintained by USCIS in general," which prevents the court from conducting a "meaningful review" of whether these four databases "were reasonably likely to contain responsive records." Resp. at 5. But the four databases USCIS searched are the same databases it searched the first time. *Compare* Dkt. 56 (2020 DSOF) ¶ 28 (describing search of databases known as AVANT, CRM, SAS, and WebHQ) *with* Dkt. 86 (2022 DSOF) ¶ 37 (describing search of same databases). Again, the court has already found that the *scope* of USCIS's search was adequate. Dkt. 72 at 19 ("USCIS's original declaration makes clear that all

files reasonably likely to contain responsive material were searched") (quotation omitted). The only issue was the omission of certain search terms from the search that USCIS conducted—an omission that has now been rectified. DSOF ¶¶ 35-38.

### D. USAID

In response to the court's ruling that USAID should have used search terms like "NWU" in addition to "Northwestern" (Dkt. 72 at 23), USAID rectified the omission where it could and explained why it was not able to do so where it could not. DSOF ¶¶ 49-58. USAID's Mission in Pakistan and Bureau for the Middle East were both able to run the searches: the Mission in Pakistan searched its Office of Education's Google Docs folder using the terms "NWU" and "NU," and the Bureau for the Middle East searched its Google drive and the shared network drive of its predecessor bureau using the terms "NWU" and "NU." *Id.* ¶¶ 56-57. USAID's Mission in West Bank and Gaza could not run the additional searches due to its IT specialist's grave concerns about potentially crashing the network and not being able to recover it. *Id.* ¶ 53. And USAID could not search its entire Gmail Vault using the additional terms because of the overwhelming volume of hits and the unfeasibility of sampling the records to review only some of them. *Id.* ¶¶ 50-54.

Stevens responds that USAID has "disingenuously" stated that it cannot run a sample on the universe of records containing the term "Northwestern" (which returned 1,486,618 hits), without explaining why it cannot run a sample on the universe of records containing the term "NWU" (which returned 30,747 hits). Resp. at 8. In fact, although USAID used "Northwestern" as an example, its feasibility estimate was not based only on "Northwestern": USAID explained that generating a random sample of 96 items from *each* of the three massive sets of records (the hits for "NWU," "NU," and "Northwestern") would take between 7 and 42 days *for each*. DSOF ¶¶ 50, 53.

Stevens also criticizes USAID for not explaining why the "NU" search could not be

completed by adding a "restrictive term corresponding to the requested documents." Resp. at 8. But Stevens's FOIA request did not ask USAID to search for records containing the term "NU." DSOF ¶ 47. It asked USAID to search for records relating to contracts or emails with Northwestern University. *Id*. In finding USAID's search partially inadequate, the court directed USAID either to search for "NU" in addition to "Northwestern University" or to explain why it cannot. Dkt. 72 at 20 ("There may be a good structural reason why only 'Northwestern University' was used [by USCIS] as a search term, but the declaration and government briefing do not provide it, and the Court will not speculate."), 23 ("For the same reasons as discussed with USCIS, [USAID's] search is insufficient as it omits other common terms for the school like NWU."). USAID has now explained why it cannot perform the additional searches. DSOF ¶¶ 50-54.

Stevens also questions the Mission in the West Bank and Gaza's concerns that running the more expansive searches would crash its network. Resp. at 8. She says that it is "not apparent" why searching for "NWU" would crash the system but searching for "Northwestern" would not. *Id*. And she points out that the Mission in Pakistan was able to search for "NWU." *Id*. First, the fact that a different mission was able to conduct the search has no bearing on whether the Mission in West Bank and Gaza was able to. They are different missions with different servers. Def. Resp. to PSOAF ¶ 23. And second, while it should be obvious on its face why an IT specialist might be concerned about crashing his network, in this particular instance the Mission was particularly concerned because its main server was down and it was relying on its backup server. *Id*.

