UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 5391 |
| v. | ) | |
| | ) | Judge Rowland |
| BROADCASTING BOARD OF | ) | |
| GOVERNORS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO**
**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Defendants, by John R. Lausch, Jr., United States Attorney for the Northern District of

Illinois, respond to plaintiff's statement of additional facts (Dkt. 89-1 at 26) as follows:

1.      In their supplemental declarations, Defendants have not described their respective recordkeeping schemes and the specific databases in which each agency's information is stored. This omission makes it impossible to determine whether each Defendant has searched the specific databases within each component likely to contain all responsive records.  (Dkt 86 at 19-24, 50-52, 73-79, 147-52, 153-59)

**Response:**      Dispute.  The declarations amply describe their recordkeeping schemes and

databases of the agency whose searches remain at issue.  Def. Ex. A (McLaren Decl.) ¶¶ 4, 6, 11;

Def. Ex. B (2020 Smith Decl.) ¶¶ 13-16; Def. Ex. C (2022 Smith Decl.) ¶¶ 6-9; Def. Ex. D

(Eggleston Decl.) ¶¶ 5, 11-17; Def. Ex. E (Munita First Decl.) ¶ 5; Def. Ex. G (2020 Colbow Decl.)

¶¶ 3-6, 12-14, 16-20, 22-24, 27, 29-31, 33, 35; Def. Ex. H (2022 Colbow Decl.) ¶¶ 3, 6-11.

2.      After the USAGM's own FOIA Appeal Committee found the agency's initial search was deficient, the agency conducted a second search and found 1,487 additional pages of responsive records but withheld in full 1,213 pages of them.  Mr. McLaren elected not to even address where those 1,487 pages were found and how they would not have been found in the initial search.  (Dkt 86 at 21, ¶¶8-9).

**Response:** Admit the first sentence. Dispute the second sentence: McLaren's declaration explains that USAGM's contract office must have searched for *all contractual material* mentioning "D3" as a contracting party or "D3 Systems," which is a different methodology than the initial search, for which USAGM searched for "D3 Systems" by *vendor code*. Def. Ex. A (McLaren Decl.) ¶¶ 6, 8-9.

3. That the second search performed by the agency was deficient is confirmed by Mr. McLaren: despite the agency being told to search for "emails" by the Appeals Committee, it was only in 2021—when Mr. McLaren conducted another search—did he discover 65 additional pages of responsive emails mentioning D3 Systems Inc. (*Id*. ¶ 11). Although he conducted the 2021 search using expanded search terms, *Id*. ¶11, in an unidentified location where emails are apparently kept by the agency, he did not conduct a similar search for "system records, reports, draft reports, and notes" as the appellate unit had directed. *Id*. Nor does he explain where such records would be kept.

**Response:** Dispute. McLaren's declaration explains that USAGM searched for *all contractual material* in 2018 and that he supplemented that search with the email search he conducted personally in 2021. Def. Ex. A (McLaren Decl.) ¶¶ 9, 11.

4. McLaren states USAGM is withholding 133 pages for three records in their entirety based on a b(5) exemption but provides no information whatsoever as to the nature of these records or the rationale for asserting a b(5) exemption. Stevens Decl. ¶14. Because no explanation has been provided for the redactions in these 133 pages, the b5 exceptions should be deemed waived.

**Response:** Admit that in its initial *Vaughn* index USAGM inadvertently did not provide an explanation for its withholding of three documents totaling 133 pages. Dispute that any waiver has occurred: USAGM has now corrected the omission in the supplementary declaration of James McLaren, which explains the justification for the withholding. Def. Ex. J (McLaren Suppl. Decl.) ¶ 3-10. The first document is a draft interview questionnaire, the second document presents qualitative research using proprietary methodology, and the third document is a proprietary study. *Id*. ¶¶ 6-8. Although USAGM cited Exemption 5 as the basis for withholding the documents, Exemption 4 also applies, because release of the documents would reveal the

methodology of USAGM's proprietary research into audience interests, its targeted audience demographic, and effective methods to capture and increase that audience. *Id*. ¶ 10. USAGM pays large amounts of money for this information, and releasing the information into the public realm would hand that information to USAGM's competitors. *Id*. This would harm USAGM, as USAGM's mission would be more difficult if Russian and Chinese media competitors were to possess USAGM's methodology and internal audience demographic information. *Id*. In that instance, more tax dollars would be required to counteract the actions of those competitors, because foreign media outlets would use USAGM's strategic methods to make its outreach less effective. *Id*.