II. **FOIA Standard**

Everything above shows that the agencies' searches were adequate and that Stevens's quibbles with the agencies' declarations are baseless. But Stevens offers an additional, general argument against summary judgment, which amounts to a grievance about the way FOIA litigation operates. She complains that accepting an agency's assertions "at face value" while requiring a

8

requestor "to produce specific evidence" would be in "sharp tension" with FOIA's "general presumption in favor of disclosure" and with the government's "burden of proof." Resp. at 6. She cites authority for the proposition that FOIA should be narrowly construed to favor disclosure, and she says the "presumption in favor of disclosure" is undercut if the court presumes good faith in a "self-serving declaration" by a "single FOIA official far removed from the actual search process." *Id*. at 7. Applying deference, she says, "prevents" the court from "weighing evidence and assessing credibility," she says. *Id*.

The Seventh Circuit has already rejected these arguments. In *Stevens v. State*, 20 F.4th 337 (7th Cir. 2021), Stevens presented the same argument against the "presumption of good faith that agencies enjoy in FOIA litigation." *Id*. at 342. The court held that "that rule is well settled," and that "there are good reasons for this approach." *Id*. ("Administrative regularity is the baseline assumption throughout our law, FOIA included."). Likewise, it is proper for an agency to submit a declaration from one individual who supervised the search process. *Hall v. CIA*, 881 F.Supp.2d 38, 64 (D.D.C. 2012).

Stevens also says that the agencies have ignored their obligations to construe her requests liberally and interpret her requests in a manner that would likely yield the greatest number of responsive records by narrowing the scope of their searches. Resp. at 8-9. But Stevens does not even attempt to explain how the agencies improperly construed her requests; the reader of her memorandum is left to guess what violations she is talking about. And regardless, even if her theory were discernable, as explained the court has already found that the scope of the agencies' searches was reasonable.

### III. Proper Withholdings

The agencies' opening memorandum explained that they properly withheld various information protected from disclosure by one or more FOIA exemptions. Mem. at 10-15.

A.     **Exemption 4**

Exemption 4 covers two broad categories: (1) trade secrets; and (2) information that is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential. Mem. at 11. Under Exemption 4, USAGM withheld 14 proprietary surveys and redacted information from emails that included proprietary or confidential pricing information. DSOF ¶¶ 16-21. USCIS also redacted information under Exemption 4, including price quotes from a contractor. *Id.* ¶¶ 41, 44.

Stevens says that USAGM and USCIS did not provide enough information for the court to find that the information was "commercial." Resp. at 9-11. But both agencies plainly did so. USAGM has explained that it contracts with third parties to use their proprietary surveys, which it withheld. DSOF ¶ 17. And USCIS redacted price quotes from its contractor. *Id.* ¶ 44. What could be more "commercial" than that is hard to imagine.

B.     **Exemption 5**

Exemption 5 protects information that would be protected by the attorney-client, attorney work-product, and deliberative-process privileges. Mem. at 12. ICE withheld information under all three privileges. DSOF ¶¶ 62-68. Stevens says that Exemption 5 applies only to "memorandums or letters," not to records that are not memoranda or letters. Resp. at 11. No court has interpreted Exemption 5 in such a limited manner, and the case Stevens cites, *Rojas v. FAA*, 927 F.3d 1046 (9th Cir. 2019), does not stand for that proposition, either. Far from having anything to say about emails, *Rojas* addresses whether communications with third-party consultants can constitute "intra-agency" communications under Exemption 5. *Id.* at 1055. Indeed, the *Rojas* court seems to have *presumed* that Exemption 5 applies to records beyond memoranda and letters, writing: "By its plain terms, Exemption 5 applies only to *records* that the government creates and retains." *Id.* (emphasis added). Other courts have done the same. *Carlborg v. Navy*, 2020 U.S. Dist. LEXIS 142543, *23-24, 2020 WL 3583270 (D.D.C. Au. 10, 2020) ("Because these *emails*

10

were both 'predecisional' and 'deliberative,' the Navy properly invoked FOIA Exemption 5 to withhold them."); *Energy & Env't Legal Inst. v. FERC*, 72 F.Supp.3d 241, 246 (D.D.C. 2014) ("FERC's redactions from the Bay-Pederson *emails* are justified by Exemption 5.") (emphasis added).