5. USAGM's "proprietary interests" in its own surveys (dated from 2007 to 2011) do not absolve the agency from its FOIA disclosure obligations or transform the surveys into non-agency records. Cf. Dkt. 86 at 22-23; Stevens Decl. ¶¶10-13.

**Response:** Dispute. As explained, the surveys are exempt from disclosure under Exemption 4, to protect third-party commercial and financial information. Def. Ex. A (McLaren Decl.) ¶ 13. The survey questions are the result of extensive research and reliability testing, and they are proprietary, representing USAGM's investment of time, money, and expertise. *Id*. USAGM contracts with third parties to use their proprietary surveys; contracts with third parties to use USAGM-developed surveys; and contracts with third parties to use surveys partially developed by USAGM and partially developed by the third party. *Id*. The proprietary interests of a given survey may belong to the third-party contractor, to USAGM, or to both. *Id*. USAGM's surveys are designed to help it reach the largest audience possible in countries that suppress the freedom of information. *Id*. ¶ 14. If the surveys were made public, there would be no benefit to the United States public, and the information could be misused by foreign governments to thwart USAGM's congressionally mandated objectives. *Id*. Publication of the surveys could also cause

3

USAGM to receive bids from copycat firms that are not experts but that have exploited proprietary information from their competitors. *Id*.

6.      The agency has not provided any information to explain how freely given responses to agency surveys were submitted by third parties with the expectation of privilege or confidentiality. A conclusory assertion that the entirety of all 15 surveys is "privileged and confidential" without more is insufficient to meet the Govt's heavy burden and to overcome the presumption of disclosure mandated by the 2022 Guidelines. (Dkt 86 at 24-27) see also 5 U.S.C. § 552(b)(4)(Exemption 4 shields from disclosure only "trade secrets and commercial or financial information obtained from a person and privileged or confidential[.]" 5 U.S.C. § 552(b)(4). To meet the requirements under b4 the commercial or financial information must be both "customarily and actually treated as private by its owner and provided to the government under an assurance of privacy" to be considered "confidential" within the meaning of Exemption 4. *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). Freely given information without assurance of privacy is not protected.

**Response:**      Dispute. It is obvious on its face that a third party would only share its *proprietary* survey with USAGM under an expectation of privilege and confidentiality. *See* Def. Ex. A (McLaren Decl.) ¶ 13.

7.      For the D3System, Inc BBG Yemen media Study (no 14 in the USAGM Vaughn index) the Government has not identified the nature of the personal information regarding unidentified individuals. (Dkt. 86 at 27, entry 14). To the extent the information goes beyond information such as the names, dates of birth, addresses, and telephone numbers but contains factual narratives, such factual narratives must be unredacted and disclosed as more fully explained in Responsive Memorandum of Law submitted concurrently.

**Response:**      Dispute. The *Vaughn* index explains that USAGM withheld the report under Exemption 6 to protect the privacy interests of the individuals identified in the survey. Def. Ex. A (McLaren Decl.) at Index of Documents Withheld entry 14. And the additional information in the survey should not be released because it is exempt from disclosure under Exemption 4, to protect commercial and financial information. *Id*.

8.      Defendant provides no information for invoking Exemption 5 for pages 55, 58, 60. (Dkt. 86 at 28 entry 4). No assertion is made that the records are either pre-decisional, deliberative in nature, or reflective of information primarily related to seeking or obtaining legal advice as as [*sic*] more fully explained in Responsive Memorandum of Law submitted concurrently.

**Response:** Dispute. The *Vaughn* index straightforwardly explains that USAGM redacted under Exemption 5 "[a]gency acquisition strategy and instructions on importance of non-public disclosure of our sources sought for the acquisition." Def. Ex. A (McLaren Decl.) at Index of Redactions to E-Mails entry 4.

9. In its prior decision, the Court noted that HSS [*sic*] while claiming that no contracts with Prof Senn exist, has provided no information how it reached the decision and that the declaration submitted in support of the first motion for summary judgment "d[id] not list, for example, the files searched or the search terms used.["] (Dec. at 16). Ms. Smith asserts in her supplemental declaration that she contacted Mata Sebgoya and conveys the assertions of various ORR employees claiming that no contractual relationship with Prof. Senn. (Dkt. 86 at 50-51). Ms. Smith still does not identify the process Mr. De La Cruz and Ms. Sebgoya used to reach their conclusions, what databases were searched, why said databases were selected, and what search terms were used. (Compare Smith' Suppl. Decl. ¶¶ 6(listing search terms) and 7 (no details).