Moreover, on *en banc* review, the Ninth Circuit in *Rojas* clarified that, despite the "most natural meaning" of the phrase, "we think context and purpose suggest that Congress had in mind a somewhat broader understanding of 'intra-agency.'" 989 F.3d 666, 672-73 (9th Cir. 2021). The court noted that, on the plaintiff's reading of Exemption 5, communications between an agency and outside counsel would be subject to public disclosure under FOIA, an outcome that "seems doubtful." *Id*. at 674. The analogy holds here: it is doubtful that Congress would intend a privileged communication to be subject to public disclosure simply because it takes the form of an email rather than a memorandum or letter.

Stevens also says that the deliberative process privilege protects only records that are pre-decisional *and* deliberative, not just one or the other, and she says the information ICE redacted was not pre-decisional, because it does not "pertain to the formation or adoption of an official agency policy and do not pertain to any agency adjudication." Resp. at 11-12. She says the withheld communications "appear to be ordinary intra-agency correspondence divorced from any deliberative process." *Id*. at 12. But ICE has explained that the communications *were* pre-decisional: for example, ICE redacted information in a draft titled "Request for Proposal – Questions and Answers," which contains unanswered questions, suggestions of who could address the questions, draft answers and edits, and internal questions. DSOF ¶ 64. This is a classic example of what the deliberative-process privilege protects. *In re Apollo Grp.*, 251 F.R.D. 12, 31 (D.D.C. 2008) (drafts "by their very nature" are "typically predecisional and deliberative" because they reflect "tentative" views "that might be altered or rejected upon further deliberation").

11

Stevens insists that, even if a withheld document was a not-yet-final draft, that fact does not automatically exempt it from disclosure, and ICE has not shown that the communications are sufficiently "bound up with" its policy mission. Resp. at 13. But as explained, considerable deference is given to an agency's judgment about what constitutes the give-and-take of deliberative process, because an agency is best situated "to know what confidentiality is needed 'to prevent the injury to the quality of agency decisions.'" *Chem. Mfrs. Ass'n v. CPSC*, 600 F.Supp. 114, 118 (D.D.C 1984) (quotation omitted).

Stevens also says that Exemption 5 does not protect a communication from disclosure "[t]o the extent that" it occurred *after* the announcement of a final decision. Resp. at 12. But she does not identify any instance of such a communication.

Stevens also says that ICE's invocation of the attorney-client privilege is misplaced because (1) rendering or receiving legal advice is not the primary purpose of the withheld communications and (2) the communications were not kept confidential. Resp. at 12. She cites nothing for the proposition that the withheld information's purpose was *not* the rendering or receipt of legal advice or for the proposition that the communications were *not* kept confidential. *Id*. Instead, she argues that the descriptions in ICE's *Vaughn* index "are too vague." *Id*. But a glance at ICE's *Vaughn* index shows that it redacted attorney's *opinions about ongoing litigation*. DSOF ¶ 66. Stevens says it "is obvious" that the redacted information consists of "factual narratives" and "messaging communications." Resp. at 12. But her basis for saying that is left for the reader to guess. Resp. at 12-13.

Stevens also criticizes ICE for voluntarily un-redacting certain material. Resp. at 13. But an agency can hardly be faulted for voluntarily choosing to produce additional records beyond what FOIA might require.