**Response:** Admit the first two sentences. Dispute the third sentence: Smith's supplemental declaration explains that Sebgoya did not "search" any "databases" but instead *personally spoke* with the senior supervisor of the refugee resettlement office's field specialists (De La Cruz) and the project officers responsible for the Southwest Key contract, all of whom confirmed that the refugee resettlement office did not enter into contracts with medical service providers. Ex. C (2022 Smith Decl.) ¶ 7. On top of that, the declaration also explains that HHS did conduct a search: information specialist Garfield Daley searched HHS's Program Support Center network drive for "David Senn" and "Senn" and "Professor Senn" and found no responsive records indicating the existence of any contracts or correspondence relating to Senn. *Id*. ¶ 6.

10. The assertion that no agreements are in place for the services of Dr. Senn and other dentists is contradicted by an email from Defendants' own counsel who stated that Defendant has in fact produced the "cooperative agreements that were in place relating to Dr. Senn." (Stevens Decl. ¶¶22, 26-27; Glazer Decl, Exhibit B). Further, Senn told Stevens that the payments for his services went to "the university." Stevens Decl. ¶ 19. ORR reviewed dental radiograph requests; payments for the radiograph assessments were made through a third-party called Point Comfort Underwriters. (Stevens Decl. ¶23). Stevens' original request was for any records reviewed or held by HHS or its components, contractors, or subcontractors for work requested, performed, or discussed with Dr. David Senn or his representatives. It was not only for contracts. (Stevens Decl. ¶¶16, 27).

**Response:** Dispute the first sentence: an agreement "relating to" Senn is on its face not the same thing as an agreement "for the services of" Senn, and Stevens's FOIA request did not reference "other dentists." Admit that Stevens has averred the statements in the second and third sentences. Admit that Stevens's FOIA request did not request "only" contracts, but note that HHS would not have had any reason to locate any records relating to "Point Comfort Underwriters" without being informed of a supposed connection between it and Senn and given that there was no reference to "Point Comfort Underwriters" in Stevens's FOIA request. Since HHS had no contracts with Senn, then it could not have requested that he perform work on HHS's behalf. And any work "discussed" with Senn would have been identified in the records that were identified by the "age assessment" search terms.

11. HSS [*sic*] asserts that no invoices are "received or collected by grantees like Southwest Key as a standard practice" and asserts in a conclusory fashion that "none were received or collected from Southwest Key." *Id* at ¶8. The Declaration, however, does not explain the search process used to "confirm" that ORR or its contractor had no agreements or payment methods in place consistent with the records and information released to Stevens. (Stevens Decl. ¶¶16, 19, 21, 23-27). Declarant does not identify what databases were searched if any, why said databases were selected, and what search terms were used. (Stevens Decl. ¶24, 26-27).

**Response:** Admit that HHS has asserted that it does not receive or collect invoices from grantees like Southwest Key as a standard practice and has not received any invoices from Southwest Key. Dispute that HHS's assertion is "conclusory"; Smith's declaration explains that a senior grants management specialist in the office of grants management reported that HHS does not as a standard practice receive invoices from grantees such as Southwest Key. Def. Ex. C (2022 Smith Decl.) ¶ 8. Dispute the second sentence: the declaration explains that a policy analysist in the division of policy and procedures at HHS's refugee resettlement office reported that Southwest Key would not have been required to submit invoices regarding expenditures for age assessments, because a forensic dental examination was not a line item in Southwest Key's budget. *Id*. ¶¶ 7-8.

6

Admit that HHS did not "identify what databases were searched," because HHS did not need to search any databases to conclude that it did not receive or collect invoices from Southwest Key. *Id*. ¶¶ 6-8.

12.     The search performed by HSS [*sic*] is unduly restrictive.  Dkt 86 at 52.  By designing a search scope that will necessarily retrieve emails mentioning age assessments only if the emails also included the words "practice", "policy", or "protocol" the agency impermissibly restricted its search.  Plaintiff had requested email messages "between ORR and employees of ICE and CBP related to age assessments of individuals in ORR or ICE custody."  (Dkt. 86 at 51-52, ¶9).

**Response:**     Dispute the first two sentences; HHS also searched for all emails containing the term "age assessment" or the term "age assessments," without restricting the results to emails containing the words "practice," "protocol," or "policy."   Def. Ex. C (2022 Smith Decl.) ¶ 9. Admit the third sentence.

13.     HSS [*sic*] has not met its burden to justify the redaction of titles of agency employees under exemption b6.  (Dkt. 86 at 51-52, ¶10).  Defendant admits that said information, including the names of the employees, is already in the public domain.  *Id*.

**Response:**     Dispute.  Although the names of the employees may be in the public domain, the information of which employee sent which email is not in the public domain.  As explained, HHS redacted the employees' names and titles to ensure that the individual shelter employees cannot be connected to particular documents.  Def. Ex. C (2022 Smith Decl.) ¶ 10.

14.     HHS did not produce responsive records maintained in numerous shelters.  (Stevens Decl. ¶ 17).

**Response:**     Dispute.  Stevens's declaration asserts only that many shelters "produced no responsive records"; it does not assert that HHS has responsive records in its possession and did not produce them.  Dkt. 90 (Stevens Decl.) ¶ 17.  Regardless, even if an agency does not produce a particular record that is or might be responsive, the relevant question is whether the agency conducted an adequate search for such records.  *Ancient Coin Collectors Guild v. Dep't of*

*State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (a search is gauged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search") (quotation omitted).

15. Ms. Munita explains in her declaration that to conduct the supplemental search ordered by this Court, USCIS personnel familiar with "their computerized databases" search in four such databases: SAS, AVANT, CRM, WebHQ. (Dkt. 86 at 75). No details have been provided to this Court as to the system of records maintained by USCIS in general, and as such, there is no way for the Court to conduct a meaningful review to determine that in fact these four databases "were reasonably likely" to contain *all* responsive records. *Id.*

**Response:** Admit the first sentence. Dispute the second sentence: USCIS's previous declaration explained the search terms and database fields that it used to search the Verification Division's Outlook email records as well as the databases SAS, AVANT, CRM, and WebHQ; that the search was reasonably calculated to locate responsive records; that all files likely to contain responsive material were searched; and that USCIS has no reason to believe that any additional responsive records in its possession exist. Ex. D (Eggleston Decl.) ¶ 13.

16. Statements by Ms. Munita disclose additional records responsive to Stevens' request were withheld. (Stevens Decl. ¶¶29-30).

**Response:** Dispute. Stevens's declaration asserts that USCIS referred a CBP contract to CBP for processing, which is the proper procedure for USCIS to follow. Dkt. 90 (Stevens Decl.) ¶ 29. And although Stevens's declaration asserts that she did not receive certain documents she requested, Dkt. 90 (Stevens Decl.) ¶ 30, again the relevant question is whether the agency conducted an adequate *search*. *Ancient Coin Collectors Guild*, 641 F.3d 504, 514 (D.C. Cir. 2011).

17. USCIS inappropriately deferred to General Dynamics, the second largest federal information technology contractor, in its redaction determinations. (Stevens Decl. ¶¶31-34; Glazer Decl. Exh. A).

**Response:** Dispute: nothing in the cited paragraphs stands for the proposition that USCIS deferred to General Dynamics, let alone inappropriately deferred. Dkt. 90 (Stevens Decl.) ¶¶ 31-34.

18. The Court ordered that Defendant[] USAID perform searches using "NU" and "NWU" or explain the "good structural reason why only "Northwestern University was used as a search term." Decision at 20, 23.

**Response:** Admit.

19. The original USAID declaration detailed the production made to Plaintiff, (Dkt 86 at 140, ¶¶ 7-10) but did not explain the search methods used to retrieve the records, Id. In the Supplemental Declaration USAID asserts that the "entire Gmail Vault" was searched using the terms "NWU", "NU", and "Northwestern". (Dkt. 86 at 149¶3). The search retrieved the following "returns" (1) NWU: 30,747 "items"; (2) Northwestern 1,486,618 "items" and (3) NU: 1,350,410 "items" (Id.)

**Response:** Dispute the first sentence: although the *cited* paragraphs (¶¶ 7-10) of USAID's 2020 declaration did not explain USAID's search methods, *other* paragraphs (¶¶ 12-22, 24-26) explained USAID's search methods at great length. Def. Ex. G (Colbow Decl.). Admit the second and third sentences.

20. USAID has not produced a legally sufficient *Vaughn* index and has no Bates numbers for its productions. (Stevens Decl. ¶36).

**Response:** Dispute. Stevens previously agreed through counsel that the *Vaughn* index that USAID had provided Stevens was adequate and would not be challenged. Def. Ex. K (Mar. 11, 2022 email chain) (Defense counsel: "Here's my understanding of where things stand in the BBG case. . . . On the redactions, we'll be presenting Vaughn indices for BBG/USAGM, HHS, USCIS, and ICE. (The Vaughn indices that USGS and USAID previously provided are adequate, per Jackie.)" Plaintiff's counsel: "Sounds right.").

21. USAID located documents responsive to Stevens' request but has not released them to her and provided no reason for the withholdings. (Stevens Decl. ¶38).

**Response:** Dispute. Stevens's declaration asserts that USAID searched for emails with a northwestern.edu address, located 24,736 emails, and determined that none of them were within the scope of Stevens's FOIA request "even though [her] request was precisely for these emails." Dkt. 90 (Stevens Decl.) ¶ 38. But Stevens's FOIA request did not ask for emails containing a

northwestern.edu address: it asked for "[c]opies of all contracts, reports, memoranda of understanding, grants, and email to, from, or about Northwestern University produced, received, or maintained by employees in your office. This includes but is not limited to records concerning the Northwestern campus in Education City, Doha, Qatar and surveys on media use commissioned by the State Department." Ex. G (2020 Colbow Decl.) ¶ 3. As USAID's 2020 declaration explained, USAID's FOIA office searched for records using the search parameters Stevens provided (including emails with a northwestern.edu address) "while ultimately evaluating the responsiveness of the records based on the original FOIA request." *Id.* ¶ 6.

22.     The declaration describes the burden in presenting a sampling but disingenuously uses the largest retrieval of 1,486,618 (Northwestern) but fails to explain the actual burden to sample the "NWU" items which are a mere 2% of the size for "Northwestern". Id. Nor does the declaration explain why the "NU" search term cannot be complemented with a restrictive search term corresponding to the requested documents.

**Response:**     Dispute. The cited paragraph of Stevens's declaration (¶ 38) says nothing about this. Regardless, USAID's 2022 declaration explained that to get the confidence interval 96 random items would need to be drawn *from each set*. Ex. H (2022 Colbow Decl.) ¶¶ 4-5. USAID used "Northwestern" as an example, but the estimate was not based only on "Northwestern": the declaration explained that pulling 96 emails out of a batch would likely take "between 7 to 42 days *per term.*" *Id.* ¶ 5. As for why the "NU" search term cannot be combined with a more restrictive search term, unilaterally adding a restrictive search term would constitute exactly the type of action that Stevens elsewhere complains about: "an agency is not permitted to deny requesters information by narrowing the scope of its search to exclude relevant information." Pl. Mem. at 9 (quotation omitted).

23.     The Mission in the West Bank and Gaza refused to perform an additional search because of some unidentified "grave concerns about potentially crashing the Mission network" (id., ¶8). No explanation was given, and none is apparent as to why a search for 'NWU' would

crash the system but a search for 'Northwestern' would not. The Mission in Pakistan was able to conduct the search. Id. at ¶9.

> **Response:** Dispute. It is obvious on its face why the Mission in West Bank and Gaza would be concerned about crashing its network. In this particular instance, the Mission was particularly concerned because its main server was down and it was relying on its backup server. Def. Ex. L (Colbow Second Suppl. Decl.) ¶ 4. The Mission perceived a "real risk" that the search for combinations of 2-3 letters would crash the server, bring down the Mission's systems, and risk permanent damage that would be difficult to recover from. *Id.* Finally, that a different mission was able to conduct the search has no bearing on whether the Mission in West Bank and Gaza was able to. They are different missions with different servers. Def. Ex. H (2022 Colbow Decl.) ¶¶ 8-9.

24. Passing references to 'personal files', 'shared drives, and 'email files', "Gmail Vault" [*sic*] do not fulfill Defendants' obligation to explain what databases it maintains, how it selected the ones that were searched in response to Plaintiff's requests, and what type of documents the searched databases contain.

> **Response:** Dispute. Each agency whose search remains at issue has amply described this information. Def. Ex. A (McLaren Decl.) ¶¶ 4, 6, 11; Def. Ex. B (2020 Smith Decl.) ¶¶ 13-16; Def. Ex. C (2022 Smith Decl.) ¶¶ 6-9; Def. Ex. D (Eggleston Decl.) ¶¶ 5, 11-17; Def. Ex. E (Munita First Decl.) ¶ 5; Def. Ex. G (2020 Colbow Decl.) ¶¶ 3-6, 12-14, 16-20, 22-24, 27, 29-31, 33, 35; Def. Ex. H (2022 Colbow Decl.) ¶¶ 3, 6-11.

25. Defendant USAGM has provided no details in their supporting declaration or in the Vaughn index to support application of Exemption 5 to 133 pages withheld. (Dkt 86 at 25, 28)

> **Response:** Admit that in its initial *Vaughn* index USAGM inadvertently did not provide an explanation for its withholding of three documents totaling 133 pages, but USAGM has now corrected the omission in the supplementary declaration of James McLaren, which explains the justification for the withholding. Def. Ex. J (McLaren Suppl. Decl.) ¶ 3-10. The first

document is a draft interview questionnaire, the second document presents qualitative research using proprietary methodology, and the third document is a proprietary study. *Id*. ¶¶ 6-8. Although USAGM cited Exemption 5 as the basis for withholding the documents, Exemption 4 also applies, because release of the documents would reveal the methodology of USAGM's proprietary research into audience interests, its targeted audience demographic, and effective methods to capture and increase that audience. *Id*. ¶ 10. USAGM pays large amounts of money for this information, and releasing the information into the public realm would hand that information to USAGM's competitors. *Id*. This would harm USAGM, as USAGM's mission would be more difficult if Russian and Chinese media competitors were to possess USAGM's methodology and internal audience demographic information. *Id*. In that instance, more tax dollars would be required to counteract the actions of those competitors, because foreign media outlets would use USAGM's strategic methods to make its outreach less effective. *Id*.

26.     A review of the sample pages that were selected by the parties for the purposes of this motion and unredacted prior to the filing of Defendants' motion reveals that it has a pattern or and practice of redacting massive quantities of responsive information that is not subject to any exemptions, especially for b(5). Throughout the Declarations, ICE officials inaccurately represent the nature of communications tied to lawsuits over private prisons paying those in their custody one dollar/day. (Stevens Decl. ¶¶40-45 & Exhibits).

**Response:**     Dispute the first sentence, as Stevens cites nothing to support it. Dispute the second sentence, as it does not offer a single example of a supposedly inaccurate communication and therefore cannot reasonably be responded to. (And broad citations to "exhibits" are improper. Judges "are not like pigs, hunting for truffles buried in briefs." *Unired States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).)

27.     ICE has created pretexts for withholding information about the detention of U.S. citizens to avoid embarrassment and not for a reason allowable under FOIA. (Stevens Decl. ¶¶46-48).

**Response:** Dispute. The cited paragraphs of Stevens's declaration present no evidence of "pretext."

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18 C 5391 |
| v. | ) | |
| | ) | Judge Rowland |
| BROADCASTING BOARD OF | ) | |
| GOVERNORS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**INDEX OF EXHIBITS TO DEFENDANTS'**
**RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

| Exhibit J | Supplemental Declaration of James McLaren |
|---|---|
| Exhibit K | March 11, 2022 email chain |
| Exhibit L | Second Supplemental Declaration of Christopher A. Colbow |

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Alex Hartzler
    ALEX HARTZLER
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 886-1390
    alex.hartzler@usdoj.gov

Exhibit J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 18 C 5391 |
| | ) | |
| BROADCASTING BOARD OF | ) | |
| GOVERNORS, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF JAMES McLAREN</u>

I, James McLaren, declare under penalty of perjury that the following statements are true to the best of my knowledge and belief.

1. I work for the U.S. Agency for Global Media[1] ("USAGM") as Acting Deputy General Counsel. I have held that role since February 2021. I was Acting General Counsel September 2020 to February 2021. I have been in a supervisory role over FOIA since September 2018.

2. **In my role as Acting Deputy General Counsel, I have reviewed the Stevens FOIA case file in response to Plaintiff's Statement of Additional Facts, Paragraph 4, in which Plaintiff states that no explanation has been given for withholding three documents totaling 133 pages under Exemption (b)5.**

3. The Plaintiff appears to be correct in this assertion. I find in the Agency's files an index of 14 documents totaling 1080 pages explaining Exemption b(4) and Exemption b(6) withholding. I also find a letter to the plaintiff stating that the three documents were

---

[1] As of August, 2018, the Broadcasting Board of Governors ("BBG") changed its name to the U.S. Agency for Global Media.

withheld under Exemption b(5) comprising 133 pages. These three documents do not appear on an index with further explanation.

4.  I have found and examined each of the three documents and now provide a further explanation of why they were withheld.

5.  First document: "VOA Weekly Focus Group Discussion Guide, November 2017". This six page document is a D3 Systems draft interview questionnaire presented to the Voice of America by D3 Systems. The questionnaire comprises questions aimed at particular sections of VOA's audience to determine the effectiveness of the broadcast entitled "VOA Weekly."

6.  Explanation of exemption: The Agency chose to withhold under b(5). The questionnaire is a draft document presented to VOA for their deliberation of whether the document will achieve the intended purpose of identifying areas of improvement in VOA's broadcast delivery to a defined demographic in the "VOA Weekly" program. I note that the questionnaire is proprietary and that other FOIA exemptions could have been cited.

7.  Second document: "D3 Systems Inc. Voice of America Weekly Qualitative Analysis: Indonesia, Nigeria, Pakistan. February 8, 2018".  This is a 38 page document presenting qualitative research using proprietary methodology to VOA. The document informs management deliberations by assessing the effectiveness of the broadcasts to the areas of Indonesia, Nigeria and Pakistan. The Agency relies on such analysis to determine the effectiveness of their broadcasting mission. Is the method of delivery reaching the intended audience? Is the message achieving the Congressionally-mandated objectives? Is there a demographic that can be more effectively reached by a different delivery method? The Agency chose to cite Exemption b(5) "deliberative process."

8.  Third document: "International Audience Research Program (IARP) – RFE/RL and VOA Pashto Programming in Afghanistan: Radio Monitoring Panel – A qualitative study to evaluate journalistic standards, unique market value, presentation and technical quality. December 2016".  This 88 page document is a proprietary study completed by D3 Systems and ASCOR Surveys in cooperation with the agency Office of Research and Assessment. The study presents the results of questionnaire surveys of audiences in Afghanistan in order to assess VOA's Pashto programming. The study is intended for an

internal agency management audience to inform deliberations about effectiveness and quality of message in carrying out Congressionally-mandated broadcasting objectives in Afghanistan. The agency chose to withhold under FOIA exemption b(5).

9. The three documents were withheld under Exemption 5, but the Agency is aware that these documents do not fit comfortably within an "agency deliberations" rationale. The questionnaire, qualitative analysis report and study contain no internal agency deliberations and merely inform such deliberations. The other 14 documents withheld by the agency were surveys. The three documents in question are a qualitative analysis and a study that were produced by executing the surveys, and a draft questionnaire in preparation for a different survey.

10. The Agency asserts that the documents were properly withheld and merit exemption under b(5) and also b(4). If released, all would reveal the methodology of proprietary research into audience interests, our targeted audience demographic, and effective methods to capture/increase that audience. This is information for which the Agency pays large amounts of tax dollars. Releasing such information into the public realm hands it to competitors. This would harm the agency and the interests of the US State Department. The Agency's mission would be more difficult if Russian and Chinese media competitors had the Agency's methodology and internal audience demographic information. More tax dollars would be required to counteract the actions of those competitors as foreign media outlets would use our revealed strategic methods to make our outreach less effective.

11. I note for the record that the total page count that I reached for withholding under b(5) was 132 vice 133 pages.

James McLaren

Date: 6/27/2022

3

Exhibit K

| | |
|---|---|
| **From:** | Nicolette Glazer |
| **To:** | Hartzler, Alex (USAILN) |
| **Subject:** | [EXTERNAL] Re: Stevens v. BBG - state of play |
| **Date:** | Friday, March 11, 2022 9:23:09 PM |

Sounds right.

Nicolette Glazer Esq.

Certified Specialist In Immigration and Nationality Law
State Bar of California, Board of Legal Specialization
Direct Line: (310) 735-3478

Law Offices of Larry R Glazer

<u>Main Office</u>: 1999 Avenue of the Stars, 11th Floor, Century City, CA 90067.
<u>Support Office</u>: 79125 Corporate Center Dr. #6351, La Quinta CA 92253

Tel:  (310) 407-5353          Fax: (310) 407-5354

www.GlazerandGlazer.com/ www.LOLRG.com/ download the LOLRG Litigation App

** If you are sending paper documents or payments, please mail them to our La Quinta support office at the address above.**

THIS MESSAGE IS INTENDED ONLY FOR THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PROVILEGED OR CONFIDENTIAL, AND EXCEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT YOU ARE HEREBY NOTIFIED THAT ANY DISSIMINATION, DISTRIBUTION, OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US PROMPTLY AND DESTROY THIS MESSAGE AND ANY ATTACHMENTS IT MAY CONTAIN.

Circular 230 Disclosure Act: Any tax advice provided in this communication is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer (i) for the purpose of avoiding tax penalties that may be imposed or (ii) in promoting, marketing, or recommending tax transaction or matter to another party. Please seek advice from an independent tax advisor with respect to any tax transaction or matter.

**From:** Hartzler, Alex (USAILN) <Alex.Hartzler@usdoj.gov>
**Date:** Friday, March 11, 2022 at 9:35 AM
**To:** Nicolette Glazer <nicolette@glazerandglazer.com>
**Subject:** Stevens v. BBG - state of play

Nicolette,

Here's my understanding of where things stand in the BBG case. Please let me know if you agree or disagree.

On the **adequacy of the search**, we will be moving for summary judgment regarding BBG/USAGM, HHS, USCIS, and USAID. (The court found USGS's and ICE's searches were adequate in its ruling last year.)

On the **redactions**, we'll be presenting Vaughn indices for BBG/USAGM, HHS, USCIS, and ICE. (The Vaughn indices that USGS and USAID previously provided are adequate, per Jackie.)

Obviously we have an **ongoing dispute** about whether HHS can Vaughn only a subset of the 2,934-page production. But for ICE, I think we have reached an agreement about the subset of around 200 pages that will be Vaughned.

For all the Vaughn indices, I think we agree that the agencies need not Vaughn **b6 redactions** for names of non-citizens and low-level employees, dates of birth, first halves of emails, A numbers, and phone numbers.

Sound right?

Alex Hartzler
Assistant United States Attorney
Northern District of Illinois
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 886-1390
alex.hartzler@usdoj.gov

# Exhibit L

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | No. 1:18cv05391 |
| v. | ) | |
| | ) | Hon. Judge Rowland |
| BROADCASTING BOARD OF | ) | |
| GOVERNORS *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF CHRISTOPHER A. COLBOW

I, Christopher A. Colbow, hereby declare pursuant to 28 U.S.C. § 1746 the following as my testimony in the above captioned case:

1. I am the Freedom of Information Act (FOIA) Officer, the FOIA Public Liaison, and the Division Chief of the Bureau for Management, Office of Management Services, Information and Records Division for the United States Agency for International Development ("USAID"). I am a second-line supervisor managing a staff of 22 direct-hires and 21 institutional contractors. I am also the Agency Records Officer, with overall responsibility for implementing and carrying out the agency's records management program. I assumed these official capacities in April 2019. I work with my staff on the adequacy of searches for information requested through FOIA and on the applicability of FOIA exemptions. I am familiar with the FOIA, its requirements for disclosure and its exemptions from disclosure, and am experienced in judging whether documents are responsive and should be produced in full, redacted, or withheld in their entirety. I am also familiar with the Federal Records Act and its dispositioning of agency records authorities for USAID.

2. The purpose of this declaration is to elaborate on the issue facing the USAID West Bank and Gaza Mission at the time the search was attempted to be run.

## USAID Mission in West Bank and Gaza

3. In my prior declaration I stated:

On or about August 31, 2021, an Information Technology Management Specialist for West Bank and Gaza went to run the searches on the local drives and shared drives of the Mission. Examining the search terms NWU and NU, the Specialist had grave concerns about potentially crashing the Mission network and potentially corrupting data given the potential for false positives. Due to certain technical issues and COVID complications, the Mission's system would be at an elevated risk of crashing and having an elongated recovery period - if recovery could even be accomplished. Accordingly the search was unable to be run.

4. Elaborating on my prior statement, it is my understanding from information provided by the Information Technology Management Specialist located in USAID's Mission in West Bank and Gaza that has responsibility for the servers, that USAID's primary server at the mission was down and only a secondary server was operational. That secondary server itself hosted multiple other servers, only one of which contained the data that would be searched. There was a real risk that the search for 2-3 letter combinations would crash both the smaller server that contained the files, as well as the larger server with unrelated data. That risk could have brought down the mission's systems and risked permanent damage that would have been difficult to recover from.

5. Running some sort of piecemeal search was not practical for the mission as a substitute. The relevant server contained approximately 1.5 terabytes of data, some of which was in zipped files that would need to be unzipped and searched. In order to even attempt such a search, the Mission would have had to figure out a search mechanism that would not have risked crashing but also allowed the server's health to be monitored. If the server was in jeopardy, the search would need to be stopped immediately. The mission did not have such a solution onhand.

6. Even if such a mechanism could have been put in place, the estimated person power to just conduct the high level search was estimated to be over 40 hours just to potentially get the data off the server for a review of the data. An exact number was not capable of being calculated since the searches themselves would have been dynamic based on what the server could withstand at a given moment. Furthermore, the searches would have been run at an increased cost to USAID, as a workday search would have been very risky - as server use is higher during the workday. Weekend and after hours overtime approvals would have been needed - again, if something could have been figured out.

7. As of the date of this declaration, while it is my understanding that USAID's primary server has been restored to operation, the risk of crashing and the manpower hours of effort needed to run such a broad search still remain.

-3-

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 28, 2022.

CHRISTOPHER ALLEN COLBOW (affiliate)
Digitally signed by CHRISTOPHER ALLEN COLBOW (affiliate)
Date: 2022.06.29 16:47:01 -04'00'

_____

Christopher A. Colbow, Division Chief
Bureau of Management, Office of Management
Services, Information and Records Division,
USAID