Finally, Stevens criticizes USAGM for not describing the 133 pages withheld under

Exemption 5. Resp. at 4 (citing PSOAF ¶ 4). And she is correct that USAGM did withhold three documents totaling 133 pages under Exemption 5 and inadvertently omitted them from its *Vaughn* index. Resp. to PSAOF ¶ 4. USAGM has now corrected the omission in a supplementary declaration, which explains the justification for the withholding. *Id*. The first document is a draft interview questionnaire, the second document presents qualitative research using proprietary methodology, and the third document is a proprietary study. *Id*. Although USAGM cited Exemption 5 as the basis for withholding the documents, Exemption 4 also applies, because release of the documents would reveal the methodology of USAGM's proprietary research into audience interests, its targeted audience demographic, and effective methods to capture and increase that audience. *Id*. USAGM pays large amounts of money for this information, and releasing the information into the public realm would hand that information to USAGM's competitors. *Id*. This would harm USAGM, as USAGM's mission would be more difficult if Russian and Chinese media competitors were to possess USAGM's methodology and internal audience demographic information. *Id*. In that instance, more tax dollars would be required to counteract the actions of those competitors, because foreign media outlets would use USAGM's strategic methods to make its outreach less effective. *Id*.

  **C.**  **Exemption 6**

Exemption 6 protects information when its release would be a "clearly unwarranted invasion of personal privacy." Mem. at 14. USAGM redacted phone numbers, names of subordinate agency personnel, and names and email addresses of individual third-party contractor personnel, and HHS redacted the names and titles of various employees. DSOF ¶¶ 19-20, 32.

Stevens says that the domain names of email addresses do not deserve privacy protection. Resp. at 14. But she does not cite a single instance in which the domain name of an email address was actually redacted.

13

Stevens also says that that the names and titles of federal employees not employed in law enforcement are considered public information by regulation. Resp. at 14. But no one has argued that a given employee's name and title are not public information. What HHS argued is that revealing *which* employee sent *which* email would allow the employees to be identified. DSOF ¶ 32. And HHS redacted its employees' titles as well as their names, because leaving the titles would still allow the authors of individual emails to be identified by simple Google searches. *Id*.

Finally, although Stevens criticizes ICE's Exemption 6 withholdings, she has waived this by previously agreeing through counsel that the agencies need not include straightforward Exemption 6 redactions on their *Vaughn* indices. Def. Ex. K (Mar. 11, 2022 email chain) (Defense counsel: "Here's my understanding of where things stand in the BBG case. . . . I think we agree that the agencies need not Vaughn b6 redactions for names of non-citizens and low-level employees, dates of birth, first halves of emails, A numbers, and phone numbers." Plaintiff's counsel: "Sounds right.").

### D. Segregation

Stevens argues that the agencies have not shown that the withheld material did not contain non-exempt material that could have been segregated and released. Resp. at 15-16. But in USAGM's case, USAGM redacted the entirety of the surveys precisely because they were proprietary in their entirety. DSOF ¶¶ 16-18. And from its email production, USAGM redacted things like "phone numbers," "names," and "pricing." DSOF ¶¶ 19-23. That USAGM segregated and produced any non-exempt material is shown by the limited information that it did redact.

Similarly, HHS redacted the names and titles of its employees, cell phone numbers, and the identities and personal information of unaccompanied minors. DSOF ¶ 32; *see also* Def. Ex. B (2020 Smith Decl.). That HHS segregated and produced any non-exempt material is shown by the limited information that it did redact.

14

Regarding USCIS, the agency redacted "price quotes" and "information General Dynamics provided regarding the quantities and prices of computer equipment that it would provide pursuant to a particular contract." DSOF ¶¶ 44-45. That USCIS segregated and produced any non-exempt material is shown by the limited information that it did redact.

With respect to USAID and USGS, Stevens previously agreed through counsel that the *Vaughn* index that those agencies provided Stevens was adequate and would not be challenged. Resp. to PSOAF ¶ 20 (citing email chain between counsel). (Indeed, Stevens does not even refer to USGS in her entire response brief.)

Finally, Stevens concedes that ICE has averred that it segregated and produced any non-exempt material. Resp. at 17; *see also* Def. Ex. I (Schurkamp Decl.) ¶¶ 18-20 (averring that ICE conducted a line-by-line review to identify information exempt from disclosure and that all information not exempt from disclosure was segregated, with the non-exempt portions released).

## Conclusion

For the reasons above, summary judgment should be granted in defendants' favor.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov